# EXHIBIT A

   

**PALM BEACH**
COUNTY

**JOSEPH ABRUZZO**
CLERK OF THE CIRCUIT COURT AND COMPTROLLER

eportaluser

| Case Number | Filed Date | Disposition Date | County | Case Type | Status | Contested | Jury Trial |
|---|---|---|---|---|---|---|---|
| 502025CA002496XXXAMB [502025CA002496XXXAMB] | 03/17/2025 | | PALM BEACH | CONTRACT & DEBT | Open | No | No |

| Filing Date | Description | Active | Contested | Judgment Date |
|---|---|---|---|---|
| 03/17/2025 | CONTRACT & DEBT | NO | NO | - |

| Party Name | Party Type | Attorney | Bar ID |
|---|---|---|---|
| KERNER, SCOTT RYAN | JUDGE | | |
| TRAYLOR, DARRYL S | ATTORNEY | | |
| BROUGHAN, CRYSTAL T | ATTORNEY | | |
| FIRST FEDERAL BANK | PLAINTIFF | TRAYLOR, DARRYL STEVE | 75981 |
| MERIDIANLINK INC | DEFENDANT | BROUGHAN, CRYSTAL THERESA | 863343 |

**Dockets**

Page : 1    ALL

| Image | Doc # | Action Date | Description | Pages |
|---|---|---|---|---|
| | 15 | 04/25/2025 | ORDER EXTENDING TIME; S. KERNER DTD 4/25/25: UNOPPOSED MOTION FOR EXTENSION OF TIME FOR DEFENDANT TO RESPOND TO AMENDED COMPLAINT - GRANTED. | 1 |
| | 14 | 04/24/2025 | MOTION FOR EXTENSION OF TIME; FOR DEFENDANT MERIDIANLINK, INC. TO RESPOND TO AMENDED COMPLAINT F/B DFT | 1 |
| | 13 | 04/24/2025 | NOTICE OF APPEARANCE CIVIL; F/B ATTY BROUGHAN OBO DFT | 1 |
| | 12 | 04/07/2025 | REQUEST TO PRODUCE; PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT MERIDIANLINK, INC | 1 |
| | 11 | 04/07/2025 | NOTICE OF SERVICE NOTICE OF SERVICE OF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT MERIDIANLINK, INC; NOTICE OF SERVICE OF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT MERIDIANLINK, INC | 1 |
| | 10 | 03/27/2025 | PAID $10.00 ON RECEIPT 5722644; $10.00; 5722644; Fully Paid | 1 |
| | 9 | 03/25/2025 | SUMMONS ISSUED; steve@borowski-traylor.com;maryann@borowski-traylor.com;lexxi@borowski-traylor.com; AS TO DFT MERIDIANLINK INC | 1 |
| | 8 | 03/25/2025 | COMPLAINT; FIRST AMENDED F/B PLT | 1 |
| | 7 | 03/20/2025 | DCM DESIGNATION TO THE STREAMLINE TRACK WITH NON-JURY TRIAL ORDER; SCOTT KERNER 03/20/2025 | 1 |
| | 6 | 03/19/2025 | PAID $411.00 ON RECEIPT 5711336; $411.00; 5711336; Fully Paid | 1 |
| | 5 | 03/17/2025 | EXHIBIT; F/B PLT | 1 |
| | 4 | 03/17/2025 | NOTICE OF APPEARANCE CIVIL; AND OF ELECTRONIC MAIL ADDRESSES DESIGNATION F/B ATTY TRAYLOR OBO PLT | 1 |
| | 3 | 03/17/2025 | COMPLAINT; F/B PLT | 1 |
| | 2 | 03/17/2025 | CIVIL COVER SHEET | 1 |
| | 1 | 03/19/2025 | DIVISION ASSIGNMENT; AN: Circuit Civil Central - AN (Civil) | |

**Judge Assignment History**

**Court Events**

**Financial Summary**

**Reopen History**

Expand All

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

I.    **CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>FIFTEENTH</u>   JUDICIAL CIRCUIT,
IN AND FOR <u>PALM BEACH</u>   COUNTY, FLORIDA

<u>First Federal Bank</u>
Plaintiff                                                        Case # _____
                                                                Judge _____

vs.

<u>MeridianLink Inc</u>
Defendant

II.    **AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☒  $50,001- $75,000
☐  $75,001 - $100,000
☐  over $100,000.00

III.    **TYPE OF CASE**      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
  ☐ Business governance
  ☐ Business torts
  ☐ Environmental/Toxic tort
  ☐ Third party indemnification
  ☐ Construction defect
  ☐ Mass tort
  ☐ Negligent security
  ☐ Nursing home negligence
  ☐ Premises liability—commercial
  ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
  ☐ Commercial foreclosure
  ☐ Homestead residential foreclosure
  ☐ Non-homestead residential foreclosure
  ☐ Other real property actions

☐ Professional malpractice
  ☐ Malpractice—business
  ☐ Malpractice—medical
  ☐ Malpractice—other professional
☐ Other
  ☐ Antitrust/Trade regulation
  ☐ Business transactions
  ☐ Constitutional challenge—statute or ordinance
  ☐ Constitutional challenge—proposed amendment
  ☐ Corporate trusts
  ☐ Discrimination—employment or other
  ☐ Insurance claims
  ☐ Intellectual property
  ☐ Libel/Slander
  ☐ Shareholder derivative action
  ☐ Securities litigation
  ☐ Trade secrets
  ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

### COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**     **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.**     **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

  1

**VI.**     **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**     **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**     **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☐ yes
    ☒ no

**IX.**     **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Darryl Steve Traylor Jr.        Fla. Bar # 75981
        Attorney or party             (Bar # if attorney)

Darryl Steve Traylor Jr.             03/17/2025
  (type or print name)           Date

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

FIRST FEDERAL BANK,
a federal savings bank,

     Plaintiff,

v.                                Case No.: _____

MERIDIANLINK, INC.,
a Delaware corporation,

     Defendant.

_____/

## COMPLAINT

COMES NOW, Plaintiff, FIRST FEDERAL BANK, a federal savings bank, by and through its undersigned counsel, and sues Defendant, MERIDIANLINK, INC., a Delaware corporation, and alleges:

## GENERAL ALLEGATIONS

1.    Plaintiff First Federal Bank ("**Plaintiff**") is a federal savings bank that conducts business in the State of Florida.

2.    Defendant MeridianLink, Inc. ("**Defendant**") is a Delaware corporation that is authorized to conduct business in the State of Florida.

3.    Defendant's address is 3560 Hyland Ave., Suite #200, Costa Mesa, CA 92626

4.    Beanstalk Networks L.L.C. is a dissolved Florida limited liability company that shared the same address as Defendant.

1

5.     Beanstalk Networks L.L.C. conducted business under the fictitious name OpenClose, which was a name that was registered with the State of Florida, and which was owned by Beanstalk Networks L.L.C.

6.     OpenClose conducted business at 314 Clematis Street, Suite 200, West Palm Beach, Florida 33401.

7.     Defendant holds itself out as having acquired Beanstalk Networks, L.L.C. doing business as OpenClose effective as of November 4, 2022, and as having been assigned the agreements that were held by Beanstalk Networks. L.L.C. doing business as OpenClose, including both rights and obligations under those agreements.  However, Plaintiff did not receive any formal notice of that acquisition and assignment until January 28, 2025.  A redacted copy of the letter dated January 28, 2025, from Defendant to Plaintiff stating that it had been assigned "all rights and obligations" held by "Beanstalk Networks LLC, dba OpenClose" (herein "**OpenClose**") is attached hereto and incorporated herein by reference as <u>Exhibit A</u>.

## <u>COUNT ONE: DECLARATORY RELIEF</u>

8.     This is an action that is within the jurisdiction of the Court pursuant to Chapter 86, Florida Statutes, or pursuant to other law, that seeks a declaration regarding Plaintiff's obligations, if any, with respect to and in connection with an invoice that Defendant sent to Plaintiff in the amount of $597,100.00 on or around August 29, 2024, pursuant to an agreement between Plaintiff and OpenClose.

2

9.      Plaintiff incorporates the allegations made in paragraphs 1 through 7 by reference as if those allegations were fully set forth in this count.

10.     Venue is proper in Palm Beach County, Florida, pursuant to terms of an "Order Form" dated December 23, 2021, between Plaintiff and OpenClose.

11.     A redacted copy of the aforesaid Order Form is attached hereto and incorporated herein by reference as <u>Exhibit B</u>.

12.     The purpose of the Order Form was intended to be a subscription or software licensing arrangement whereby OpenClose would provide mortgage loan processing and origination software to Plaintiff, which are the "Products and Services" described in and contemplated by the Order Form ("**Products and Services**").

13.     The Order Form contains list of service level standards that OpenClose agreed to maintain and to which it agreed to adhere, and those standards are material terms of the Order Form.  (Ex. B, p. 10-11.)

14.     In connection with the execution of the Order Form, Plaintiff remitted an "Implementation Fee Payment" to OpenClose in the amount of $51,500.00 ("**Implementation Fee**").

15.     Soon after the execution of the Order Form, problems arose with the OpenClose's ability to deliver the Products and Services that were promised to Plaintiff pursuant to or in connection with the Order Form.

16.     During the first six months of 2022, multiple meetings and conferences were held between employees of Plaintiff and employees of OpenClose regarding the

3

problems that arose with respect to OpenClose not being able to deliver the Products and Services that Plaintiff had been promised in connection with or pursuant to the Order Form.

17.     For example, some of the problems and issues that OpenClose was unable or unwilling to resolve by June 2022, which resulted in Plaintiff not being able to use OpenClose's software to process or originate mortgage loans, are shown on the spreadsheet that is attached hereto and incorporated herein by reference as Exhibit C.

18.     Due to unresolved problems and issues with the OpenClose software or program that OpenClose was unable or unwilling to resolve, Plaintiff never "on boarded" OpenClose's program or software, and OpenClose's program or software was not used by Plaintiff, through no fault of its own, to process or originate mortgage loans.

19.     By August 2022, OpenClose knew that Plaintiff was not able to use OpenClose's software for mortgage loan origination or processing due to problems and issues with OpenClose's software that OpenClose was unable or unwilling to resolve in order for OpenClose to deliver the Products and Services that are described in and contemplated by the Order Form.

20.     OpenClose being unable or unwilling to resolve all of the known problems and issues that prohibited Plaintiff from using OpenClose's program or software for its intended purpose of Plaintiff processing and originating mortgage loans was OpenClose's material breach of the Order Form that entitled Plaintiff to cancel or terminate any obligation that it may have had under the terms of or in connection with

4

the Order Form, or that released or excused Plaintiff from any obligation that it may have had under the terms of or in connection with the Order Form.

21.     OpenClose not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

22.     Defendant not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

23.     OpenClose not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

24.     Defendant not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

25.     OpenClose being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form that released or excused or terminated any further obligation by Plaintiff.

5

26.     Defendant being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form that released or excused or terminated any further obligation by Plaintiff.

27.     The Order Form provides for a "Minimum Monthly License Fee" in the amount of $21,325.00 per month for "Months 1 – 60."  (Ex. B. p. 1.)

28.     In acknowledgment that Plaintiff had no further obligation to OpenClose or to Defendant pursuant to the Order Form, neither Defendant nor OpenClose sent Plaintiff any invoice for the monthly licensing fee for any services that were rendered pursuant to the Order Form during 2022 or during 2023 or during the first seven months of 2024.

29.     Knowing that, through no fault of its own, Plaintiff was unable to use the Products and Services stated in and contemplated by the Order Form, and knowing that OpenClose was not providing Plaintiff with those Products and Services, neither OpenClose nor Defendant communicated with Plaintiff regarding the Order Form between late October 2022 and August 2024.

30.     Notwithstanding the fact that Plaintiff was unable to use OpenClose's software or licensing that was contemplated by the Order Form due to problems and issues that OpenClose did not resolve or correct through no fault of Plaintiff, on August 2024, Defendant sent Plaintiff an invoice dated August 29, 2024, in the amount of $597,100.00 that purports to be for the minimum monthly licensing fee that is stated in

6

the Order Form in the amount of $21,325 for the period of April 2022 through July 2024. A redacted copy of that invoice is attached hereto and incorporated herein by reference as <u>Exhibit D</u> ("**Invoice**").

31.     Because Plaintiff, through no fault of its own, was not able to use OpenClose's software or subscription as contemplated by the Order Form because OpenClose was unable or unwilling to resolve the problems and issues with its software, Plaintiff is entitled to a refund of the Implementation Fee that is stated in the Order Form in the amount of $51,500.00.

32.     There is a bona fide, actual, present, and practical need for the Court to declare Plaintiff's obligations, if any, with respect to the Order Form.

33.     There is a bona fide, actual, present, and practical need for the Court to declare Plaintiff's obligations, if any, with respect to whether Plaintiff owes Defendant the sums that Defendant claims to be owed pursuant to the Invoice and with respect to other sums, if any, that Plaintiff may owe to Defendant that arise from or pertain to the Order Form.

34.     There is a bona fide, actual, present, and practical need for the Court to declare that Plaintiff is entitled to a refund of the Implementation Fee.

35.     The declarations that are sought by Plaintiff deal with a present, ascertained, or ascertainable state or set of facts.

36.    Plaintiff's obligations, if any, with respect to the Order Form, with respect to the Invoice, and with respect to the Implementation Fee are dependent upon the set of facts that are set forth herein or the law that is applicable to these facts.

37.    The parties have, or reasonably may have, actual, present, adverse, and antagonistic interests, either in fact or law, with respect to Plaintiff's obligations, if any, to Defendant that arise from or pertain to the Order Form, the Invoice, and the Implementation Fee.

38.    All parties with antagonistic and adverse interests with respect to the Order Form, the Invoice, and the Implementation Fee are before the Court.

39.    The relief and declarations that are sought herein are not sought for the purpose of obtaining legal advice or to answer questions propounded from curiosity.

40.    Plaintiff has performed all conditions precedent that were required to be performed by Plaintiff, or those conditions have been waived by Defendant.

41.    Plaintiff has employed the law firm of Borowski & Traylor, P.A. to represent its interests herein, and Plaintiff is obligated to pay its attorneys a reasonable fee for their services.

WHEREFORE, Plaintiff First Federal Bank prays that this Honorable Court will enter its judgment declaring that:

(i)    Plaintiff has no obligation to Defendant MeridianLink, Inc. that arises from or that pertains to the Order Form;

8

(ii)    Any obligation that Plaintiff may have previously had under the Order Form was terminated by OpenClose being unable or unwilling to provide Plaintiff with the Products and Services that are described in and contemplated by the Order Form;

(iii)    Plaintiff does not owe Defendant MeridianLink, Inc. the sums that are stated in and sought by the Invoice;

(iv)    Plaintiff does not owe Defendant MeridianLink, Inc. any other sums that arise from or pertain to the Order Form;

(v)    Plaintiff is entitled to a refund of the Implementation Fee, and that Defendant MeridianLink, Inc. owes Plaintiff the Implementation Fee;

(vi)    Plaintiff is entitled to recover its attorney's fees that were incurred in connection with this action; and

(vii)    Plaintiff is entitled to such other and further relief as is just and proper.

## COUNT TWO: BREACH OF CONTRACT

42.    This is an action for breach of contract that is within the jurisdiction of the Court that seeks damages in excess of $50,000, exclusive of attorney's fees and costs.

43.    Plaintiff incorporates the allegations made in paragraphs 1 through 7 by reference as if those allegations were fully set forth in this count.

44.    Venue is proper in Palm Beach County, Florida, pursuant to terms of an "Order Form" dated December 23, 2021, between Plaintiff and OpenClose.

9

45.     A redacted copy of the aforesaid Order Form is attached hereto and incorporated herein by reference as Exhibit B, which is the contract that is sought to be enforced in this count.

46.     The purpose of the Order Form was intended to be a subscription or software licensing arrangement whereby OpenClose would provide mortgage loan processing and origination software to Plaintiff, which are the "Products and Services" described in and contemplated by the Order Form ("**Products and Services**").

47.     In connection with the execution of the Order Form, Plaintiff remitted an "Implementation Fee Payment" to OpenClose in the amount of $51,500.00 ("**Implementation Fee**").

48.     Soon after the execution of the Order Form, problems arose with the OpenClose's ability to deliver the Produces and Services that were promised to Plaintiff pursuant to or in connection with the Order Form.

49.     During the first six months of 2022, multiple meetings and conferences were held between employees of Plaintiff and employees of OpenClose regarding the problems that arose with respect to OpenClose not being able to deliver the Products and Services that Plaintiff had been promised in connection with or pursuant to the Order Form.

50.     For example, some of the problems and issues that that OpenClose was unable or unwilling to resolve by June 2022, which resulted in Plaintiff not being able to

10

use OpenClose's software to process or originate mortgage loans, are shown on the spreadsheet that is attached hereto and incorporated herein by reference as Exhibit C.

51. A material term of the Order Form provides that OpenClose would "provide the Products and Services in a manner consistent with general industry standards and that the Products and Services will perform substantially as demonstrated under normal use and circumstances," which was an obligation that Defendant assumed. (Ex. B, ¶ 12.)

52. The Order Form contains list of service level standards that OpenClose agreed to maintain and to which it agreed to adhere, and those standards are material terms of the Order Form. (Ex. B, p. 10-11.)

53. Due to unresolved problems and issues with the OpenClose software or program that OpenClose was unable or unwilling to resolve, Plaintiff never "on boarded" OpenClose's program or software, and OpenClose's program or software was not used by Plaintiff, through no fault of its own, to process or originate mortgage loans.

54. By August 2022, OpenClose knew that Plaintiff was not able to use OpenClose's software for mortgage loan origination or processing due to problems issues with OpenClose's software that OpenClose was unable or unwilling to resolve in order for OpenClose to deliver the Products and Services that are described in and contemplated by the Order Form.

55. OpenClose being unable or unwilling to resolve all of the known problems and issues that prohibited Plaintiff from using OpenClose's program or software for its

11

intended purpose of Plaintiff processing and originating mortgage loans was OpenClose's material breach of the Order Form that entitled Plaintiff to cancel or terminate any obligation that it may have had under the terms of or in connection with the Order Form, or that released Plaintiff from any obligation that it may have had under the terms of or in connection with the Order Form.

56.     OpenClose being unable or unwilling to resolve issues with its software so as to deliver the Products and Services described in and contemplated by the Order Form was its material breach of the terms of the Order Form, which is also Defendant's material breach of the Order Form.

57.     In acknowledgment that Plaintiff had no further obligation to OpenClose or to Defendant pursuant to the Order Form, neither Defendant nor OpenClose sent Plaintiff any invoice for the monthly licensing fee for any services that were rendered pursuant to the Order Form during 2022 or during 2023 or during the first seven months of 2024.

58.     Knowing that, through no fault of its own, Plaintiff was unable to use the Products and Services stated in and contemplated by the Order Form, and knowing that OpenClose was not providing Plaintiff with those Products and Services, neither OpenClose nor Defendant communicated with Plaintiff regarding the Order Form between late October 2022 and August 2024.

12

59.    In connection with its acquisition of OpenClose, Defendant assumed "all rights and obligations" that OpenClose owed to Plaintiff pursuant to the Order Form. As such, Defendant is liable to Plaintiff for the damages that are sought in this count.

60.    OpenClose not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form.

61.    Defendant not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form.

62.    OpenClose not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form.

63.    Defendant not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form.

64.    OpenClose being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form.

65.    Defendant being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form.

66.    Because of those material breaches of the Order Form, Plaintiff, through no fault of its own, was not able to use the software or subscription as described in or as

13

contemplated by the Order Form, and Defendant has assumed all of OpenClose's obligations under the Order Form.

67.     Plaintiff has been damaged as the result of the aforesaid material breaches of the Order Form in such amounts as will be established at trial or at the final hearing in this matter.

68.     As the direct and proximate result of the aforesaid material breaches of the Order Form, Plaintiff is entitled to a refund of the Implementation Fee that is stated in the Order Form in the amount of $51,500.00.

69.     Plaintiff has performed all conditions precedent that were required to be performed by Plaintiff, or those conditions have been waived by Defendant.

70.     Plaintiff has employed the law firm of Borowski & Traylor, P.A. to represent its interests herein, and Plaintiff is obligated to pay its attorneys a reasonable fee for their services.

(continued on the following page)

14

WHEREFORE, Plaintiff First Federal Bank demands judgment for damages against Defendant MeridianLink, Inc., the amount of said judgment to include Plaintiff's attorney's fees and costs incurred in connection with this action, and said judgment to include prejudgment interest from the time that the Implementation Fee was remitted, and Plaintiff further prays that this Honorable Court will grant such other and further relief as is just and proper.

_____
DARRYL STEVE TRAYLOR, JR.
Florida Bar No. 0075981
steve@borowski-traylor.com
T. A. BOROWSKI, JR.
Florida Bar No. 843393
ted@borowski-traylor.com
Borowski & Traylor, P.A.
4300 Bayou Blvd., Suite 14
Pensacola, FL  32503
(850) 429-2027; (850) 429-7465 fax
Attorneys for Plaintiff First Federal Bank

NOT A CERTIFIED COPY

**meridian**link

January 28, 2025

First Federal Bank
1300 McFarland Blvd, NE
Tuscaloosa AL 35406-2252
ATTN: Sherry Romano

Notice of Material Breach under Agreement with MeridianLink, Inc.

WHEREAS, Beanstalk Networks LLC, dba OpenClose was acquired by MeridianLink, Inc. ("MeridianLink") effective November 4, 2022, by which the Agreements have been assigned to MeridianLink, including all rights and obligation set forth therein.

To Whom It May Concern:

Please allow this to serve as formal notice that First Federal Bank is currently in material breach of that certain agreement for services between OpenClose and customer dated 12/23/2021 (the "Agreement"). We have sent two prior notices of default on 10/13/2024 and 10/28/2024. Despite these notices, we have not received full payment on the amounts due of $597,100.00 to bring your account current. This amount may not include applicable late fees, which MeridianLink will assess on termination if this balance remains uncured.

Payment is immediately due for the amount listed above. If payment is not received within twenty (20) days (or as otherwise set forth in the Agreement to cure breach), MeridianLink may terminate this Agreement immediately with notice. Please be advised that services provided under the Agreement will be suspended pending payment of fees due. MeridianLink retains all other rights and remedies available to it pursuant to the Agreement, at law or in equity. Please contact ████████████████████████ with any questions on your current statement, attached here for your reference.

Sincerely,

Elias Olmeta
Chief Financial Officer
MeridianLink, Inc.

**EXHIBIT**
**A**



DocuSign Envelope ID:

**ORDER FORM**

## openclose

Order # 1

Proposed By:  Ken Ellis

Beanstalk Networks LLC, dba OpenClose
314 Clematis Street, Suite 200
West Palm Beach, FL 33401
(561) 650-8106 fax

Offer Valid Through: 12.31.2021

### Responsible Party

| | | | |
|---|---|---|---|
| Legal Entity Name: | First Federal Bank | Billing Contact: | Janice Jolly~~Sherry Roman~~ |
| Address: | 1300 McFarland Blvd. NE | Billing Email: | ~~Janice.jolly@1stfed.com~~ and ~~Sherry.Roman@1stfed.c~~ |
| | Tuscaloosa, AL 35406-2252 | | om |
| Phone: | 910-793-4600 x31805 | Billing Phone: | 205-391-6700 |
| Fax: | | Billing Fax: | |
| Website | www.1stfed.com | Fed Tax ID #: | ▬▬▬▬ |

### Terms and Conditions

| | | | |
|---|---|---|---|
| Effective Date: | _12 / 23_ , 2021 | Implementation Payment Type: | ☑ Check or ☐ Wire/ACH |
| Initial Term: | 5 years from date of the first Monthly License Fee | Monthly Payment Type: | ☑ Check or ☐ Wire/ACH |
| Renewal Term: | 2 years | Payment Terms: | In advance of due date |

### Products and Fees[1]

| | |
|---|---|
| **LenderAssist**: Retail LOS | Unlimited Users ☒ |
| **DecisionAssist**: Program Eligibility & Pricing Engine | ☒ |
| **DocAssist**: Document Management & Imaging System | ☒ |
| 5 Simple PDF Forms | ☒ |
| Includes (4) days of onsite training | In OpenClose's West Palm Beach, FL corporate headquarters |
| Implementation Fee | $40,000.00 (-$5,000 Implementation Fee discount if executed on or before 12/31/2021) |
| Minimum Monthly License Fee | $14,000.00 Funded Loan Minimum* (includes 200 Funded Loans) |
| **\*Loan Fee Charges after Funded Loan Minimum** | |
| 201 - 400  Funded Loans | $65.00 per Funded Loan |
| 401+  Funded Loans | $60.00 per Funded Loan |
| *Additional Modules* | |
| **ConsumerAssist Enterprise Digital POS** | ☒ |
| Implementation Fee | $5,000.00 |
| Per Funded Loan Fee | $35.00 |
| Minimum Monthly License Fee | $6,125.00 (includes 175 Funded Loans) |
| **OC Optics**: Analytics and Reporting Module | ☒ |
| Implementation Fee | $3,500.00 |
| Monthly License Fee | $950.00 |
| **Core Image Booking Module** | |
| Implementation Fee | $3,000.00 |
| Monthly License Fee | $250.00 |

### Payment Schedule for All Products

| Type of Fee | Schedule of Payments Due on the Effective Date | Amount of Payment |
|---|---|---|
| Implementation Fee Payment | | $51,500.00 |
| Minimum Monthly License Fee[2] | Months 1 - 60 | $21,325.00 |

(1) We reserve the right to increase our Fees annually by an amount not to exceed 3%, and we shall give you 30 days advance notice of any such increase.
(2) The first payment of the Minimum Monthly License Fee is due April 1, 2022 or on the Release Date whichever occurs first and monthly thereafter.
(3) -$5,000 Implementation Fee discount if executed on or before 12/31/2021.

By signing this Order Form, you agree that you have read the OpenClose Terms of Service attached hereto as Exhibit A and the Service Level Standards attached hereto as Exhibit B and agree to be legally bound by its and their terms which are incorporated by reference hereby. Prices do not include any taxes that may apply.  Any such taxes are the responsibility of Customer.  Subscriptions are non-cancelable before the end of the current Term.  Additional Pricing for Products and Services not purchased are posted at https://www.openclose.com/publishedpricing/ , and the Approved Investor Program List is posted at https://www.openclose.com/current-available-investors/ which are incorporated herein by reference. Upon your request, additional products may be added by addendum which will automatically adjust the Initial Term (or any Renewal Term) to begin on the Effective Date of the addendum.

**FIRST FEDERAL BANK**

**BEANSTALK NETWORKS LLC, DBA OPENCLOSE**

| | | | |
|---|---|---|---|
| Signature | *Sherry Romano* | Signature | *James P. Kelly* |
| Name | Sherry Romano | Name | James P. Kelly |
| Title | SVP Mortgage Lending | Title | President |
| Date | 12/23/2021 | Date | Dec-27-2021 |



**EXHIBIT B**

DocuSign Envelope ID:



## Exhibit A to Agreement between First Federal Bank and OpenClose
## OPENCLOSE TERMS OF SERVICE

BY SIGNING OUR ORDER FORM, YOU AGREE TO THE FOLLOWING TERMS GOVERNING YOUR USE OF ONLINE PRODUCTS AND SERVICES OF OPENCLOSE©, INCLUDING OFFLINE COMPONENTS (THE "PRODUCTS AND SERVICES"). IF YOU ARE ENTERING INTO THIS AGREEMENT ON BEHALF OF A CORPORATION, LIMITED LIABILITY COMPANY OR OTHER LEGAL ENTITY, YOU REPRESENT THAT YOU HAVE THE AUTHORITY TO BIND SUCH ENTITY TO THESE TERMS AND CONDITIONS, IN WHICH CASE THE TERMS "YOU" OR "YOUR" SHALL REFER TO SUCH ENTITY.

### Introduction:

Welcome to OpenClose. Your registration for, or use of, the Products and Services set forth on the Order Form shall be deemed to be your agreement to our Terms of Service as applicable to our Products and Services, including any Customer Website. For reference, a Definitions Section is included at the end of this Agreement.

### 1. Advertising

By becoming a paying customer of the Products and Services, you agree that we shall have the right to disclose the fact that you are a paying customer, and the Products and Services that you are using however if either party desires to issue any press release or advertisement which relates to the Products and Services listed hereunder or which mentions the name of the other party, or the name of our Products and Services, then such party shall submit a copy of any such proposed press release or advertisement to the other party for its consent at least ten (10) days prior to its release to the media which consent shall not be unreasonably withheld or delayed. Each press release shall be deemed approved unless the party to whom it is submitted objects within such ten (10) day period. Notwithstanding the foregoing, the restrictions in this section will not apply to incidental oral comments in the ordinary course of business.

### 2. License Grant & Restrictions

For the Term described on the Order Form, you shall have a non-exclusive, non-transferable, right to use the Products and Services, subject to the terms and conditions of this Agreement. All rights not expressly granted to you are reserved by us.

You may not access the Products and Services if you are a direct competitor of ours, except with our prior written consent. In addition, you may not access the Products and Services for purposes of monitoring availability, performance or functionality, or for any other benchmarking or competitive purposes and in addition, you agree not to allow a competitor of ours to access our Products and Services.

You agree not to directly or indirectly (i) license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third party, the Products and Services or the Content; (ii) modify or make derivative works based upon the Products and Services or the Content; (iii) create Internet "links" to the Products and Services or "frame" or "mirror" any Content on any other server or wireless or Internet-based device; or (iv) reverse engineer or access or use the Products and Services for any improper purpose including: (a) building a competitive product or service, using ideas, features, functions or graphics similar to those contained within the Products and Services; (b) copying any ideas, features, functions or graphics of the Products and Services; (c) removing or modifying any copyright or other proprietary notice of ours; (d) using any of our Intellectual Property Rights in any foreign jurisdiction in violation of any trade laws or regulations; or (e) allowing others to do any of the foregoing. This paragraph may be enforced by injunction.

Starting on the Release Date, you may use the Products and Services only for your internal business purposes and you shall not: (i) send or store infringing, obscene, threatening, libelous, or otherwise unlawful or tortious material, including material harmful to children or violative of third party privacy rights; (ii) send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs; (iii) interfere with or disrupt the integrity or performance of the Products and Services or the data contained therein; or (iv) directly or indirectly attempt to gain unauthorized access to the Products and Services or its related systems or networks.

DocuSign Envelope ID: 5▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

We shall not be responsible for errors, defects, or downtime caused by any of the following: hardware failures, power problems, environmental problems; modifications to any of Our Technology unless such modifications are made by us or with our authorization; viruses, destructive programs, or self-replicating code, programming, scripts, your business requirements, work flow, or applets unique to your business provided by you; misuse or negligence by you, your employees, or agents in operating any of Our Technology; functionality of third party software used in connection herewith or with which any of Our Technology interfaces except for third-party software approved or authorized by us; or any Force Majeure.

By you: For the Term of this Agreement, you hereby grant to us the royalty-free, irrevocable, worldwide, non-exclusive right and license to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, perform, and display all content, remarks, suggestions, ideas, graphics, or other information communicated to us by you through the Customer Website or otherwise in connection with this Agreement, excluding Confidential Information (together, the "Feedback"), and to incorporate any Feedback in other works in any form, media, or technology now known or later developed. We will not be required to treat any Feedback as confidential, and may use any Feedback in our business (including without limitation, for products or advertising) without incurring any liability for royalties or any other consideration of any kind, and will not incur any liability as a result of any similarities that may appear in our future operations.

We will treat any Confidential Information, your Customer Data, or other proprietary data that you submit through this site in accordance with our Privacy Policy as stated in Section 4 of this Agreement.

## 3. Your Responsibilities

You are responsible for: (i) all activity occurring under your User accounts and you agree to abide by all applicable local, state, national and foreign laws, treaties and regulations in connection with your use of our Products and Services, including laws related to data privacy, international communications and the transmission of technical or Personally Identifiable Information as defined in Section 4; (ii) acquiring any authorization(s) necessary for hypertext links to third party Websites; (iii) the accuracy of materials provided to us including without limitation Customer Content, disputing claims, warranties, guarantees, nature of your business, and address where your business is conducted; (iv) compliance by Users with the terms of this Agreement; (v) preventing access to the Customer Website by persons other than Users with Customer-issued passwords; and (vi) using commercially reasonable best efforts to assist us in providing configuration and testing services related to implementation of the Products and Services in your environment. You agree to: (a) notify us immediately of any unauthorized use of any password or account or any other known or suspected breach of security; (b) report to us immediately and use reasonable efforts to stop immediately any unauthorized copying or distribution of Customer Content and Customer Data that is known or suspected by you or your Users; and (c) be responsible for registration and maintenance of your Domain Names including acquisition of necessary SSL certificates.

## 4. Privacy Policy in Connection with Customer Data & Account Information.

We do not own any data, information or material that you submit to the Products and Services in the course of your use of the Products and Services ("Customer Data"). We have, however, the responsibility to maintain the confidentiality of your Customer Data and we will take steps we deem commercially reasonable to assure that confidentiality is maintained and that there is no unauthorized dissemination of your Customer Data. Personally identifiable information ("PII"), or sensitive personal information ("SPI"), as used in US privacy law and information security, is information that can be used on its own or with other information to identify, contact or locate a single person (accordingly PII excludes general statistical data or analysis of our customer base as a whole). In the unlikely event of a data breach resulting in unauthorized acquisition of Customer Data, you may be required by applicable regulations to take certain remedial actions such as notification of affected customers of yours, or we may be required by applicable law to take certain remedial actions on your behalf. In such event, we will use commercially reasonable efforts to notify you promptly, and we shall endeavor to work closely with you to minimize the impact, however you understand any costs we incur in connection with the foregoing are your responsibility and shall be paid by you as if set forth on a Work Order.

You, not us, shall have sole responsibility for the accuracy, quality, integrity, legality, reliability, appropriateness, or right to use of Customer Data, and we shall not be responsible or liable for the deletion, correction, destruction, damage, loss or failure to store or restore any Customer Data, although we shall use commercially reasonable efforts to prevent damage or loss of your Customer Data, we shall not be responsible or liable for such damage or loss other than as provided in this Agreement.

## 5. Confidentiality

By virtue of this Agreement, the parties may have access to information that is confidential to one another. Confidential Information shall mean: (i) Our Technology; (ii) all of the terms and conditions of this Agreement including the pricing as highlighted in Section 8 [Billing] under this Agreement; (iii) Customer Data; (iv) information related to loan programs and

DocuSign Envelope ID:

product pricing; and (v) information clearly identified by either party as confidential at the time of disclosure (collectively, the "Confidential Information"). Confidential Information shall not include information that: (a) is or becomes a part of the public domain through no act or omission of the other party; (b) is lawfully disclosed to receiving party by a third party without an obligation of nondisclosure to the disclosing party; (c) is independently developed by the other party without reference to the Confidential Information; or (d) was already in the receiving party's possession prior to the Effective Date of this Agreement.

During the Term of this Agreement, the parties are authorized to use the Confidential Information of the other party solely for the purposes of this Agreement. The parties agree to use the same care and discretion to avoid the unauthorized disclosure, publication or dissemination of the other party's Confidential Information received pursuant to this Agreement as it uses to protect its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable standard of care). Each party's obligations of confidentiality hereunder for Confidential Information disclosed during the Term of this Agreement shall continue indefinitely.

A party may disclose its own Confidential Information as it deems appropriate in conducting its own business. A party may disclose the other party's Confidential Information solely to the extent required by subpoena, court order or government requirement to be disclosed, provided that the party which is required to make such disclosure shall give the other party prompt written notice of such subpoena, court order or government requirement so as to allow such the other party to have an opportunity to obtain a protective order to prohibit or restrict such disclosure. Confidential Information disclosed pursuant to subpoena, court order or government requirement shall otherwise remain subject to the terms applicable to Confidential Information.

## 6. Intellectual Property Ownership

We own all right, title and interest, including all related Intellectual Property Rights, in and to Our Technology, the Content and the Products and Services and any suggestions, ideas, enhancement requests, feedback, recommendations or other information provided by you or any of your employees, contractors or agents relating to the Products and Services. This Agreement is not a sale and does not convey to you any rights of ownership in or related to the Products and Services, Our Technology or the Intellectual Property Rights owned by us. Our name(s), our logo(s), and the product names associated with the Products and Services are owned by us, and no right or license is granted to use them other than as provided herein.

## 7. Hyper-Links

The Customer Website may be hyper-linked to other sites which are not maintained by, or related to us. Hyper-links to such sites are not sponsored by or affiliated with the Customer Web Site or us. We have not reviewed any or all of such sites and are not responsible for the content of those sites. Hyper-links are to be accessed at your own risk, and we make no representations or warranties about the content, completeness or accuracy of these hyper-links or the sites hyper-linked to the Site. The inclusion of any hyper-link to a third-party site does not necessarily imply endorsement by us of that site.

## 8. Billing

**Payment:** You agree to pay our fees or charges set forth on the Order Form(s) and any Work Orders. We charge and collect in advance for use of the Products and Services, and we will automatically issue an invoice to you each month for payment as set forth on the Order Form.

All payment obligations are non-cancelable, all amounts paid are nonrefundable and fully earned upon receipt, and you are responsible for paying for all Monthly License Fees set forth on the Order Form for the entire Term, whether or not such Products and Services are actively used.

**Additional Products and Services and Expenses:** The fee for any Products and Services ordered subsequent to the Order Form will be at the rates then in effect. You shall only be responsible to reimburse us for expenses which are reasonably incurred in rendering any Products and Services to you (hereinafter "Expenses") if approved by you in advance in writing. Such Expenses, which shall be billed monthly, include without limitation travel expenses including airfare and or ground transportation, lodging, meals, and the cost of any other related expenses.

**Confidential Nature of Fee Information:** All pricing terms are confidential, and you agree not to disclose them to anyone other than your employees, contractors or agents who have a need to know and who are informed of, and agree to the confidentiality provisions hereof.

**Taxes:** Our fees are exclusive of all taxes, levies, or duties imposed by taxing authorities, and you shall be responsible for payment of all such taxes, levies, or duties, excluding only United States (federal or state) taxes based solely on our income.

**Your Billing Information:** You agree to provide us with complete and accurate billing and contact information. This information includes your legal company name, street address, e-mail address, and name, telephone number, and fax number of an authorized billing contact. You agree to update this information within 30 days of any change to it. If the contact information you have provided is false or fraudulent, we reserve the right to terminate your access to the Products and Services in addition to any other legal remedies. If you believe your bill is incorrect, you must contact us in writing within 30 days of the invoice date of the invoice containing the amount in question to be eligible to receive an adjustment or credit.

## 9. Non-Payment and Suspension

In addition to any other rights granted to us herein, in the event your account becomes delinquent, we reserve the right to either [a] terminate this Agreement pursuant to section 11 or [b] suspend your access to the Products and Services. Delinquent invoices are subject to a late fee of 1.5% per month on any outstanding balance, or the maximum amount permitted by law, whichever is less, plus all costs and expenses of collection including our reasonable attorney fees. During any period of delinquency, you will continue to be charged for monthly fees. We reserve the right to impose a reconnection fee in the event Services are suspended and thereafter you request access to the Products and Services.

## 10. Termination upon Expiration of the Term and Business Continuity Services

This Agreement commences on the Effective Date and continues for the Initial Term as agreed in the Order Form. Upon the expiration of the Initial Term, this Agreement will automatically renew for successive Renewal Terms as specified on the Order Form unless either of us notifies the other in writing at least ninety (90) days prior to the expiration of the then applicable Term of a decision not to renew this Agreement. Upon termination of this Agreement under this Section 10, your right to access or use our Products and Services ceases and we are no longer required to retain your Customer Data. However, in the event of termination upon expiration of the Term, the protocol shall be as follows:

Upon your request, if received by us within thirty (30) days of termination upon expiration of the Term of this Agreement ("Data Retrieval Notice Period"), and full payment of all fees due hereunder, we shall offer you the one time opportunity to enter into a Work Order by which we will provide Business Continuity Services of the Archived Modules, as defined below, at our then current professional service fee schedule (or we may apply a reasonable time and materials fee based on then current reasonable industry standards). Business Continuity Services is defined as the services we will provide to you for our continued hosting of your Customer Data and allow you access to our LenderAssist and DocAssist (the "Archived Modules") solely for data retrieval, and not to enter new loans, and to make such copies of your Customer Data as you require. Upon expiration of the Data Retrieval Notice Period or termination of our Business Continuity Services if applicable, we are not required to retain your Customer Data and it may be deleted.

## 11. Termination for Cause

In the event of any material breach of this Agreement, such as your payment obligations hereunder, or unauthorized use of Our Technology or Products and Services, we may, in our sole discretion, after written notice and a twenty (20) day period to cure (the "Cure Period") terminate this Agreement whereupon [i] your right to continue to access or use our Products and Services will cease; [ii] all Monthly License Fees set forth on the Order Form for the entire Term shall become immediately due and payable and [iii] your right to access or use your Customer Data ceases and [iv] we shall have no further or continuing obligation to deliver to you, maintain or retain any of your Customer Data and it will be deleted.

## 12. Representations & Warranties

Each party represents and warrants that it has the authority to enter into this Agreement. We represent and warrant that we will provide the Products and Services in a manner consistent with general industry standards and that the Products and Services will perform substantially as demonstrated under normal use and circumstances. You acknowledge that (a) you have examined the functionality of the Products and Services; (b) have not relied on general descriptions of our Products and Services as may be found on our Website to determine if the functionality of Our Products and Services is suitable for your intended use, and (c) you agree to license our Products and Services on the terms set forth herein and on the Order Form commencing on the Effective Date. You represent and warrant that you have not falsely identified yourself or provided any false information to gain access to the Products and Services and that your billing information is correct.

DocuSign Envelope ID:

## 13. Indemnification

You shall indemnify and hold us, and our parent organizations, subsidiaries, affiliates, officers, members, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with a claim against us: (i) alleging that you have infringed the rights of, or have caused harm to, a third party; (ii) which if true, would constitute a violation of your representations and warranties; or (iii) arising from the breach by you or your Users of this Agreement, provided in any such case that we (a) promptly give you written notice of the claim; (b) give you control of the defense and settlement of the claim (provided that you may not settle or defend any claim unless it unconditionally releases us of all liability, and such settlement does not have a material adverse effect on our business or Products and Services); (c) provide to you all available information and assistance; and (d) have not compromised or settled such claim.

We shall indemnify and hold you and your parent organizations, subsidiaries, affiliates, officers, directors, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with a claim against you: (i) alleging that we have infringed a copyright, a U.S. patent issued as of the date of the Order Form, or a trademark of a third party; (ii) which if true, would constitute a violation of our representations or warranties; or (iii) arising from breach of this Agreement by us; provided that you (a) promptly give us written notice of the claim; (b) give us control of the defense and settlement of the claim (provided that we may not settle or defend any claim unless it unconditionally releases you of all liability), and such settlement does not have a material adverse effect on your business; (c) provide to us all available information and assistance; and (d) have not compromised or settled such claim. We shall have no indemnification obligation, and you shall indemnify us pursuant to this Agreement, for claims arising from any infringement arising from the combination of the Products and Services with any of your products, service, hardware, or business process(s).

## 14. Disclaimer of Warranties

YOUR USE OF OUR TECHNOLOGY IS AT YOUR OWN RISK. WE MAKE NO REPRESENTATION, WARRANTY, OR GUARANTY AS TO THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, TRUTH, AVAILABILITY, ACCURACY OR COMPLETENESS OF THE PRODUCTS AND SERVICES OR ANY CONTENT. WE DO NOT REPRESENT OR WARRANT THAT: (i) THE USE OF THE PRODUCTS OR SERVICES WILL BE SECURE, TIMELY, UNINTERRUPTED OR ERROR-FREE OR OPERATE IN COMBINATION WITH ANY OTHER HARDWARE, SOFTWARE, SYSTEM OR DATA; (ii) THE PRODUCTS OR SERVICES WILL MEET YOUR REQUIREMENTS OR EXPECTATIONS; (iii) ANY STORED DATA WILL BE ACCURATE OR RELIABLE; (iv) ERRORS OR DEFECTS WILL BE CORRECTED; OR (v) THE PRODUCTS AND SERVICES OR THE SERVER(S) THAT MAKE THE PRODUCTS AND SERVICES AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. THE PRODUCTS AND SERVICES AND ALL CONTENT ARE PROVIDED TO YOU STRICTLY ON AN "AS IS" BASIS. ALL CONDITIONS, REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED TO THE MAXIMUM EXTENT PERMITTED BY LAW.

## 15. Internet Delays

OUR PRODUCTS AND SERVICES MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS. WE ARE NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS.

## 16. Limitation of Liability

IN NO EVENT SHALL OUR AGGREGATE LIABILITY FOR ANY AND ALL CLAIMS ARISING UNDER THIS AGREEMENT EXCEED THE AMOUNT OF MINIMUM MONTHLY LICENSE FEES ACTUALLY PAID BY YOU IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO ANYONE FOR ANY INDIRECT, PUNITIVE, SPECIAL, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES OF ANY TYPE OR KIND (INCLUDING LOSS OF DATA, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE), ARISING OUT OF, OR IN ANY WAY CONNECTED WITH OUR PRODUCTS AND SERVICES, INCLUDING BUT NOT LIMITED TO THE USE OR INABILITY TO USE THE PRODUCTS AND SERVICES, OR FOR ANY CONTENT OBTAINED FROM OR THROUGH THE PRODUCTS AND SERVICES, ANY INTERRUPTION, INACCURACY, ERROR OR OMISSION, REGARDLESS

DocuSign Envelope ID:

OF CAUSE , EVEN IF THE PARTY FROM WHICH DAMAGES ARE BEING SOUGHT HAVE BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 17. Force Majeure

We shall not be responsible for any failure to perform our obligations under this Agreement caused by an event reasonably beyond our control, including but not limited to, hurricanes, floods, the infrastructure of the Internet, wars, riots, labor strikes, natural disasters, pandemic, national emergency or any law, regulation, ordinance, or other act or order of any court, government, or governmental agency.

## 18. Notices

We may give notice by means of a general notice on the Products and Services, electronic mail to your e-mail address on record in our account information, or by written communication sent by first class mail or pre-paid post to your address on record in our account information. Such notice shall be deemed to have been given upon the expiration of 48 hours after mailing or posting (if sent by first class mail or pre-paid post) or 12 hours after sending (if sent by email or fax). You may give notice to us (such notice shall be deemed given when received by us) at any time by any of the following: letter sent by confirmed facsimile to us; letter delivered by nationally recognized overnight delivery service or first class postage prepaid mail to us at the applicable fax number or address set forth on the Order Form or Work Order.

## 19. Modification to Terms

We reserve the right to modify the terms and conditions of these Terms of Service, or our policies relating to the Products and Services, at any time, effective upon these Terms of Service on our Website, however no such modification will have any effect on fees and charges you have agreed to pay in the Order Form unless they are set forth in an amendment which you and we have signed. Continued use of our Products and Services after any such modification to these Terms of Service shall constitute your consent to such changes.

## 20. Assignment; Change in Control

This Agreement may not be assigned by you without our prior written approval but may be assigned without your consent by us to: (i) a parent or subsidiary; (ii) an acquirer of assets; or (iii) a successor by merger. Any purported assignment in violation of this Section shall be void. Any actual or proposed change in control of yours that results or would result in a direct competitor of ours directly or indirectly owning or controlling 50% or more of you shall entitle us to terminate this Agreement for Cause immediately upon written notice.

## 21. Survival

The provisions of Sections 1. Advertising, 2. License Grant & Restrictions, 4. Privacy Policy in Connection with Customer Data & Account Information., 5. Confidentiality, 6. Intellectual Property Ownership, 8. Billing, 9. Non-Payment and Suspension, 10. Termination upon Expiration of the Term, 11. Termination for Cause, 13. Indemnification, 14. Disclaimer of Warranties, 16. Limitation of Liability, 17. Force Majeure, 18. Notices, 21. Survival, 22. General and 25. Definitions shall survive termination of this Agreement for any reason. In the event of any termination or expiration of this Agreement for any reason, all provisions of this Agreement whose meaning requires them to survive shall survive the expiration or termination of this Agreement for the period of time indicated therein.

## 22. General

This Agreement shall be governed by Florida law without regard to its conflict of law principles. Any action brought to enforce any of the terms hereof shall be brought exclusively in the State or Federal courts of Palm Beach County, Florida and in any such action, the prevailing party shall be entitled to an award of all of its reasonable attorney's fees and court costs. No text or information set forth on any other purchase order, preprinted form or document (other than an Order Form, Amendment or Work Order, if applicable) shall add to or vary the terms and conditions of this Agreement. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then such provision(s) shall be construed, as nearly as possible, to reflect the intentions of the invalid or unenforceable provision(s), with all other provisions remaining in full force and effect. No joint venture, partnership, employment, or agency relationship exists between the parties as a result of this Agreement or use of the Products and Services. Other than in connection with a general employment solicitation or response thereto, you shall not solicit, offer, or extend employment or consulting opportunities to any employee or consultant of ours

DocuSign Envelope ID:

during the Term of this Agreement and for a period of three (3) years following the end of the Term, or the earlier termination of this Agreement, without our prior written consent. Our failure to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by us in writing. This Terms of Service, together with any applicable Order Form, Amendment or Work Order, comprises the entire agreement between the parties and supersedes all prior or contemporaneous negotiations, discussions or agreements, whether written or oral, between the parties regarding the subject matter contained herein.

## 23. Custom Work

Fees for customization of Customer Website(s) (hereinafter "Custom Work") are published on the Current Published Rate List. Any request for Custom Work must be pursuant to a Work Order. During the installation and integration of the Products and Services there will be discovery and gap analysis performed which may require Custom Work.

## 24. Training

Included in the Implementation Fee is a training package for your trainers. Training sessions typically may include: (a) lender administrator training, (b) broker/branch administrator training, (c) broker/branch loan flow training, and (d) lender loan flow training. A standard User manual will be provided along with training agendas for each session which will be designed to facilitate your intended use of the Customer's Website(s). Training will be performed via the Web and telephone using GoToMeeting® or a similar software selected by us. Additional charges shall apply for on-site training at your facilities as well as for supplementary training services offered by our training department as set forth on the Current Published Rate List.

## 25. Definitions

As used in this Agreement and in any Order Forms or change orders, the following meanings shall apply:

"**Agreement**" means any Order Form, all Exhibits referred to in the Order Form, and any amendments which both parties may agree to in the future.

"**Content**" means the audio and visual information, documents, software, products and services contained or made available to you in the course of using the Products and Services.

"**Customer Content**" means materials provided by you for incorporation into Customer Website including, but not limited to, audio clips, data, graphics, illustrations, images, photographs, text, or video clips. You shall deliver the Customer Content to us in an electronic file format specified and accessible by us (e.g., .gif, .jpg, .txt) or by entering directly using the site's existing functionality.

"**Customer Data**" means information or material provided or submitted by you in the course of using the Products and Services, but excludes general statistical data or analysis of our customer base.

"**Customer Website**" means the site(s) on the World Wide Web portion of the Internet developed by us for you pursuant to the terms of this Agreement for purposes of delivering the Products and Services.

"**Effective Date**" means the date this Agreement is accepted by your signature on an Order Form.

"**Intellectual Property Rights**" means unpatented inventions, patent applications, patents, design rights, copyrights, trademarks, service marks, trade names, domain name rights, mask work rights, know-how and other trade secret rights, and all other intellectual property rights, derivatives thereof, and forms of protection of a similar nature anywhere in the world pertaining to Our Technology.

"**Order Form(s)**" means any paper or online order form evidencing the initial subscription for the Products and Services and any subsequent order forms, specifying, among other things, the loan charges, number of licenses and other services contracted for, the applicable fees, the billing period, and other charges as agreed to between the parties, each such Order Form to be incorporated into and to become a part of this Agreement (in the event of any conflict between the terms of this Agreement and the terms of any such Order Form, the terms of this Agreement shall prevail).

"**Our Technology**" means our Products and Services named in the Order Form or otherwise belonging to us and also includes all related Intellectual Property as well as our hardware, products, processes, algorithms, User interfaces, know-how, techniques, designs and other tangible or intangible technical material or information made available to you by us in providing the Products and Services.

DocuSign Envelope ID: ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

"**Products and Services(s)**" means products and services specifically identified during the ordering process, developed, operated, and maintained by us, made accessible via the Customer Website or offline products and services provided to you by us, to which you are being granted access under this Agreement, including Our Technology and the Content.

"**Release Date**" is the date you are notified that the Products and Services are available to you in an environment for testing, training, configuration, and use. The Release Date may occur even if there are outstanding Custom Work requests. There may be a different Release Date for each Product. You assume the responsibility for the unique configuration of the Products and Services which occurs after the Release Date.

"**Term**" means the "Initial Term" or any "Renewal Term" set forth on an Order Form, Amendment or Addendum. For the avoidance of doubt, the Initial Term begins on the Release Date and not the Effective Date.  For example, if the Effective Date on the Order Form is November 1st, 2021 and the Initial Term on the Order Form is six (6) years, and if the Release Date occurs on January 1, 2022; (i) the Initial Term would expire on January 1, 2028 and your obligation to pay fees hereunder would conclude upon your payment of seventy two (72) Monthly License Fee Payments as well as any other fees due under this Agreement as of the expiration of the Term.

"**Work Order**" means any written agreement signed by the parties for custom work.

"**User(s)**" or "User Accounts" means either [a] an employee of yours authorized and Registered to use the Products and Services or [b] any other individual you have authorized and registered to use the Products and Services ("Customer Authorized Individual"). Authorized and Registered means you have created a log in for our Products and Services indicating that the employee or Customer Authorized Individual is authorized by you to use our Products and Services pursuant to the Agreement.

## *Questions or Additional Information:*

If you have questions regarding this Agreement or wish to obtain additional information, please send an e-mail to legal@OpenClose.com.

**IN WITNESS WHEREOF**, this Terms of Service has been executed by the parties through their duly authorized officers as of the date set forth below.

| FIRST FEDERAL BANK | BEANSTALK NETWORKS LLC, DBA OPENCLOSE |
|---|---|
| Signature *Sherry Romano* | Signature *James P. Kelly* |
| Name *Sherry Romano* | Name James P. Kelly |
| Title *SVP Mortgage Lending* | Title President |
| Date *12/23/21* | Date Dec-27-2021 |

Page 9 of 11

DocuSign Envelope



## Exhibit B to Agreement between First Federal Bank and OpenClose
## OPENCLOSE SERVICE LEVEL STANDARDS

We use commercially reasonable efforts to maintain the following Service Level Standards for Customers:

### Software Maintenance Services:

1. Correct, replace, or provide services to remedy any programming error which materially affects Customer's use of the software.
2. Remedy software bugs properly documented by Customer by means of a contemporaneous e-mail, help ticket, or letter describing in detail the software bug.
3. Provide, at no additional charge, newer versions, standard modifications, or enhancements to the software. OpenClose requires its Customers to use a software version that is less than two (2) versions old.
4. Provide not less than Twenty Four (24) hours notice of scheduled maintenance and as much notice as commercially reasonable for events beyond our control. Scheduled maintenance is intended to last no longer than Four (4) hours, and will be scheduled between the hours of 9:00 p.m. and 7:00 a.m. (Eastern Time), unless otherwise agreed to by the Customer and OpenClose. OpenClose may request extensions or timeframes of scheduled maintenance above Four (4) hours. The time of the scheduled maintenance will be considered approved if OpenClose does not receive a written objection from Customer no later than Eight (8) hours in advance of the scheduled maintenance outage.

### Web Hosting Services:

1. Provide, install, and manage production Web server(s) and other equipment for Customer at a third party hosting provider, such as but not limited to Quality Tech Services (QTS) or Amazon Web Services (AWS).
2. Maintain sufficient server capacity and Internet connectivity to accommodate managed growth in User numbers and overall traffic levels to support the Products and Services you have ordered including the Customer Website(s).
3. Host and operate our Customers' Website such that the Users experience access times and time to retrieve full Web pages that are substantially similar to the access times and times to retrieve full Web pages by Users visiting other secure sites hosted by OpenClose.

### Service Monitoring and Management:

1. Perform periodic monitoring and management of Customers' Website(s) to optimize availability of service.
2. Monitor Web servers and other service components of firewalls on a periodic basis.
3. Restore service should a failure occur.
4. Maintain redundancy in key components such that service outages are less likely to occur due to individual component failures.
5. Customer Website(s) shall be available for use for no less than Ninety-Nine Percent (99%) of the time. Upon written notification by Customer if reported down time exceeds 1%, in any two consecutive 30 day periods, by up to Four (4) hours in each 30 day period, Customer will receive a credit in the amount of fifteen percent (15%) of the amount of one month's Monthly License Fee. If reported down time exceeds 1% by more than Four (4) hours in each 30 day period for any two consecutive 30 day periods, Customer will receive a credit of twenty five percent (25%) of the amount of one month's Monthly License fee. To claim a remedy under this SLS, Customer will send OpenClose a notice, via email addressed to legal@openclose.com, containing the following details: (a) Customer name; (b) dates and time periods for each instance of claimed downtime during the relevant period; and (c) an explanation of the claim, including any relevant calculations. Claims must be submitted within ten (10) days after the end of the applicable consecutive thirty (30) day periods and must be verified by our records.
6. Determine the source of unscheduled service outages and report the finding to Customer.

DocuSign Envelope ID: ▓▓▓▓▓▓▓▓

7. Monitor "heartbeat" signals of servers, routers, leased lines, and HTTPS availability of the Web server by proactively probing Twenty-Four (24) hours a day. If a facility does not respond to a ping-like stimulus, it is checked again. A second failure will automatically trigger a page to OpenClose's service center and a log entry will be generated.

8. Restore a service failure or, if determined to be a connectivity vendor problem, open a trouble ticket with the connectivity carrier and notify and provide updates to our Customer(s) Technical Administrator

9. Provide daily incremental back-ups and regular back-up of standard file systems and the timely restoration of data at Customer's request.

10. If the hosting server or location is expected to be down for an extended time , OpenClose will transfer appropriate back-up data and re-establish all hosting operations in an appropriately functioning secondary server or location.

## Security:

1. Limit physical and electronic access to Web servers.

2. Review security notifications and alerts relevant to the hosting platform (e.g., vendor notifications of bugs, attacks, patches, etc.).

3. Comply with vendor notifications and recommendations, apply patches, or take other commercially reasonable or customary actions as appropriate to maintain an industry standard  level of defense.

4. Prevent or halt a breach of security, including taking the affected Customer Websites off line.

## Support:

1. Provide help desk support to serve as the central collection point and information repository for our Customers' support issues and service requests in accordance with the target response times below. The Help Desk electronically documents, tracks, monitors, and manages all support issues from initial reporting through final resolution. Interactive reporting tools shall be employed to keep Customer advised of issue status.

2. Receive requests for support from up to two of Customers' designated employees during Business Hours, submitted via a Web portal, e-mail, or telephone, as directed by OpenClose. Business Hours are defined as any calendar day that is not a Saturday, Sunday or OpenClose observed holiday and are between the hours of 8 am to 7 pm EST. Requests received when the Help Desk is not staffed are automatically routed to an on-call technician. The on-call technician will respond to Customer as soon as reasonably possible to render assistance in accordance with the target response times below.

3. If a support request cannot be resolved at the time of the call, it will be categorized due to severity (severity definitions noted below):

**Target Response Times:**

Critical:

2 Hours during Business Hours

Use of Products and Services is stopped or is so severely impacted that the Users cannot reasonably use it. OpenClose will work continuously to resolve the issue and will provide frequent updates to Customer.

Low Severity Minimal:

1 Business Day

Customer requests information about or an enhancement to the Products and Services. Use of the Products and Services continues without work being impeded.

| FIRST FEDERAL BANK | BEANSTALK NETWORKS LLC, DBA OPENCLOSE |
|---|---|
| Signature *Sherry Romano* | Signature *James P. Kelly* |
| Name  Sherry Romano | Name   James P. Kelly |
| Title  SVP Mortgage Lending | Title   President |
| Date  12/23/21 | Date   Dec-27-2021 |



Exhibit C

NOT A CERTIFIED COPY

| First Federal Bank | Issue | Gap / Action | Solution | *hours |
|---|---|---|---|---|
| | MCT integration/reporting is not seamless like we were told. | * Setup Data Feed with MCT (15 minute interval)<br>* Setup Bulk Loan Import Template | | 40 |
| | Appraisal ordering. It was not made clear in the beginning that we had to use Global DMS for ordering our appraisals. We were not told that we could enter our own appraisal panel. but it was never made clear that it had to be through Global DMS. | * Have no plans to sign-up with GlobalDMS or Mercury Network at this time<br>* Appraisal ordering, tracking flow is currently manual via spreadsheets and maintain own appraisal list and rotation<br>* Need to be able to enter appraiser details in the system without being visible to LOS.. Supported<br>* Once new vendor Hub integration is complete, First Fed appraisers could integrate directly with our Hub (CTR 4) | | |
| | Processor/Underwriter have access to the same fields in the loan file at the same time, we feel this affects the integrity of the initial underwriting data. | * 1009 versions.. System versions w/ date/time/user stamp of any change<br>* Versions can be compared and system will allow changes old/new value, data added and data detected.<br>* UW can revert back to prior version<br>* Move Processors to Origination side Processor users | | |
| | The report writing is cumbersome and cannot easily be distributed to many people | * Move Processors to Origination side Processor users<br>* Need training on OC Optics<br>* Field search function in Development | | |
| | We cannot lock down fields so that they cannot be changed. | * Screen lock down supported<br>* LO lock downs are workflow and lock driven<br>* Most customers love our UI / LOS reporting utility<br>* Move Processors to Origination side Processor users | | |
| | Cannot look out or hide screens and/or fields so that certain people/groups cannot see them | * Softens are permission based<br>* Move Processors to Origination side Processor users<br>* Appraiser fields are not exposed to Origination users<br>First Fed to provide sample screen shots of screens | | |
| | Cannot have custom screens / limited/custom docs | * First Fed to provide sample of custom forms? | | |
| | Anyone is able to add docs to the file after the loan is closed and not way to control that. | Gap<br>EX. LO gets Hazard Insurance after closing could loan to loan and no one knows. Rare instance.. couple times per month<br>Desired Behavior:<br>* Restrict upload rights after loan is closed to lender employee manager only | Action Menu: Close Loan<br>System default to restrict doc upload to employee managers only<br>Small - Medium (*40 hours) | 40 |
| | Unable to keep LO/Processor from creating new contracts, will require constant monitoring to maintain integrity of the contracts | GAP<br>* Add feature to restrict ability to manage/add contacts to system Admins and Lender Employee Managers | Medium - Large (*60 hours) | 60 |
| | We were told UDM monitoring would be an automatic thing when in fact it is a manual process for the processors or LO's | * DataVerify Drive Interface includes UDM support<br>* Updated Fraud Guard interface in development includes UDM support<br>Supported | | |
| | Cannot block junk from other groups that may not need to see it | Supported | | |
| | Cannot start new file if there is already an application in the system for that same borrower | | | |
| | Nothing like a Sandbox mode where LO can work on file without making live changes to the file | Supported | | |
| | Too much of the ordering of documents and/or services are not integrated services are not way to control that. (fraud report) | GAPS:<br>* FHA Connection: in development. Early QTR 4<br>* 4506t Tax transcripts: New Vendor HUB<br>* What other vendor services are not natively supported? | Add 4506t vendor<br>4506t DataVerify. Small<br>4506t Other: Medium-Large | 25<br>60 |
| | MI will not give multiple quotes for comparison for best execution., you have to pull each quote individually | Gap:<br>* Roadmap Item<br>* Accelerate completion | Medium - Large (*80 hours) | 80 |
| | No way to stop or hold files from moving forward if selected for a pre-funding QA Audit. | Gap<br>* Need workflow contract<br>* Random selection @CTC for pre-close Audit<br>* Restrict closing docs from being generated if loan is marked Pre-fund QA Audit<br>After discussion 4/4 it was determined that this would be an item to monitor for need | Bulk loan update to set status<br>Medium - Large (*80 hours) | 60 |
| | Not enough "assigned staff" options | Desired Behavior: Suppress all #'s except LNID | | |
| | Multiple loan numbers per file, is confusing and doesn't make sense to us | * Can we use LNID for LEI<br>* Supported with multiple browser sessions | | |
| | Cannot have more than one file open at a time | Supported with multiple browser sessions | | |
| | Users cannot sign docs within the system. | Gap<br>* Create feature that allows for a signature to be stored in user settings and applied to a document in eDoc Manager | Medium (*40-50 hours) | 45 |
| | Cannot make copy files with borrower data only | OC to provide detail of what data is copied when loan is copied | | |
| | Disclosure Desk – once a file is put in the disclosure desk queue status is processing, but it is not submitted to the processor. This is confusing. | Gap<br>* Lending Authority build many cure<br>* Desired Behavior: When loan sent to Disclosure Desk status should be Disclosure Desk<br>* Could use Request Documents feature to move loan back, this would keep the loan in Origination status and can move the loan into a disclosure status | Small - Medium (*40 hours) | 40 |

# meridianlink®

PO Box 846822
Los Angeles, CA 90084-6822
(714) 662-9526
Email ████████████████

# Invoice
#### #2726157
8/29/2024
**Customer ID** 3913471

| Bill To | ACH Details: | TOTAL | |
|---|---|---|---|
| Accounts Payable<br>First Federal Bank<br>1300 McFarland Blvd. NE<br>Tuscaloosa AL 35406<br>United States | Wells Fargo Bank<br>Account #: ████<br>Routing #: ████ | | $597,100.00 |

| Terms | Due Date | PO # |
|---|---|---|
| Net 30 | 9/28/2024 | |

| Item | Description | Qty | Amount |
|---|---|---|---|
| 11009 LenderAssist Commitment | LenderAssist Minimum Monthly License Fee<br>(Months (1-60) (Apr'22-Jul'24)<br>($21,325*28 Months) | 28 | $597,100.00 |

| | | |
|---|---|---|
| Subtotal | | $597,100.00 |
| Tax Total (%) | | $0.00 |
| Payments & Credits Applied | | $0.00 |
| Total Balance Remaining | | $597,100.00 |

NOT A CERTIFIED COPY

**EXHIBIT**
**D**

If you have any questions regarding your invoice, please conta██████████████████

1 of 1

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

FIRST FEDERAL BANK,
a federal savings bank,

      Plaintiff,

v.                                 Case No.: _____

MERIDIANLINK, INC.
a Delaware corporation,

      Defendant.

_____/

### NOTICE OF APPEARANCE AND NOTICE OF ELECTRONIC MAIL
### ADDRESSES DESIGNATION

    COME NOW, DARRYL STEVE TRAYLOR, JR., T. A. BOROWSKI, JR., and the law

firm of Borowski & Traylor, P.A., and enter their appearance as counsel for Plaintiff,

FIRST FEDERAL BANK, in the captioned proceeding.  The undersigned requests that

they be served with copies of all pleadings, notices, motions, and other documents filed

in this case.

    Darryl Steve Traylor, Jr. and T. A. Borowski, Jr. of the law firm of Borowski &

Traylor, P. A., pursuant to Fla. R. Jud. Admin. 2.516(b)(1)(A), hereby designate the

following primary and secondary email addresses for email service in the above-

referenced case.

1

<u>Primary e-mail addresses</u>:

T. A. Borowski, Jr.: ted@borowski-traylor.com

Darryl Steve Traylor, Jr.: steve@borowski-traylor.com

<u>Secondary e-mail address</u>:

Mary Ann Boatright: maryann@borowski-traylor.com

Lexxi Kite: lexxi@borowski-traylor.com

DARRYL STEVE TRAYLOR, JR.
Florida Bar No. 0075981
steve@borowski-traylor.com
T. A. BOROWSKI, JR.
Florida Bar No. 843393
ted@borowski-traylor.com
Borowski & Traylor, P.A.
4300 Bayou Blvd., Suite 14
Pensacola, FL  32503
(850) 429-2027; (850) 429-7465 fax
Attorneys for Plaintiff First Federal Bank

NOT A CERTIFIED COPY

2



# D| |TRAYLOR, P.A.

4300 BAYOU BOULEVARD, SUITE 14
PENSACOLA, FLORIDA 32503

POST OFFICE BOX 12651
PENSACOLA, FLORIDA 32591-2651

T.A. BOROWSKI, JR.                PH (850) 429-2027 FAX (850) 429-7465                DARRYL STEVE TRAYLOR, JR.
ted@borowski-traylor.com                                                              steve@borowski-traylor.com

March 17, 2025

Joseph Abruzzo
Clerk of the Circuit Court
205 N. Dixie Hwy
West Palm Beach, FL 33401

        RE:    First Federal Bank v. MeridianLink, Inc.
              Case No.:

To Whom It May Concern:

We recently filed Plaintiff First Federal Bank's Complaint contemporaneously herewith. We are needing a Summons to be made out to the Defendant at the address I have listed below.

MeridianLink, Inc.
*Attn. Corporation Service Company*
1201 Hays Street
Tallahassee, FL 32301

Should you have any questions, please advise.

Thank you for your assistance in this matter.

                    Sincerely,

                    */s/ Lexxi Kite*
                    Paralegal

NOT A CERTIFIED COPY

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AN"
CASE NO.: 502025CA002496XXXAMB

FIRST FEDERAL BANK,
  Plaintiff/Petitioner

vs.

MERIDIANLINK INC,
  Defendant/Respondent.

_____/

### UNIFORM DIFFERENTIATED CASE MANAGEMENT ORDER
### AND ORDER SETTING TRIAL
(DCMSNT)

 **THIS MATTER** is a Circuit Civil case calling for a non-jury trial (or streamlined jury by stipulation or court order). Pursuant to Fla. R. Gen. Prac. & Jud. Admin. 2.250(a)(1)(B) and 2.545(b), and Fifteenth Judicial Circuit Administrative Order 3.110 (as amended), **Plaintiff/Petitioner is directed to serve this Order upon each Defendant/Respondent with the initial Complaint/Petition and Summons**.

 It is hereby **ORDERED AND ADJUDGED** that this case is designated to the **STREAMLINED TRACK** for time to disposition. The deadlines and procedures set forth in this Order will be strictly enforced unless changed by court order.

Consistent with the Professionalism Expectations of the Florida Supreme Court and the Florida Bar, the parties and counsel are expected to govern themselves at all times with a spirit of cooperation, professionalism and civility. They are expected to accommodate each other whenever reasonably possible and eliminate disputes by reasonable agreements. Self-Represented/*Pro Se* Litigants (i.e., those without counsel) are held to the same procedural and legal obligations as are imposed upon counsel.

I. **SCHEDULING**

 A. **Calendar Call**

  **YOU MUST APPEAR FOR A MANDATORY CALENDAR CALL on July 2, 2026 at 9:00 am**. The parties must be ready to try the case by that date. The actual trial period begins on the docket associated with this Calendar Call date as provided in Divisional Instructions or by court order.

  Calendar Call may be conducted in person, via Zoom or by e-calendar. All parties are instructed to review the Court's Divisional Instructions for specific procedures at www.15thcircuit.com/divisions.

*** FILED: PALM BEACH COUNTY, FL  JOSEPH ABRUZZO, CLERK. 03/20/2025 07:04:03 AM ***

At the Calendar Call, the Court may conduct a final case management conference. Attorneys who appear for Calendar Call must be prepared on all pending matters and have authority to make representations to the Court and enter into binding agreements concerning motions, issues, and scheduling. These include issues raised by the parties' Pre-Trial Stipulation; trial procedures; jury selection procedures; jury instructions and objections; and the need for any special equipment, courtroom facilities, or interpreters. An appearing attorney must be prepared to advise the Court of all attorneys' availability for trial and future hearings as necessary.

**This Order serves as notice to the parties that failure to attend Calendar Call will result in an Order of Dismissal without prejudice, or entry of default, without further notice or hearing.** *See* **Fla. R. Civ. P. 1.200(j)(6).**

B. **Case Management Deadlines**

The following deadlines strictly apply unless otherwise modified by the Court:

| | EVENTS | COMPLETION DEADLINE |
|---|---|---|
| 1. | Service of Complaint | July 15, 2025; service under extension is only by court order. |
| 2. | Answer and/or initial motions/objections directed to the pleadings (i.e. to dismiss or strike) | 20 days after service |
| 3. | Initial Discovery Disclosures | 60 days after service |
| 4. | Amendment of pleadings/Adding parties | August 24, 2025 |
| 5. | Resolution of all motions/ objections directed to the pleadings and pleadings closed | September 13, 2025 |
| 6. | Disclosure of Expert Witness(es) | March 4, 2026 |
| 7. | Disclosure of Rebuttal Experts | March 24, 2026 |
| 8. | Inspections, Expert Witness Depositions and Compulsory Examinations completed | April 13, 2026 |
| 9. | File Witness & Exhibit Lists | May 3, 2026 |
| 10. | Completion of Discovery relating to Summary Judgment and *Daubert* Motions | April 13, 2026 |
| 11. | File and Serve Motion(s) for Summary Judgment and *Daubert* Motions | April 23, 2026 |
| 12. | File Rebuttal Witness Lists | May 13, 2026 |
| 13. | Completion of All Discovery | May 23, 2026 |
| 14. | Pre-Trial Meet & Confer | June 2, 2026 |
| 15. | File all Pre-Trial Motions (i.e. Motions in Limine) | June 2, 2026 |
| 16. | Deadline for Mediation | June 22, 2026 |
| 17. | Deposition Designations | June 22, 2026 |
| 18. | File Joint Pre-Trial Stipulation | June 22, 2026 |

| 19. | Deadline to hear ALL Motions | June 27, 2026 |
| 20. | Jury Instructions and Verdict Form | June 29, 2026 |
| 21. | Calendar Call/Trial Ready Date | July 2, 2026 |
| 22. | Trial Period | Begins on the docket associated with the above Calendar Call date, as provided in Divisional Instructions or by court order. |

**Note: If the above deadlines fall on a weekend or holiday, please refer to Fla. R. Gen. Prac. & Jud. Admin. 2.514.**

The parties are expected to actively manage the case and to confer early and often to ensure compliance with the Florida Rules of Civil Procedure and this order in timely resolving this case. **The parties are encouraged to file, meet, and make disclosures prior to the deadlines imposed above, in order to ensure compliance with the Rules requiring timely disposition of cases**.

The Court may, at any time, modify this Order by entry of: 1) an Amended Trial Order, 2) an Amended Case Management Order; or 3) any other Order intended to establish a modified case resolution schedule, any of which shall supersede the deadlines set forth in this Order. The Court reserves the authority to expedite the trial setting and amend pretrial deadlines accordingly. The Court further retains its discretion to modify any provision herein.

C. **Motions**

Unless court approval is required to set a particular motion for hearing, the parties must expeditiously set all contested motions for hearing. All non-dispositive motions, including motions directed to the pleadings, must be scheduled for hearing within **five (5) days** of filing. Parties shall schedule the hearing for the first vacancy on the Court's docket when all parties are available. **Failure to schedule a hearing within five (5) days may result in the Court deeming the motion(s) abandoned without further notice or hearing**.

The moving party shall be the party responsible for securing the presence of a court reporter. The moving party shall advise all parties in writing in advance of the hearing or trial of the arrangements made, if any, for the presence of a court reporter, or shall advise all parties in advance of the hearing or trial that the moving party has chosen not to obtain a court reporter.

Before filing a non-dispositive motion, the movant must follow Rule 1.202 and Local Rule 4. Failure to comply with the requirements of Rule 1.202 and Local Rule 4 may result in sanctions against the non-compliant party.

The requirements of Rule 1.202 do not apply when the movant or the nonmovant is unrepresented by counsel (*pro se*).

D. **Extensions, Modifications and Continuances**

**Extensions of Deadlines Other than Trial/Calendar Call: All motions to extend deadlines must be filed prior to the deadline.** Untimely motions will be denied absent compelling circumstances and a showing of good cause.

The parties must strictly follow Rule 1.200(e) and Administrative Order 3.110 (as amended) when filing motions for extension or modification. If the parties agree, and the extension will not prevent the case from being trial ready by the original Calendar Call date, the parties may file a motion and submit for the Court's consideration an agreed order or proposed Amended DCMO, as applicable under Rule 1.200(e)(1). The motion shall identify which deadlines are requested to be extended and the basis for the request. Each agreed order or Amended DCMO must contain agreed-upon dates for all remaining deadlines and confirm that the Calendar Call date remains as previously set. The Court will accept the amendment or direct the parties to set a DCM Conference. **Agreements to extend the dates for the filing of Summary Judgment and *Daubert* motions, and for completion of discovery, must be set for hearing, and the parties must be prepared to address how the proposed extension will not affect the Calendar Call date.**

**Motions to Continue Trial:** Motions to continue trial must strictly comply with Rule 1.460. **Motions to continue are disfavored and will rarely be granted and then only upon good cause shown. Successive continuances are highly disfavored. Lack of due diligence in preparing for trial is not grounds to continue the case**. Failure to timely complete discovery and/or file a motion for summary judgment shall not be grounds to continue the trial.

E. **DCM Conferences**

If any party is unable to meet the deadlines set forth in this Order for any reason, including unavailability of hearing time, the affected party must promptly set a DCM conference as described in Administrative Order 3.110 (as amended), identifying the hearing time requested and the pending motion(s). DCM conferences shall be scheduled through online scheduling (OLS) on either the Court's: 1) DCM - Case Management Conference docket; or 2) Uniform Motion Calendar, in accordance with Divisional Instructions.

II. **UNIFORM PRE-TRIAL PROCEDURE**

A. TIMELY SERVICE AND DEFAULTS

Parties must make reasonable efforts to ensure speedy service. Each return of service must be separately filed for each defendant. If service is not completed within ninety (90) days, an Order will be issued directing service by the **ONE-HUNDRED TWENTY (120) DAY DEADLINE**. Failure to comply will result in dismissal of the case or party for lack of service. Any motions to extend the deadline for service must specify why service could not have been effectuated, what has and is being done to effectuate service and request only that amount of additional time necessary.

Case No. 50-2025-CA-002496-XXXA-MB

If all defendants become defaulted, a Motion for Default Final Judgment along with supporting documentation must be filed within **thirty (30) days** of the last default and set for hearing at the next available hearing time.

B.   <u>INITIAL DISCLOSURES</u>

Within **sixty (60) days after service** on a defendant, and except as exempted by Rule 1.280(a)(2) or as ordered by the court, each party must, without awaiting a discovery request, provide to the other parties initial discovery disclosures in compliance with Rule 1.280(a), unless privileged or protected from disclosure.

C.   <u>EXHIBITS AND WITNESSES</u>

No later than **sixty (60) days before Calendar Call**, each party shall file and exchange lists of all trial exhibits, names, and addresses of all trial witnesses. Each party's witness list must include a brief description of the substance and scope of the testimony to be elicited from each witness. Both sides must cooperate in the scheduling of all witness depositions.

Each party's exhibit list shall include each exhibit separately numbered and identified. Generic or prospective designations are not allowed (e.g. insurer's file, documents to be produced, etc.). Each party shall provide for a reasonable time and place for the other parties to review and copy the exhibits.

D.   <u>EXPERT WITNESS DISCLOSURES</u>

In addition to the names and addresses of each expert retained to formulate an expert opinion, as well as any hybrid fact/expert witnesses, no later than **one-hundred and twenty (120) days before Calendar Call**, the parties must provide:

1.   The subject matter about which the expert will testify;
2.   The opinions to which the expert will testify;
3.   A summary of the grounds and facts for each opinion; and
4.   A copy of the expert's curriculum vitae.

**Each expert will be limited to testifying only about those matters which have been fully disclosed.**

Parties shall furnish opposing counsel with two (2) alternative dates of availability of all expert witnesses for the purpose of taking their deposition. All parties shall cooperate in the scheduling of expert depositions.

The parties shall also provide answers to standard form expert interrogatories. All reports or other data compiled by each disclosed expert which are intended to be used by the expert and/or referred to during his/her deposition testimony shall be provided

Case No. 50-2025-CA-002496-XXXA-MB

electronically to all opposing parties at least 72 hours prior to the date of the scheduled deposition.

**Rebuttal/Responsive Experts**

No later than **one-hundred (100) days before Calendar Call**, the parties shall provide opposing counsel with a written list with the names and addresses of all rebuttal/responsive expert witnesses intended to be called at trial and only those rebuttal/responsive expert witnesses listed shall be permitted to testify. The parties shall also furnish opposing counsel with expert reports or summaries of all rebuttal/responsive expert witnesses' anticipated testimony to the same extent as the expert disclosure requirement above.

Within **twenty (20) days** following this disclosure, the parties shall make their rebuttal/responsive experts available for deposition. The experts' depositions may be conducted without further court order.

E. REBUTTAL FACT WITNESSES AND EXHIBITS

No later than **fifty (50) days before Calendar Call**, the parties must file and exchange lists of names and addresses of all rebuttal fact witnesses and lists of any rebuttal exhibits.

F. ADDITIONAL EXHIBITS, WITNESSES OR OBJECTIONS

At trial, the parties will be strictly limited to exhibits and witnesses previously disclosed absent agreement of the parties or order of the Court upon good cause shown. A party desiring to use an exhibit or witness discovered after counsel have conferred must immediately furnish the Court and other counsel with a description of the exhibit or with the witness' name and address and the expected subject matter of the witness' testimony, together with the reason for the late discovery of the exhibit or witness. Failure to reserve objections constitutes a waiver. Use of the exhibit or witness may be allowed by the Court for good cause shown.

G. DEPOSITION DESIGNATIONS

No later than **ten (10) days prior to Calendar Call**, each party must serve deposition designations, or portions of depositions, each intends to offer as testimony. No later than **eight (8) days prior to Calendar Call**, each opposing party is to serve any counter (or "fairness") designations, together with objections to the depositions, or portions thereof, originally designated. No later than **five (5) days before Calendar Call**, each party must serve any objections to counter-designations served by an opposing party.

H. DISCOVERY COMPLETION

Case No. 50-2025-CA-002496-XXXA-MB

All discovery relating to Summary Judgment and *Daubert* motions must be completed no later than **eighty (80) days prior to Calendar Call**.

All discovery must be completed no later than **forty (40) days prior to Calendar Call**.

Rulings as to admission on late discovery will be made on a case by case basis. Absent unforeseeable, exigent circumstances, the failure to complete discovery is not grounds for a continuance.

I.  COUNSEL MEETING AND PRE-TRIAL STIPULATION

Counsel or the parties, if not represented by counsel, shall meet in person at a mutually convenient time and place no later than **thirty (30) days before Calendar Call** to discuss settlement, simplify the issues, and stipulate to as many facts and issues as possible, and prepare a Pre-Trial Stipulation in accordance with this paragraph.

It shall be the duty of Plaintiff's counsel to see that the Pre-Trial Stipulation is drawn, executed by counsel for all parties, and filed with the Clerk no later than **ten (10) days prior to Calendar Call. UNILATERAL PRE-TRIAL STIPULATIONS ARE DISALLOWED, UNLESS APPROVED BY THE COURT AFTER NOTICE AND HEARING**. If a party does not receive a substantive response to a proposed Pre-Trial Stipulation after good faith effort, such party shall file a unilateral Pre-Trial Stipulation with a certification of all efforts that were made to confer with the opposing party. Counsel for all parties are charged with good faith cooperation in preparing the Pre-Trial Stipulation, and the parties shall make exhibits available for inspection and copying. Failure to cooperate in preparing the Pre-Trial Stipulation may result in striking pleadings, witnesses, or exhibits.

The Pre-Trial Stipulation must contain the following in separately numbered paragraphs:

1. Names and contact information of attorneys to try case.

2. A list of all pending motions requiring action by the Court. **Motions not listed are deemed abandoned or waived**.

3. A statement of estimated trial time, including the total number of trial days anticipated, and the time needed per side for (1) jury selection, (2) opening arguments, (3) each case in chief, and (4) closing arguments.

4. **Statement of the Facts:** A concise statement of the facts in an impartial, easily understandable manner which may be read to the jury.

5. **Statement Facts and Agreed Rules of Law:** A list of any stipulated facts requiring no proof at trial and any agreed rules of law.

6. **Statements of Disputed Law & Fact:** A statement of disputed issues of law and fact that are to be tried.

7. **Witness Lists:** Parties must attach their previously filed Witness Lists,

including rebuttal or impeachment witnesses. If any party objects to any witness, such objections must be stated in the Stipulation, setting forth the grounds with specificity. At trial, all parties will be strictly limited to witnesses properly and timely disclosed. Only those witnesses listed by NAME will be permitted to testify at trial.

8.  **Exhibit Lists:** Parties must attach their previously filed Exhibit Lists. All exhibits to be offered in evidence at trial must have been made available to opposing counsel for examination. Only those exhibits listed may be offered in evidence. If any party objects to the introduction of any such exhibit, such objection must be stated in the Pre-Trial Stipulation, setting forth the grounds with specificity. Demonstrative exhibits (e.g. PowerPoints, charts, enlargements of exhibits) to be used at a Jury Trial must be displayed to all counsel before being shown to the jury. All exhibits must be pre-marked and numbered consistent with Clerk guidelines.

9.  **Jury Instructions:** Counsel must identify all agreed-upon standard jury instructions and all special instructions. Any objections or disputed jury instructions must be attached and identified as to the party that proposed the instruction [indicated in redline/track changes]. Copies of all agreed-upon instructions or disputed instructions must be attached to the Stipulation as one document, redlined as necessary, along with copies of supporting statutory citations and/or case law.

10. **Verdict Forms:** The jury verdict form must be attached and designated as agreed to or disputed.

11. **Peremptory Challenges:** State the number of peremptory challenges for each party.

12. Other agreements or issues for trial, if any.

Failure to file a Joint Pre-Trial Stipulation as provided above may result in Court-imposed sanctions, including dismissal or default without further notice of the Court.

J.  MOTIONS

**Summary Judgment and *Daubert* Motions** must be filed at least **seventy (70) days before Calendar Call**. The parties shall confer regarding summary judgment motions to ensure discovery necessary for those motions is completed in advance of their filing.

**ALL MOTIONS** (including dispositive motions and motions in limine), deposition objections, and expert challenges must be filed, served and heard at least **five (5) days before Calendar Call**.

K.  PRE-MARKING EXHIBITS

Prior to trial, each party is to mark for identification all exhibits in accordance with the guidelines of the Clerk of Court. Instructions and templates may be found at: www.mypalmbeachclerk.com/departments/courts/evidence-guidelines/civil-evidence).

L.  ENLARGED JURY PANELS

Local Rules require advance approval of the Chief Judge and Jury Office for jury panels exceeding 31 jurors. **To ensure enough jurors are available, requests for enlarged jury panels must be resolved at least six (6) months before Calendar Call**. Failure to timely request an enlarged panel may result in Court-ordered sanctions, including a limitation on peremptory challenges.

M.  <u>INTERPRETERS</u>

Unless otherwise ordered by the Court, it shall be the responsibility of the party who needs the services of an interpreter, whether for a litigant or for a witness, to have a competent interpreter present in court.

N.  JURY INSTRUCTIONS AND VERDICT FORM

A joint set of proposed jury instructions and a proposed verdict form must be provided to the court no less than **three (3) days before Calendar Call** in a printed form appropriate for submission to the jury and in Microsoft Word format.

If there is an objection to a proposed instruction, the instruction should be followed by the specific objection, a brief explanation, and a citation to legal authority. If an alternative or modified instruction is proposed, it should follow the instruction it is intended to replace.

O.  UNIQUE QUESTIONS OF LAW

Prior to calendar call, counsel for the parties are directed to exchange and simultaneously submit to the Court appropriate memoranda with citations to legal authority in support of any unique legal questions that may reasonably be anticipated to arise during the trial.

III.  **MEDIATION**

A.  MEDIATION REQUIRED

1.  All parties are required to participate in mediation.

2.  The attendance of counsel who will try the case and representatives of each party with full authority to enter into a complete compromise and settlement is mandatory. If insurance is involved, an adjuster with authority up to the policy limits must attend.

3.  At least one week prior to a scheduled mediation conference, all parties are to file with the mediator a brief, written summary of the case containing a list of issues as to each party.

4.  All communications at the mediation conference are privileged consistent with Florida Statutes sections 44.102 and 90.408.

5.  The mediator has no power to compel or enforce a settlement agreement. If a

Case No. 50-2025-CA-002496-XXXA-MB

settlement is reached, it is a responsibility of the attorneys or parties to reduce the agreement to writing and to comply with Florida Rule of Civil Procedure 1.730(b), unless waived.

B. MEDIATION SCHEDULING

**The Plaintiff's attorney is responsible for scheduling mediation**. The parties should agree on a mediator. If they are unable to agree, any party may apply to the Court for appointment of a mediator in conformity with Rule 1.720 (j), Fla. R. Civ. P. The lead attorney or party must file and serve on all parties and the mediator a Notice of Mediation giving the time, place, and date of the mediation and the mediator's name.

C. COMPLETION OF MEDIATION BEFORE CALENDAR CALL

Completion of mediation prior to calendar call is a prerequisite to trial and must be completed no later than **ten (10) days prior to Calendar Call**. If mediation is not conducted, or if a party fails to participate in mediation, the Court may impose sanctions, including monetary sanctions, striking pleadings and witnesses, and dismissal or default without further notice of the Court.

D. OPPOSITION TO MEDIATION

Any party opposing mediation may proceed under Florida Rule of Civil Procedure 1.700(b).

IV. **NON-COMPLIANCE**

**NON-COMPLIANCE WITH ANY PORTION OF THIS ORDER MAY RESULT IN THE STRIKING OF THE PLEADINGS, WITNESSES, OR EXHIBITS, ENTRY OF DEFAULT OR DISMISSAL WITHOUT FURTHER NOTICE OF THE COURT, OR IMPOSITION OF SUCH OTHER SANCTIONS AS IS JUST AND PROPER.**

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida.

50-2025-CA-002496-XXXA-MB    03/20/2025
Scott Kerner    Circuit Judge

50-2025-CA-002496-XXXA-MB    03/20/2025
Scott Kerner
Circuit Judge

A copy of this Order has been furnished to the Plaintiff. The Plaintiff shall serve this Order to the Defendant(s) in compliance with Administrative Order 3.110 (amended).

# ADA NOTICE

Case No. 50-2025-CA-002496-XXXA-MB

This notice is provided pursuant to Administrative Order No. 2.207-7/22

"**If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**"

"**Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**"

"**Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.**"

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

FIRST FEDERAL BANK,
a federal savings bank,

     Plaintiff,

v.                      Case No.: 05-2025-CA-002496-XXXA-MB

MERIDIANLINK, INC.,
a Delaware corporation,

     Defendant.

_____/

## FIRST AMENDED COMPLAINT

     COMES NOW, Plaintiff, FIRST FEDERAL BANK, a federal savings bank, by and through its undersigned counsel, and sues Defendant, MERIDIANLINK, INC., a Delaware corporation, and alleges:

## GENERAL ALLEGATIONS

     1.    Plaintiff First Federal Bank ("**Plaintiff**") is a federal savings bank that conducts business in the State of Florida.

     2.    Defendant MeridianLink, Inc. ("**Defendant**") is a Delaware corporation that is authorized to conduct business in the State of Florida.

     3.    Defendant's address is 3560 Hyland Ave., Suite #200, Costa Mesa, CA 92626

     4.    Beanstalk Networks L.L.C. is a dissolved Florida limited liability company that shared the same address as Defendant.

1

5.     Beanstalk Networks L.L.C. conducted business under the fictitious name OpenClose, which was a name that was registered with the State of Florida, and which was owned by Beanstalk Networks L.L.C.

6.     OpenClose conducted business at 314 Clematis Street, Suite 200, West Palm Beach, Florida 33401.

7.     Defendant holds itself out as having acquired Beanstalk Networks, L.L.C. doing business as OpenClose effective as of November 4, 2022, and as having been assigned the agreements that were held by Beanstalk Networks. L.L.C. doing business as OpenClose, including both rights and obligations under those agreements.  However, Plaintiff did not receive any formal notice of that acquisition and assignment until January 28, 2025.  A redacted copy of the letter dated January 28, 2025, from Defendant to Plaintiff stating that it had been assigned "all rights and obligations" held by "Beanstalk Networks LLC, dba OpenClose" (herein "**OpenClose**") is attached hereto and incorporated herein by reference as <u>Exhibit A</u>.

<u>**COUNT ONE: DECLARATORY RELIEF**</u>

8.     This is an action that is within the jurisdiction of the Court pursuant to Chapter 86, Florida Statutes, or pursuant to other law, that seeks a declaration regarding Plaintiff's obligations, if any, with respect to and in connection with and "Order Form" dated December 23, 2021, and with respect to and in connection with the invoices discussed herein.

2

9.      Plaintiff incorporates the allegations made in paragraphs 1 through 7 by reference as if those allegations were fully set forth in this count.

10.      Venue is proper in Palm Beach County, Florida, pursuant to terms of an "Order Form" dated December 23, 2021, between Plaintiff and OpenClose.

11.      A redacted copy of the aforesaid Order Form is attached hereto and incorporated herein by reference as <u>Exhibit B</u>.

12.      The purpose of the Order Form was intended to be a subscription or software licensing arrangement whereby OpenClose would provide mortgage loan processing and origination software to Plaintiff, which are the "Products and Services" described in and contemplated by the Order Form ("**Products and Services**").

13.      The Order Form contains list of service level standards that OpenClose agreed to maintain and to which it agreed to adhere, and those standards are material terms of the Order Form.  (Ex. B, p. 10-11.)

14.      A representation and warranty by Defendant and by OpenClose that is contained in the Order Form provides that the Products and Services will be provided in a manner that is consistent with general industry standards and that the Products and Services will perform substantially as OpenClose had demonstrated to Plaintiff.

15.      In connection with the execution of the Order Form, Plaintiff remitted an "Implementation Fee Payment" to OpenClose in the amount of $51,500.00 ("**Implementation Fee**").

3

16.     Soon after the execution of the Order Form, problems arose with the OpenClose's ability to deliver the Products and Services that were promised to Plaintiff pursuant to or in connection with the Order Form.

17.     During the first six months of 2022, multiple meetings and conferences were held between employees of Plaintiff and employees of OpenClose regarding the problems that arose with respect to OpenClose not being able to deliver the Products and Services that Plaintiff had been promised in connection with or pursuant to the Order Form.

18.     For example, some of the problems and issues that OpenClose was unable or unwilling to resolve by June 2022, which resulted in Plaintiff not being able to use OpenClose's software to process or originate mortgage loans, are shown on the spreadsheet that is attached hereto and incorporated herein by reference as <u>Exhibit C</u>, which also identifies OpenClose's material misrepresentations and material omissions that it made in connection with the Order Form.

19.     Due to unresolved problems and issues with the OpenClose software or program that OpenClose was unable or unwilling to resolve, Plaintiff never "on boarded" OpenClose's program or software, and OpenClose's program or software was not used by Plaintiff, through no fault of its own, to process or originate mortgage loans.

20.     By August 2022, OpenClose knew that Plaintiff was not able to use OpenClose's software for mortgage loan origination or processing due to problems and issues with OpenClose's software that OpenClose was unable or unwilling to resolve in

4

order for OpenClose to deliver the Products and Services that are described in and contemplated by the Order Form.

21.     OpenClose being unable or unwilling to resolve all of the known problems and issues that prohibited Plaintiff from using OpenClose's program or software for its intended purpose of Plaintiff processing and originating mortgage loans was OpenClose's material breach of the Order Form that entitled Plaintiff to cancel or terminate any obligation that it may have had under the terms of or in connection with the Order Form, or that released or excused Plaintiff from any obligation that it may have had under the terms of or in connection with the Order Form.

22.     OpenClose not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

23.     Defendant not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

24.     OpenClose not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

5

25.     Defendant not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

26.     Defendant and OpenClose not providing the Products and Services in the manner that was demonstrated to Plaintiff by OpenClose was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

27.     OpenClose being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form that released or excused or terminated any further obligation by Plaintiff.

28.     Defendant being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form that released or excused or terminated any further obligation by Plaintiff.

29.     The Order Form provides for a "Minimum Monthly License Fee" in the amount of $21,325.00 per month for "Months 1 – 60."  (Ex. B. p. 1.)

30.     The Order Form provides that there are additional monthly fees, over and above the "Minimum Monthly License Fees," for loans that Plaintiff funded using OpenClose's of Defendant's software or subscription or the Products and Services that exceeded two hundred funded loans per month.

6

31.     Both Defendant and OpenClose knew that Plaintiff was not actually using, and never used, the software or subscription or the Products and Services described in or contemplated by the Order Form. .

32.     A term of the Order Form provides that OpenClose or Defendant "will automatically issue an invoice" to Plaintiff "each month for payment as set forth on the Order Form."  (Ex. B, p. 4.)

33.     In acknowledgment that Plaintiff had no further obligation to OpenClose or to Defendant pursuant to the Order Form, neither Defendant nor OpenClose sent Plaintiff any monthly invoice for the "Minimum Monthly License Fee" or for any other amount for any services that were rendered to Plaintiff pursuant to the Order Form during 2022 or during 2023 or during the first seven months of 2024.

34.     Knowing that, through no fault of its own, Plaintiff was unable to use the Products and Services stated in and contemplated by the Order Form, and knowing that OpenClose was not providing Plaintiff with those Products and Services, neither OpenClose nor Defendant communicated with Plaintiff regarding the Order Form between late October 2022 and August 2024.

35.     Notwithstanding the fact that Plaintiff was unable to use OpenClose's software or licensing that was described in or contemplated by the Order Form due to problems and issues that OpenClose did not resolve or correct through no fault of Plaintiff, and notwithstanding the fact the Plaintiff did not otherwise use any of the services that are described in or contemplated by the Order Form, on August 2024,

7

Defendant sent Plaintiff an invoice dated August 29, 2024, in the amount of $597,100.00 that purports to be for the "Minium Monthly License Fee" that is stated in the Order Form in the amount of $21,325 per month for the period of April 2022 through July 2024.

36.     In other words, prior to August 29, 2024, neither Defendant nor OpenClose sent Plaintiff any monthly invoice for any services that were rendered to Plaintiff or that sought payment from Plaintiff pursuant to the Order Form of the months of April 2022, May 2022, June 2022, July 2022, August 2022, September 2022, October 2022, November 2022, December 2022, January 2023, February 2023, March 2023, April 2023, May 2023, June 2023, July 2023, August 2023, September 2023, October 2023, November 2023, December 2023, January 2024, February 2024, March 2024, April 2024, May 2024, or June 2024.

37.     Notwithstanding the fact that Plaintiff was unable to use OpenClose's software or licensing that was described in or contemplated by the Order Form due to problems and issues that OpenClose did not resolve or correct through no fault of Plaintiff, and notwithstanding the fact the Plaintiff did not otherwise use any of the services that are described in or contemplated by the Order Form, on March 21, 2025, Defendant sent Plaintiff the attached "Statement" dated March 20, 2025, which states that an invoice dated March 19, 2025, in the amount of $682,400.00 was sent to Plaintiff. However, Plaintiff has not yet received that invoice.

38.     Using the "Minimum Monthly Licensing Fee" that is stated in the Order Form in the amount of $21,325 per month, the invoice dated March 19, 2025, in the

8

amount of $682,400.00 that is referenced in the "Statement" presumably seeks the minimum monthly fee for the monthly periods from August 2024 through March 2027.

39.    Redacted copies of the invoice dated August 29, 2024, in the amount of $597,100.00 and the "Statement" referencing the invoice dated March 19, 2025, in the amount of $682,400.00 are attached hereto and incorporated herein by reference as composite Exhibit D ( collectively herein the "**Invoices**").

40.    On March 21, 2025, Defendant sent Plaintiff a "Notice of Termination of Agreement with MeridianLink, Inc." that demanded or requested that Plaintiff immediately pay Defendant the sum of "$1,279,500.00 in full satisfaction" of obligations that Defendant contends it is owed by Plaintiff.  A redacted copy of this notice is attached hereto and incorporated herein by reference as Exhibit E.

41.    Presumably, Defendant arrives at the sum in the amount of $1,279,500.00 that it has sought from Plaintiff by multiplying the "Minimum Monthly License Fee" in the amount of $21,325.00 that is stated in the Order Form by the entire sixty (60) month period from April 2022 through March 2027, notwithstanding the fact that neither Defendant nor OpenClose actually provided Plaintiff any of the Products and Services that are described in or contemplated by the Order Form, and notwithstanding the fact that Plaintiff did not use the Products and Services to process or originate any mortgage loans.

42.    For Defendant to be owed or to otherwise be entitled to receive the sum of $1,279,500.00 from Plaintiff when, under the circumstances alleged herein, Plaintiff has

9

not used any of the Products and Services that are described in or contemplated by the Order Form would be unconscionable.

43.     Because Plaintiff, through no fault of its own, was not able to use OpenClose's software or subscription as contemplated by the Order Form because OpenClose was unable or unwilling to resolve the problems and issues with its software, Plaintiff is entitled to a refund of the Implementation Fee that is stated in the Order Form in the amount of $51,500.00.

44.     There is a bona fide, actual, present, and practical need for the Court to declare Plaintiff's obligations, if any, with respect to the Order Form.

45.     There is a bona fide, actual, present, and practical need for the Court to declare Plaintiff's obligations, if any, with respect to whether Plaintiff owes Defendant the sums that Defendant claims to be owed pursuant to the Invoices and with respect to other sums, if any, that Plaintiff may owe to Defendant that arise from or pertain to the Order Form.

46.     There is a bona fide, actual, present, and practical need for the Court to declare that Plaintiff is entitled to a refund of the Implementation Fee.

47.     The declarations that are sought by Plaintiff deal with a present, ascertained, or ascertainable state or set of facts.

48.     Plaintiff's obligations, if any, with respect to the Order Form, with respect to the Invoices, and with respect to the Implementation Fee are dependent upon the set of facts that are set forth herein or the law that is applicable to these facts.

10

49.     The parties have, or reasonably may have, actual, present, adverse, and antagonistic interests, either in fact or law, with respect to Plaintiff's obligations, if any, to Defendant that arise from or pertain to the Order Form, the Invoices, and the Implementation Fee.

50.     All parties with antagonistic and adverse interests with respect to the Order Form, the Invoice, and the Implementation Fee are before the Court.

51.     The relief and declarations that are sought herein are not sought for the purpose of obtaining legal advice or to answer questions propounded from curiosity.

52.     Plaintiff has performed any conditions precedent that were required to be performed by Plaintiff, or those conditions have been waived by Defendant.

53.     Plaintiff has employed the law firm of Borowski & Traylor, P.A. to represent its interests herein, and Plaintiff is obligated to pay its attorneys a reasonable fee for their services.

WHEREFORE, Plaintiff First Federal Bank prays that this Honorable Court will enter its judgment declaring that:

(i)     Plaintiff has no obligation to Defendant MeridianLink, Inc. that arises from or that pertains to the Order Form;

(ii)    Any obligation that Plaintiff may have previously had under the Order Form was terminated by OpenClose being unable or unwilling to provide Plaintiff with the Products and Services that are described in and contemplated by the Order Form;

11

(iii)   Plaintiff has no obligation to Defendant because it is unconscionable to enforce the terms of the Order Form under the circumstances here;

(iv)   Plaintiff does not owe Defendant MeridianLink, Inc. the sums that are stated in and sought by the Invoices;

(v)   Plaintiff does not owe Defendant MeridianLink, Inc. any other sums that arise from or pertain to the Order Form;

(vi)   Plaintiff is entitled to a refund of the Implementation Fee, and that Defendant MeridianLink, Inc. owes Plaintiff the Implementation Fee;

(vii)   Plaintiff is entitled to recover its attorney's fees that were incurred in connection with this action; and

(viii)   Plaintiff is entitled to such other and further relief as is just and proper.

## COUNT TWO: BREACH OF CONTRACT

54.   This is an action for breach of contract that is within the jurisdiction of the Court that seeks damages in excess of $50,000, exclusive of attorney's fees and costs.

55.   Plaintiff incorporates the allegations made in paragraphs 1 through 7 by reference as if those allegations were fully set forth in this count.

56.   Venue is proper in Palm Beach County, Florida, pursuant to terms of an "Order Form" dated December 23, 2021, between Plaintiff and OpenClose.

57.   A redacted copy of the aforesaid Order Form is attached hereto and incorporated herein by reference as Exhibit B, which is the contract that is sought to be enforced in this count.

12

58.     The purpose of the Order Form was intended to be a subscription or software licensing arrangement whereby OpenClose would provide mortgage loan processing and origination software to Plaintiff, which are the "Products and Services" described in and contemplated by the Order Form ("**Products and Services**").

59.     In connection with the execution of the Order Form, Plaintiff remitted an "Implementation Fee Payment" to OpenClose in the amount of $51,500.00 ("**Implementation Fee**").

60.     Soon after the execution of the Order Form, problems arose with the OpenClose's ability to deliver the Produces and Services that were promised to Plaintiff pursuant to or in connection with the Order Form.

61.     During the first six months of 2022, multiple meetings and conferences were held between employees of Plaintiff and employees of OpenClose regarding the problems that arose with respect to OpenClose not being able to deliver the Products and Services that Plaintiff had been promised in connection with or pursuant to the Order Form.

62.     For example, some of the problems and issues that that OpenClose was unable or unwilling to resolve by June 2022, which resulted in Plaintiff not being able to use OpenClose's software to process or originate mortgage loans, are shown on the spreadsheet that is attached hereto and incorporated herein by reference as Exhibit C, which also identifies OpenClose's material misrepresentations and material omissions that it made in connection with the Order Form.

13

63.     A material term of the Order Form provides that OpenClose would "provide the Products and Services in a manner consistent with general industry standards and that the Products and Services will perform substantially as demonstrated under normal use and circumstances," which was an obligation that Defendant assumed. (Ex. B, ¶ 12.)

64.     The Order Form contains list of service level standards that OpenClose agreed to maintain and to which it agreed to adhere, and those standards are material terms of the Order Form. (Ex. B, p. 10-11.)

65.     Due to unresolved problems and issues with the OpenClose software or program that OpenClose was unable or unwilling to resolve, Plaintiff never "on boarded" OpenClose's program or software, and OpenClose's program or software was not used by Plaintiff, through no fault of its own, to process or originate mortgage loans.

66.     By August 2022, OpenClose knew that Plaintiff was not able to use OpenClose's software for mortgage loan origination or processing due to problems issues with OpenClose's software that OpenClose was unable or unwilling to resolve in order for OpenClose to deliver the Products and Services that are described in and contemplated by the Order Form.

67.     OpenClose being unable or unwilling to resolve all of the known problems and issues that prohibited Plaintiff from using OpenClose's program or software for its intended purpose of Plaintiff processing and originating mortgage loans was OpenClose's material breach of the Order Form that entitled Plaintiff to cancel or

14

terminate any obligation that it may have had under the terms of or in connection with the Order Form, or that released Plaintiff from any obligation that it may have had under the terms of or in connection with the Order Form.

68.     OpenClose being unable or unwilling to resolve issues with its software so as to deliver the Products and Services described in and contemplated by the Order Form was its material breach of the terms of the Order Form, which is also Defendant's material breach of the Order Form.

69.     In acknowledgment that Plaintiff had no further obligation to OpenClose or to Defendant pursuant to the Order Form, neither Defendant nor OpenClose sent Plaintiff any invoice for the monthly licensing fee for any services that were rendered pursuant to the Order Form during 2022 or during 2023 or during the first seven months of 2024.

70.     Knowing that, through no fault of its own, Plaintiff was unable to use the Products and Services stated in and contemplated by the Order Form, and knowing that OpenClose was not providing Plaintiff with those Products and Services, neither OpenClose nor Defendant communicated with Plaintiff regarding the Order Form between late October 2022 and August 2024.

71.     In connection with its acquisition of OpenClose, Defendant assumed "all rights and obligations" that OpenClose owed to Plaintiff pursuant to the Order Form. As such, Defendant is liable to Plaintiff for the damages that are sought in this count.

72.     OpenClose not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form.

73.     Defendant not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form.

74.     OpenClose not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form.

75.     Defendant not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form.

76.     Defendant and OpenClose not providing the Products and Services in the manner that was demonstrated to Plaintiff by OpenClose was a material breach of the terms of the Order Form.

77.     OpenClose being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form.

78.     Defendant being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form.

79.     Because of those material breaches of the Order Form, Plaintiff, through no fault of its own, was not able to use the software or subscription as described in or as

16

contemplated by the Order Form, and Defendant has assumed all of OpenClose's obligations under the Order Form.

80.     Plaintiff has been damaged as the result of the aforesaid material breaches of the Order Form in such amounts as will be established at trial or at the final hearing in this matter.

81.     As the direct and proximate result of the aforesaid material breaches of the Order Form, Plaintiff is entitled to a refund of the Implementation Fee that is stated in the Order Form in the amount of $51,500.00.

82.     Plaintiff has performed any conditions precedent that were required to be performed by Plaintiff, or those conditions have been waived by Defendant.

83.     Plaintiff has employed the law firm of Borowski & Traylor, P.A. to represent its interests herein, and Plaintiff is obligated to pay its attorneys a reasonable fee for their services.

WHEREFORE, Plaintiff First Federal Bank demands judgment for damages against Defendant MeridianLink, Inc., the amount of said judgment to include Plaintiff's attorney's fees and costs incurred in connection with this action, and said judgment to include prejudgment interest from the time that the Implementation Fee was remitted, and Plaintiff further prays that this Honorable Court will grant such other and further relief as is just and proper.

## COUNT THREE: VIOLATION OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT

84.     This is an action that is within the jurisdiction of the Court pursuant to Chapter 501, Part II, Florida Statutes, which is known as the "Florida Deceptive and Unfair Trade Practices Act," or pursuant to other law, that seeks damages in an amount in excess of $50,000, exclusive of attorney's fees and costs.

85.     Plaintiff is a legitimate business enterprise that is entitled to protection pursuant to the Florida Unfair and Deceptive Trade Practices Act as set forth therein or pursuant to judicial rulings that have construed that act.

86.     Plaintiff incorporates the allegations made in paragraphs 1 through 7 by reference as if those allegations were fully set forth in this count.

87.     Venue is proper in Palm Beach County, Florida, pursuant to terms of an "Order Form" dated December 23, 2021, between Plaintiff and OpenClose.

88.     A redacted copy of the aforesaid Order Form is attached hereto and incorporated herein by reference as Exhibit B.

89.     The purpose of the Order Form was intended to be a subscription or software licensing arrangement whereby OpenClose would provide mortgage loan processing and origination software to Plaintiff, which are the "Products and Services" described in and contemplated by the Order Form ("**Products and Services**").

18

90.     The Order Form contains list of service level standards that OpenClose agreed to maintain and to which it agreed to adhere, and those standards are material terms of the Order Form. (Ex. B, p. 10-11.)

91.     In connection with the execution of the Order Form, Plaintiff remitted an "Implementation Fee Payment" to OpenClose in the amount of $51,500.00 (**"Implementation Fee"**).

92.     Soon after the execution of the Order Form, problems arose with the OpenClose's ability to deliver the Products and Services that were promised to Plaintiff pursuant to or in connection with the Order Form.

93.     During the first six months of 2022, multiple meetings and conferences were held between employees of Plaintiff and employees of OpenClose regarding the problems that arose with respect to OpenClose not being able to deliver the Products and Services that Plaintiff had been promised in connection with or pursuant to the Order Form.

94.     For example, some of the problems and issues that OpenClose was unable or unwilling to resolve by June 2022, which resulted in Plaintiff not being able to use OpenClose's software to process or originate mortgage loans, are shown on the spreadsheet that is attached hereto and incorporated herein by reference as Exhibit C, which also identifies OpenClose's material misrepresentations and material omissions that it made in connection with the Order Form.

95.     Due to unresolved problems and issues with the OpenClose software or program that OpenClose was unable or unwilling to resolve, Plaintiff never "on boarded" OpenClose's program or software, and OpenClose's program or software was not used by Plaintiff, through no fault of its own, to process or originate mortgage loans.

96.     By August 2022, OpenClose knew that Plaintiff was not able to use OpenClose's software for mortgage loan origination or processing due to problems and issues with OpenClose's software that OpenClose was unable or unwilling to resolve in order for OpenClose to deliver the Products and Services that are described in and contemplated by the Order Form.

97.     The Order Form provides for a "Minimum Monthly License Fee" in the amount of $21,325.00 per month for "Months 1 – 60." (Ex. B. p. 1.)

98.     The Order Form provides that there are additional monthly fees, over and above the "Minimum Monthly License Fees," for loans that Plaintiff funded using OpenClose's of Defendant's software or subscription or the Products and Services that exceeded two hundred funded loans per month.

99.     Both Defendant and OpenClose knew that Plaintiff was not actually using, and never used, the software or subscription or the Products and Services described in or contemplated by the Order Form.

100.    A term of the Order Form provides that OpenClose or Defendant "will automatically issue an invoice" to Plaintiff "each month for payment as set forth on the Order Form." (Ex. B, p. 4.)

20

101.    In acknowledgment that Plaintiff had no further obligation to OpenClose or to Defendant pursuant to the Order Form, neither Defendant nor OpenClose sent Plaintiff any monthly invoice for the "Minimum Monthly License Fee" or for any other amount for any services that were rendered to Plaintiff pursuant to the Order Form during 2022 or during 2023 or during the first seven months of 2024.

102.    Knowing that, through no fault of its own, Plaintiff was unable to use the Products and Services stated in and contemplated by the Order Form, and knowing that OpenClose was not providing Plaintiff with those Products and Services, neither OpenClose nor Defendant communicated with Plaintiff regarding the Order Form between late October 2022 and August 2024.

103.    Notwithstanding the fact that Plaintiff was unable to use OpenClose's software or licensing that was described in or contemplated by the Order Form due to problems and issues that OpenClose did not resolve or correct through no fault of Plaintiff, and notwithstanding the fact the Plaintiff did not otherwise use any of the services that are described in or contemplated by the Order Form, on August 2024, Defendant sent Plaintiff an invoice dated August 29, 2024, in the amount of $597,100.00 that purports to be for the "Minium Monthly License Fee" that is stated in the Order Form in the amount of $21,325 per month for the period of April 2022 through July 2024.

104.    In other words, prior to August 29, 2024, neither Defendant nor OpenClose sent Plaintiff any monthly invoice for any services that were rendered to Plaintiff or that sought payment from Plaintiff pursuant to the Order Form of the months of April 2022,

21

May 2022, June 2022, July 2022, August 2022, September 2022, October 2022, November 2022, December 2022, January 2023, February 2023, March 2023, April 2023, May 2023, June 2023, July 2023, August 2023, September 2023, October 2023, November 2023, December 2023, January 2024, February 2024, March 2024, April 2024, May 2024, or June 2024.

105.    Notwithstanding the fact that Plaintiff was unable to use OpenClose's software or licensing that was described in or contemplated by the Order Form due to problems and issues that OpenClose did not resolve or correct through no fault of Plaintiff, and notwithstanding the fact the Plaintiff did not otherwise use any of the services that are described in or contemplated by the Order Form, on March 21, 2025, Defendant sent Plaintiff the attached "Statement" dated March 20, 2025, which states that an invoice dated March 19, 2025, in the amount of $682,400.00 was sent to Plaintiff. However, Plaintiff has not yet received that invoice.

106.    Using the "Minimum Monthly Licensing Fee" that is stated in the Order Form in the amount of $21,325 per month, the invoice dated March 19, 2025, in the amount of $682,400.00 that is referenced in the "Statement" presumably seeks the minimum monthly fee for the monthly periods from August 2024 through March 2027.

107.    Redacted copies of the invoice dated August 29, 2024, in the amount of $597,100.00 and the "Statement" referencing the invoice dated March 19, 2025, in the amount of $682,400.00 are attached hereto and incorporated herein by reference as composite Exhibit D ( collectively herein the "**Invoices**").

22

108.    On March 21, 2025, Defendant sent Plaintiff a "Notice of Termination of Agreement with MeridianLink, Inc." that demanded or requested that Plaintiff immediately pay Defendant the sum of "$1,279,500.00 in full satisfaction" of obligations that Defendant contends it is owed by Plaintiff.  A redacted copy of this notice is attached hereto and incorporated herein by reference as Exhibit E.

109.    Presumably, Defendant arrives at the sum in the amount of $1,279,500.00 that it has sought from Plaintiff by multiplying the "Minimum Monthly License Fee" in the amount of $21,325.00 that is stated in the Order Form by the entire sixty (60) month period from April 2022 through March 2027, notwithstanding the fact that neither Defendant nor OpenClose actually provided Plaintiff any of the Products and Services that are described in or contemplated by the Order Form, and notwithstanding the fact that Plaintiff did not use the Products and Services to process or originate any mortgage loans.

110.    A term of the Order Form provides that Plaintiff is responsible for paying all of the Monthly License Fees that are set in the Order Form for its entire sixty (60) month term, "whether or not such Products and Services are actively used," which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

111.    A similar term of the Order Form provides that, if Defendant terminates the Order Form, then all of the Monthly Licensing Fees "for the entire term shall become immediately due and payable," and that Defendant will have "no further or continuing

23

obligation" to Plaintiff, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

112.    Defendant is attempting to collect the Monthly Licensing Fee for sixty (60) months from Plaintiff in the amount $1,279,500.00, notwithstanding the fact that Defendant has not actually provided any Products or Services to Plaintiff and notwithstanding the fact that Plaintiff has not used any Product or Services to process originate any mortgage loans, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

113.    For Defendant to claim to be owed or to otherwise be entitled to receive the sum of $1,279,500.00 from Plaintiff when, under the circumstances alleged herein, Plaintiff has not used any of the Products and Services that are described in or contemplated by the Order Form is Defendant's action that is so unfair or one-sided that it shocks the conscience, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

114.    A representation and warranty by Defendant and by OpenClose that is contained in the Order Form provides that the Products and Services will be provided in a manner that is consistent with general industry standards and that the Products and Services will perform substantially as OpenClose had demonstrated to Plaintiff.

115.    Inconsistent with that representation and warranty, another term of the Order Form contains a disclaimer of warranties whereby Defendant and OpenClose stated that there were no representations or warranty that the technology that was being

24

provided to Plaintiff would meet Plaintiff's requirements or expectations or that Defendant's and OpenClose's errors or defects would be corrected, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

116.    Inconsistent with Defendant's and OpenClose's representations and warranties made in Order Form or in connection with the Order Form, a term of the Order Form provides for Defendant's and OpenClose's limited liability for Plaintiff's inability to use the Products and Services, regardless of the cause, and provides that Defendant's and OpenClose's liability for their own errors and omissions is limited to the amount of the Minimum Licensing Fee that Plaintiff paid for a six (6) month period, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

117.    As the direct and proximate cause of Defendant's or OpenClose's aforesaid unconscionable, deceptive or unfair acts or practices, Plaintiff has been damaged, including Plaintiff's damage in the amount of the Implementation Fee, and the total amount of Plaintiff's damages will be established at the trial or final hearing in this matter.

118.    Plaintiff has performed any conditions precedent that were required to be performed by Plaintiff, or those conditions have been waived by Defendant.

119.     Plaintiff has employed the law firm of Borowski & Traylor, P.A. to represent its interests herein, and Plaintiff is obligated to pay its attorneys a reasonable fee for their services.

WHEREFORE, Plaintiff First Federal Bank demands judgment for damages against Defendant MeridianLink, Inc., the amount of said judgment to include Plaintiff's attorney's fees and costs incurred in connection with this action, and Plaintiff further prays that this Honorable Court will grant such other and further relief as is just and proper.

_____
DARRYL STEVE TRAYLOR, JR.
Florida Bar No. 0075981
steve@borowski-traylor.com
T. A. BOROWSKI, JR.
Florida Bar No. 843393
ted@borowski-traylor.com
Borowski & Traylor, P.A.
4300 Bayou Blvd., Suite 14
Pensacola, FL 32503
(850) 429-2027; (850) 429-7465 fax
Attorneys for Plaintiff First Federal Bank

26

# meridianlink

January 28, 2025

First Federal Bank
1300 McFarland Blvd, NE
Tuscaloosa AL 35406-2252
ATTN: Sherry Romano

Notice of Material Breach under Agreement with MeridianLink, Inc.

WHEREAS, Beanstalk Networks LLC, dba OpenClose was acquired by MeridianLink, Inc. ("MeridianLink") effective November 4, 2022, by which the Agreements have been assigned to MeridianLink, including all rights and obligation set forth therein.

To Whom It May Concern:

Please allow this to serve as formal notice that First Federal Bank is currently in material breach of that certain agreement for services between OpenClose and customer dated 12/23/2021 (the "Agreement"). We have sent two prior notices of default on 10/13/2024 and 10/28/2024. Despite these notices, we have not received full payment on the amounts due of $597,100.00 to bring your account current. This amount may not include applicable late fees, which MeridianLink will assess on termination if this balance remains uncured.

Payment is immediately due for the amount listed above. If payment is not received within twenty (20) days (or as otherwise set forth in the Agreement to cure breach), MeridianLink may terminate this Agreement immediately with notice. Please be advised that services provided under the Agreement will be suspended pending payment of fees due. MeridianLink retains all other rights and remedies available to it pursuant to the Agreement, at law or in equity. Please contact ███████████████████████ with any questions on your current statement, attached here for your reference.

Sincerely,

Elias Olmeta
Chief Financial Officer
MeridianLink, Inc.

**EXHIBIT**

**A**

NOT A CERTIFIED COPY

 3560 Hyland Ave., Suite # 200
Costa Mesa, CA 92626    844-986-3285     meridianlink.com

DocuSign Envelope ID: ~~████████████████████████████~~

## ORDER FORM

**Beanstalk Networks LLC, dba OpenClose**
314 Clematis Street, Suite 200
West Palm Beach, FL 33401
(561) 650-8106 fax

Order # 1                              Proposed By: Ken Ellis                    Offer Valid Through: 12.31.2021

### Responsible Party

| | |
|---|---|
| Legal Entity Name: First Federal Bank | Billing Contact: ~~Janice Jolly~~ ~~Sherry Roman~~ |
| Address:   1300 McFarland Blvd. NE | Billing Email: ~~████████~~ |
|            Tuscaloosa, AL 35406-2252 | ~~om~~ |
| Phone:     910-793-4600 x31805 | Billing Phone:   205-391-6700 |
| Fax: | Billing Fax: |
| Website:   www.1stfed.com | Fed Tax ID #:   ~~████~~ |

### Terms and Conditions

| | | |
|---|---|---|
| Effective Date:  _12 / 23_, 2021 | Implementation Payment Type: | ☑ Check or ☐ Wire/ACH |
| Initial Term:  5 years from date of the first Monthly License Fee | Monthly Payment Type: | ☑ Check or ☐ Wire/ACH |
| Renewal Term:  2 years | Payment Terms: | In advance of due date |

### Products and Fees[(1)]

| | |
|---|---|
| **LenderAssist**: Retail LOS | Unlimited Users  ☒ |
| **DecisionAssist**: Program Eligibility & Pricing Engine | ☒ |
| **DocAssist**: Document Management & Imaging System | ☒ |
| 5 Simple PDF Forms | |
| Includes (4) days of onsite training | In OpenClose's West Palm Beach, FL corporate headquarters |
| Implementation Fee | $40,000.00 (-$5,000 Implementation Fee discount if executed on or before 12/31/2021) |
| Minimum Monthly License Fee | $14,000.00 Funded Loan Minimum* (includes 200 Funded Loans) |
| **\*Loan Fee Charges after Funded Loan Minimum** | |
| 201 - 400   Funded Loans | $65.00 per Funded Loan |
| 401+         Funded Loans | $60.00 per Funded Loan |
| *Additional Modules* | |
| **ConsumerAssist Enterprise Digital POS** | ☒ |
| Implementation Fee | $5,000.00 |
| Per Funded Loan Fee | $35.00 |
| Minimum Monthly License Fee | $6,125.00 (includes 175 Funded Loans) |
| **OC Optics**: Analytics and Reporting Module | ☒ |
| Implementation Fee | $3,500.00 |
| Monthly License Fee | $950.00 |
| **Core Image Booking Module** | |
| Implementation Fee | $3,000.00 |
| Monthly License Fee | $250.00 |

### Payment Schedule for All Products

| Type of Fee | Schedule of Payments | Amount of Payment |
|---|---|---|
| Implementation Fee Payment | Due on the Effective Date | $51,500.00 |
| Minimum Monthly License Fee[(2)] | Months 1 - 60 | $21,325.00 |

(1) We reserve the right to increase our Fees annually by an amount not to exceed 3%, and we shall give you 30 days advance notice of any such increase.
(2) The first payment of the Minimum Monthly License Fee is due April 1, 2022 or on the Release Date whichever occurs first and monthly thereafter.
(3) -$5,000 Implementation Fee discount if executed on or before 12/31/2021.

By signing this Order Form, you agree that you have read the OpenClose Terms of Service attached hereto as Exhibit A and the Service Level Standards attached hereto as Exhibit B and agree to be legally bound by its and their terms which are incorporated by reference hereby. Prices do not include any taxes that may apply. Any such taxes are the responsibility of Customer. Subscriptions are non-cancelable before the end of the current Term. Additional Pricing for Products and Services not purchased are posted at https://www.openclose.com/publishedpricing/, and the Approved Investor Program List is posted at https://www.openclose.com/current-available-investors/ which are incorporated herein by reference. Upon your request, additional products may be added by addendum which will automatically adjust the Initial Term (or any Renewal Term) to begin on the Effective Date of the addendum.

**FIRST FEDERAL BANK**                            **BEANSTALK NETWORKS LLC, DBA OPENCLOSE**

| | | | |
|---|---|---|---|
| Signature  *Sherry Romano* | | Signature  *James P. Kelly* | |
| Name  *Sherry Romano* | | Name  James P. Kelly | |
| Title  *SVP Mortgage Lending* | | Title  President | |
| Date  *12/23/2021* | | Date  Dec-27-2021 | |



EXHIBIT
B

DocuSign Envelope ID: ████████████████████



---

## Exhibit A to Agreement between First Federal Bank and OpenClose
## OPENCLOSE TERMS OF SERVICE

---

**BY SIGNING OUR ORDER FORM, YOU AGREE TO THE FOLLOWING TERMS GOVERNING YOUR USE OF ONLINE PRODUCTS AND SERVICES OF OPENCLOSE©, INCLUDING OFFLINE COMPONENTS (THE "PRODUCTS AND SERVICES"). IF YOU ARE ENTERING INTO THIS AGREEMENT ON BEHALF OF A CORPORATION, LIMITED LIABILITY COMPANY OR OTHER LEGAL ENTITY, YOU REPRESENT THAT YOU HAVE THE AUTHORITY TO BIND SUCH ENTITY TO THESE TERMS AND CONDITIONS, IN WHICH CASE THE TERMS "YOU" OR "YOUR" SHALL REFER TO SUCH ENTITY.**

### Introduction:

Welcome to OpenClose. Your registration for, or use of, the Products and Services set forth on the Order Form shall be deemed to be your agreement to our Terms of Service as applicable to our Products and Services, including any Customer Website. For reference, a Definitions Section is included at the end of this Agreement.

### 1. Advertising

By becoming a paying customer of the Products and Services, you agree that we shall have the right to disclose the fact that you are a paying customer, and the Products and Services that you are using however if either party desires to issue any press release or advertisement which relates to the Products and Services listed hereunder or which mentions the name of the other party, or the name of our Products and Services, then such party shall submit a copy of any such proposed press release or advertisement to the other party for its consent at least ten (10) days prior to its release to the media which consent shall not be unreasonably withheld or delayed. Each press release shall be deemed approved unless the party to whom it is submitted objects within such ten (10) day period. Notwithstanding the foregoing, the restrictions in this section will not apply to incidental oral comments in the ordinary course of business.

### 2. License Grant & Restrictions

For the Term described on the Order Form, you shall have a non-exclusive, non-transferable, right to use the Products and Services, subject to the terms and conditions of this Agreement. All rights not expressly granted to you are reserved by us.

You may not access the Products and Services if you are a direct competitor of ours, except with our prior written consent. In addition, you may not access the Products and Services for purposes of monitoring availability, performance or functionality, or for any other benchmarking or competitive purposes and in addition, you agree not to allow a competitor of ours to access our Products and Services.

You agree not to directly or indirectly (i) license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third party, the Products and Services or the Content; (ii) modify or make derivative works based upon the Products and Services or the Content; (iii) create Internet "links" to the Products and Services or "frame" or "mirror" any Content on any other server or wireless or Internet-based device; or (iv) reverse engineer or access or use the Products and Services for any improper purpose including: (a) building a competitive product or service, using ideas, features, functions or graphics similar to those contained within the Products and Services; (b) copying any ideas, features, functions or graphics of the Products and Services; (c) removing or modifying any copyright or other proprietary notice of ours; (d) using any of our Intellectual Property Rights in any foreign jurisdiction in violation of any trade laws or regulations; or (e) allowing others to do any of the foregoing. This paragraph may be enforced by injunction.

Starting on the Release Date, you may use the Products and Services only for your internal business purposes and you shall not: (i) send or store infringing, obscene, threatening, libelous, or otherwise unlawful or tortious material, including material harmful to children or violative of third party privacy rights; (ii) send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs; (iii) interfere with or disrupt the integrity or performance of the Products and Services or the data contained therein; or (iv) directly or indirectly attempt to gain unauthorized access to the Products and Services or its related systems or networks.

DocuSign Envelope ID: 58...

We shall not be responsible for errors, defects, or downtime caused by any of the following: hardware failures, power problems, environmental problems; modifications to any of Our Technology unless such modifications are made by us or with our authorization; viruses, destructive programs, or self-replicating code, programming, scripts, your business requirements, work flow, or applets unique to your business provided by you; misuse or negligence by you, your employees, or agents in operating any of Our Technology; functionality of third party software used in connection herewith or with which any of Our Technology interfaces except for third-party software approved or authorized by us; or any Force Majeure.

By you: For the Term of this Agreement, you hereby grant to us the royalty-free, irrevocable, worldwide, non-exclusive right and license to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, perform, and display all content, remarks, suggestions, ideas, graphics, or other information communicated to us by you through the Customer Website or otherwise in connection with this Agreement, excluding Confidential Information (together, the "Feedback"), and to incorporate any Feedback in other works in any form, media, or technology now known or later developed. We will not be required to treat any Feedback as confidential, and may use any Feedback in our business (including without limitation, for products or advertising) without incurring any liability for royalties or any other consideration of any kind, and will not incur any liability as a result of any similarities that may appear in our future operations.

We will treat any Confidential Information, your Customer Data, or other proprietary data that you submit through this site in accordance with our Privacy Policy as stated in Section 4 of this Agreement.

## 3. Your Responsibilities

You are responsible for: (i) all activity occurring under your User accounts and you agree to abide by all applicable local, state, national and foreign laws, treaties and regulations in connection with your use of our Products and Services, including laws related to data privacy, international communications and the transmission of technical or Personally Identifiable Information as defined in Section 4; (ii) acquiring any authorization(s) necessary for hypertext links to third party Websites; (iii) the accuracy of materials provided to us including without limitation Customer Content, descriptive claims, warranties, guarantees, nature of your business, and address where your business is conducted; (iv) compliance by Users with the terms of this Agreement; (v) preventing access to the Customer Website by persons other than Users with Customer-issued passwords; and (vi) using commercially reasonable best efforts to assist us in providing configuration and testing services related to implementation of the Products and Services in your environment. You agree to: (a) notify us immediately of any unauthorized use of any password or account or any other known or suspected breach of security; (b) report to us immediately and use reasonable efforts to stop immediately any unauthorized copying or distribution of Customer Content and Customer Data that is known or suspected by you or your Users; and (c) be responsible for registration and maintenance of your Domain Names including acquisition of necessary SSL certificates.

## 4. Privacy Policy in Connection with Customer Data & Account Information.

We do not own any data, information or material that you submit to the Products and Services in the course of your use of the Products and Services ("Customer Data"). We have, however, the responsibility to maintain the confidentiality of your Customer Data and we will take steps we deem commercially reasonable to assure that confidentiality is maintained and that there is no unauthorized dissemination of your Customer Data. Personally identifiable information ("PII"), or sensitive personal information ("SPI"), as used in US privacy law and information security, is information that can be used on its own or with other information to identify, contact or locate a single person (accordingly PII excludes general statistical data or analysis of our customer base as a whole). In the unlikely event of a data breach resulting in unauthorized acquisition of Customer Data, you may be required by applicable regulations to take certain remedial actions such as notification of affected customers of yours, or we may be required by applicable law to take certain remedial actions on your behalf. In such event, we will use commercially reasonable efforts to notify you promptly, and we shall endeavor to work closely with you to minimize the impact, however you understand any costs we incur in connection with the foregoing are your responsibility and shall be paid by you as if set forth on a Work Order.

You, not us, shall have sole responsibility for the accuracy, quality, integrity, legality, reliability, appropriateness, or right to use of Customer Data, and we shall not be responsible or liable for the deletion, correction, destruction, damage, loss or failure to store or restore any Customer Data, although we shall use commercially reasonable efforts to prevent damage or loss of your Customer Data, we shall not be responsible or liable for such damage or loss other than as provided in this Agreement.

## 5. Confidentiality

By virtue of this Agreement, the parties may have access to information that is confidential to one another. Confidential Information shall mean: (i) Our Technology; (ii) all of the terms and conditions of this Agreement including the pricing as highlighted in Section 8 [Billing] under this Agreement; (iii) Customer Data; (iv) information related to loan programs and

DocuSign Envelope ID:

product pricing; and (v) information clearly identified by either party as confidential at the time of disclosure (collectively, the "Confidential Information"). Confidential Information shall not include information that: (a) is or becomes a part of the public domain through no act or omission of the other party; (b) is lawfully disclosed to receiving party by a third party without an obligation of nondisclosure to the disclosing party; (c) is independently developed by the other party without reference to the Confidential Information; or (d) was already in the receiving party's possession prior to the Effective Date of this Agreement.

During the Term of this Agreement, the parties are authorized to use the Confidential Information of the other party solely for the purposes of this Agreement. The parties agree to use the same care and discretion to avoid the unauthorized disclosure, publication or dissemination of the other party's Confidential Information received pursuant to this Agreement as it uses to protect its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable standard of care). Each party's obligations of confidentiality hereunder for Confidential Information disclosed during the Term of this Agreement shall continue indefinitely.

A party may disclose its own Confidential Information as it deems appropriate in conducting its own business. A party may disclose the other party's Confidential Information solely to the extent required by subpoena, court order or government requirement to be disclosed, provided that the party which is required to make such disclosure shall give the other party prompt written notice of such subpoena, court order or government requirement so as to allow such the other party to have an opportunity to obtain a protective order to prohibit or restrict such disclosure. Confidential Information disclosed pursuant to subpoena, court order or government requirement shall otherwise remain subject to the terms applicable to Confidential Information.

## 6. Intellectual Property Ownership

We own all right, title and interest, including all related Intellectual Property Rights, in and to Our Technology, the Content and the Products and Services and any suggestions, ideas, enhancement requests, feedback, recommendations or other information provided by you or any of your employees, contractors or agents relating to the Products and Services. This Agreement is not a sale and does not convey to you any rights of ownership in or related to the Products and Services, Our Technology or the Intellectual Property Rights owned by us. Our name(s), our logo(s), and the product names associated with the Products and Services are owned by us, and no right or license is granted to use them other than as provided herein.

## 7. Hyper-Links

The Customer Website may be hyper-linked to other sites which are not maintained by, or related to us. Hyper-links to such sites are not sponsored by or affiliated with the Customer Web Site or us. We have not reviewed any or all of such sites and are not responsible for the content of those sites. Hyper-links are to be accessed at your own risk, and we make no representations or warranties about the content, completeness or accuracy of these hyper-links or the sites hyper-linked to the Site. The inclusion of any hyper-link to a third-party site does not necessarily imply endorsement by us of that site.

## 8. Billing

**Payment:** You agree to pay our fees or charges set forth on the Order Form(s) and any Work Orders. We charge and collect in advance for use of the Products and Services, and we will automatically issue an invoice to you each month for payment as set forth on the Order Form.

All payment obligations are non-cancelable, all amounts paid are nonrefundable and fully earned upon receipt, and you are responsible for paying for all Monthly License Fees set forth on the Order Form for the entire Term, whether or not such Products and Services are actively used.

**Additional Products and Services and Expenses:** The fee for any Products and Services ordered subsequent to the Order Form will be at the rates then in effect. You shall only be responsible to reimburse us for expenses which are reasonably incurred in rendering any Products or Services to you (hereinafter "Expenses") if approved by you in advance in writing. Such Expenses, which shall be billed monthly, include without limitation travel expenses including airfare and or ground transportation, lodging, meals, and the cost of any other related expenses.

**Confidential Nature of Fee Information:** All pricing terms are confidential, and you agree not to disclose them to anyone other than your employees, contractors or agents who have a need to know and who are informed of, and agree to the confidentiality provisions hereof.

**Taxes:** Our fees are exclusive of all taxes, levies, or duties imposed by taxing authorities, and you shall be responsible for payment of all such taxes, levies, or duties, excluding only United States (federal or state) taxes based solely on our income.

DocuSign Envelope ID:

**Your Billing Information:** You agree to provide us with complete and accurate billing and contact information. This information includes your legal company name, street address, e-mail address, and name, telephone number, and fax number of an authorized billing contact. You agree to update this information within 30 days of any change to it. If the contact information you have provided is false or fraudulent, we reserve the right to terminate your access to the Products and Services in addition to any other legal remedies. If you believe your bill is incorrect, you must contact us in writing within 30 days of the invoice date of the invoice containing the amount in question to be eligible to receive an adjustment or credit.

## 9. Non-Payment and Suspension

In addition to any other rights granted to us herein, in the event your account becomes delinquent, we reserve the right to either [a] terminate this Agreement pursuant to section 11 or [b] suspend your access to the Products and Services. Delinquent invoices are subject to a late fee of 1.5% per month on any outstanding balance, or the maximum amount permitted by law, whichever is less, plus all costs and expenses of collection including our reasonable attorney fees. During any period of delinquency, you will continue to be charged for monthly fees. We reserve the right to impose a reconnection fee in the event Services are suspended and thereafter you request access to the Products and Services.

## 10. Termination upon Expiration of the Term and Business Continuity Services

This Agreement commences on the Effective Date and continues for the Initial Term as agreed in the Order Form. Upon the expiration of the Initial Term, this Agreement will automatically renew for successive Renewal Terms as specified on the Order Form unless either of us notifies the other in writing at least ninety (90) days prior to the expiration of the then applicable Term of a decision not to renew this Agreement. Upon termination of this Agreement under this Section 10, your right to access or use our Products and Services ceases and we are no longer required to retain your Customer Data. However, in the event of termination upon expiration of the Term, the protocol shall be as follows:

Upon your request, if received by us within thirty (30) days of termination upon expiration of the Term of this Agreement ("Data Retrieval Notice Period"), and full payment of all fees due hereunder, we shall offer you the one time opportunity to enter into a Work Order by which we will provide Business Continuity Services of the Archived Modules, as defined below, at our then current professional service fee schedule (or we may apply a reasonable time and materials fee based on then current reasonable industry standards). Business Continuity Services is defined as the services we will provide to you for our continued hosting of your Customer Data and allow you access to our LenderAssist and DocAssist (the "Archived Modules") solely for data retrieval, and not to enter new loans, and to make such copies of your Customer Data as you require. Upon expiration of the Data Retrieval Notice Period or termination of our Business Continuity Services if applicable, we are not required to retain your Customer Data and it may be deleted.

## 11. Termination for Cause

In the event of any material breach of this Agreement, such as your payment obligations hereunder, or unauthorized use of Our Technology or Products and Services, we may, in our sole discretion, after written notice and a twenty (20) day period to cure (the "Cure Period") terminate this Agreement whereupon [i] your right to continue to access or use our Products and Services will cease; [ii] all Monthly License Fees set forth on the Order Form for the entire Term shall become immediately due and payable and [iii] your right to access or use your Customer Data ceases and [iv] we shall have no further or continuing obligation to deliver to you, maintain or retain any of your Customer Data and it will be deleted.

## 12. Representations & Warranties

Each party represents and warrants that it has the authority to enter into this Agreement. We represent and warrant that we will provide the Products and Services in a manner consistent with general industry standards and that the Products and Services will perform substantially as demonstrated under normal use and circumstances. You acknowledge that (a) you have examined the functionality of the Products and Services; (b) have not relied on general descriptions of our Products and Services as may be found on our Website to determine if the functionality of Our Products and Services is suitable for your intended use, and (c) you agree to license our Products and Services on the terms set forth herein and on the Order Form commencing on the Effective Date. You represent and warrant that you have not falsely identified yourself or provided any false information to gain access to the Products and Services and that your billing information is correct.

DocuSign Envelope ID:

## 13. Indemnification

You shall indemnify and hold us, and our parent organizations, subsidiaries, affiliates, officers, members, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with a claim against us: (i) alleging that you have infringed the rights of, or have caused harm to, a third party; (ii) which if true, would constitute a violation of your representations and warranties; or (iii) arising from the breach by you or your Users of this Agreement, provided in any such case that we (a) promptly give you written notice of the claim; (b) give you control of the defense and settlement of the claim (provided that you may not settle or defend any claim unless it unconditionally releases us of all liability, and such settlement does not have a material adverse effect on our business or Products and Services); (c) provide to you all available information and assistance; and (d) have not compromised or settled such claim.

We shall indemnify and hold you and your parent organizations, subsidiaries, affiliates, officers, directors, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with a claim against you: (i) alleging that we have infringed a copyright, a U.S. patent issued as of the date of the Order Form, or a trademark of a third party; (ii) which if true, would constitute a violation of our representations or warranties; or (iii) arising from breach of this Agreement by us; provided that you (a) promptly give us written notice of the claim; (b) give us control of the defense and settlement of the claim (provided that we may not settle or defend any claim unless it unconditionally releases you of all liability), and such settlement does not have a material adverse effect on your business; (c) provide to us all available information and assistance; and (d) have not compromised or settled such claim. We shall have no indemnification obligation, and you shall indemnify us pursuant to this Agreement, for claims arising from any infringement arising from the combination of the Products and Services with any of your products, service, hardware, or business process(s).

## 14. Disclaimer of Warranties

YOUR USE OF OUR TECHNOLOGY IS AT YOUR OWN RISK. WE MAKE NO REPRESENTATION, WARRANTY, OR GUARANTY AS TO THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, TRUTH, AVAILABILITY, ACCURACY OR COMPLETENESS OF THE PRODUCTS AND SERVICES OR ANY CONTENT. WE DO NOT REPRESENT OR WARRANT THAT: (i) THE USE OF THE PRODUCTS OR SERVICES WILL BE SECURE, TIMELY, UNINTERRUPTED OR ERROR-FREE OR OPERATE IN COMBINATION WITH ANY OTHER HARDWARE, SOFTWARE, SYSTEM OR DATA; (ii) THE PRODUCTS OR SERVICES WILL MEET YOUR REQUIREMENTS OR EXPECTATIONS; (iii) ANY STORED DATA WILL BE ACCURATE OR RELIABLE; (iv) ERRORS OR DEFECTS WILL BE CORRECTED; OR (v) THE PRODUCTS AND SERVICES OR THE SERVER(S) THAT MAKE THE PRODUCTS AND SERVICES AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. THE PRODUCTS AND SERVICES AND ALL CONTENT ARE PROVIDED TO YOU STRICTLY ON AN "AS IS" BASIS. ALL CONDITIONS, REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED TO THE MAXIMUM EXTENT PERMITTED BY LAW.

## 15. Internet Delays

OUR PRODUCTS AND SERVICES MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS. WE ARE NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS.

## 16. Limitation of Liability

IN NO EVENT SHALL OUR AGGREGATE LIABILITY FOR ANY AND ALL CLAIMS ARISING UNDER THIS AGREEMENT EXCEED THE AMOUNT OF MINIMUM MONTHLY LICENSE FEES ACTUALLY PAID BY YOU IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO ANYONE FOR ANY INDIRECT, PUNITIVE, SPECIAL, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES OF ANY TYPE OR KIND (INCLUDING LOSS OF DATA, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE), ARISING OUT OF, OR IN ANY WAY CONNECTED WITH OUR PRODUCTS AND SERVICES, INCLUDING BUT NOT LIMITED TO THE USE OR INABILITY TO USE THE PRODUCTS AND SERVICES, OR FOR ANY CONTENT OBTAINED FROM OR THROUGH THE PRODUCTS AND SERVICES, ANY INTERRUPTION, INACCURACY, ERROR OR OMISSION, REGARDLESS

DocuSign Envelope ID:

OF CAUSE , EVEN IF THE PARTY FROM WHICH DAMAGES ARE BEING SOUGHT HAVE BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 17. Force Majeure

We shall not be responsible for any failure to perform our obligations under this Agreement caused by an event reasonably beyond our control, including but not limited to, hurricanes, floods, the infrastructure of the Internet, wars, riots, labor strikes, natural disasters, pandemic, national emergency or any law, regulation, ordinance, or other act or order of any court, government, or governmental agency.

## 18. Notices

We may give notice by means of a general notice on the Products and Services, electronic mail to your e-mail address on record in our account information, or by written communication letter by first class mail or pre-paid post to your address on record in our account information. Such notice shall be deemed to have been given upon the expiration of 48 hours after mailing or posting (if sent by first class mail or pre-paid post) or 12 hours after sending (if sent by email or fax). You may give notice to us (such notice shall be deemed given when received by us) at any time by any of the following: letter sent by confirmed facsimile to us; letter delivered by nationally recognized overnight delivery service or first class postage prepaid mail to us at the applicable fax number or address set forth on the Order Form or Work Order.

## 19. Modification to Terms

We reserve the right to modify the terms and conditions of these Terms of Service, or our policies relating to the Products and Services, at any time, effective upon these Terms of Service on our Website, however no such modification will have any effect on fees and charges you have agreed to pay in the Order Form unless they are set forth in an amendment which you and we have signed. Continued use of our Products and Services after any such modification to these Terms of Service shall constitute your consent to such changes.

## 20. Assignment; Change in Control

This Agreement may not be assigned by you without our prior written approval but may be assigned without your consent by us to: (i) a parent or subsidiary; (ii) an acquirer of assets; or (iii) a successor by merger. Any purported assignment in violation of this Section shall be void. Any actual or proposed change in control of yours that results or would result in a direct competitor of ours directly or indirectly owning or controlling 50% or more of you shall entitle us to terminate this Agreement for Cause immediately upon written notice.

## 21. Survival

The provisions of Sections 1. Advertising, 2. License Grant & Restrictions, 4. Privacy Policy in Connection with Customer Data & Account Information., 5. Confidentiality, 6. Intellectual Property Ownership, 8. Billing, 9. Non-Payment and Suspension, 10. Termination upon Expiration of the Term, 11. Termination for Cause, 13. Indemnification, 14. Disclaimer of Warranties, 16. Limitation of Liability, 17. Force Majeure, 18. Notices, 21. Survival, 22. General and 25. Definitions shall survive termination of this Agreement for any reason. In the event of any termination or expiration of this Agreement for any reason, all provisions of this Agreement whose meaning requires them to survive shall survive the expiration or termination of this Agreement for the period of time indicated therein.

## 22. General

This Agreement shall be governed by Florida law without regard to its conflict of law principles. Any action brought to enforce any of the terms hereof shall be brought exclusively in the State or Federal courts of Palm Beach County, Florida and in any such action, the prevailing party shall be entitled to an award of all of its reasonable attorney's fees and court costs. No text or information set forth on any other purchase order, preprinted form or document (other than an Order Form, Amendment or Work Order, if applicable) shall add to or vary the terms and conditions of this Agreement. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then such provision(s) shall be construed, as nearly as possible, to reflect the intentions of the invalid or unenforceable provision(s), with all other provisions remaining in full force and effect. No joint venture, partnership, employment, or agency relationship exists between the parties as a result of this Agreement or use of the Products and Services. Other than in connection with a general employment solicitation or response thereto, you shall not solicit, offer, or extend employment or consulting opportunities to any employee or consultant of ours

DocuSign Envelope ID:

during the Term of this Agreement and for a period of three (3) years following the end of the Term, or the earlier termination of this Agreement, without our prior written consent. Our failure to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by us in writing. This Terms of Service, together with any applicable Order Form, Amendment or Work Order, comprises the entire agreement between the parties and supersedes all prior or contemporaneous negotiations, discussions or agreements, whether written or oral, between the parties regarding the subject matter contained herein.

## 23. Custom Work

Fees for customization of Customer Website(s) (hereinafter "Custom Work") are published on the Current Published Rate List. Any request for Custom Work must be pursuant to a Work Order. During the installation and integration of the Products and Services there will be discovery and gap analysis performed which may require Custom Work.

## 24. Training

Included in the Implementation Fee is a training package for your trainers. Training sessions typically may include: (a) lender administrator training, (b) broker/branch administrator training, (c) broker/branch loan flow training, and (d) lender loan flow training. A standard User manual will be provided along with training agendas for each session which will be designed to facilitate your intended use of the Customer's Website(s). Training will be performed via the Web and telephone using GoToMeeting® or a similar software selected by us. Additional charges shall apply for on-site training at your facilities as well as for supplementary training services offered by our training department as set forth on the Current Published Rate List.

## 25. Definitions

As used in this Agreement and in any Order Forms or change orders, the following meanings shall apply:

"**Agreement**" means any Order Form, all Exhibits referred to in the Order Form, and any amendments which both parties may agree to in the future.

"**Content**" means the audio and visual information, documents, software, products and services contained or made available to you in the course of using the Products and Services.

"**Customer Content**" means materials provided by you for incorporation into Customer Website including, but not limited to, audio clips, data, graphics, illustrations, images, photographs, text, or video clips. You shall deliver the Customer Content to us in an electronic file format specified and accessible by us (e.g., .gif, .jpg, .txt) or by entering directly using the site's existing functionality.

"**Customer Data**" means information or material provided or submitted by you in the course of using the Products and Services, but excludes general statistical data or analysis of our customer base.

"**Customer Website**" means the site(s) on the World Wide Web portion of the Internet developed by us for you pursuant to the terms of this Agreement for purposes of delivering the Products and Services.

"**Effective Date**" means the date this Agreement is accepted by your signature on an Order Form.

"**Intellectual Property Rights**" means unpatented inventions, patent applications, patents, design rights, copyrights, trademarks, service marks, trade names, domain name rights, mask work rights, know-how and other trade secret rights, and all other intellectual property rights, derivatives thereof, and forms of protection of a similar nature anywhere in the world pertaining to Our Technology.

"**Order Form(s)**" means any paper or online order form evidencing the initial subscription for the Products and Services and any subsequent order forms, specifying, among other things, the loan charges, number of licenses and other services contracted for, the applicable fees, the billing period, and other charges as agreed to between the parties, each such Order Form to be incorporated into and to become a part of this Agreement (in the event of any conflict between the terms of this Agreement and the terms of any such Order Form, the terms of this Agreement shall prevail).

"**Our Technology**" means our Products and Services named in the Order Form or otherwise belonging to us and also includes all related Intellectual Property as well as our hardware, products, processes, algorithms, User interfaces, know-how, techniques, designs and other tangible or intangible technical material or information made available to you by us in providing the Products and Services.

DocuSign Envelope ID:

**"Products and Services(s)"** means products and services specifically identified during the ordering process, developed, operated, and maintained by us, made accessible via the Customer Website or offline products and services provided to you by us, to which you are being granted access under this Agreement, including Our Technology and the Content.

**"Release Date"** is the date you are notified that the Products and Services are available to you in an environment for testing, training, configuration, and use. The Release Date may occur even if there are outstanding Custom Work requests. There may be a different Release Date for each Product. You assume the responsibility for the unique configuration of the Products and Services which occurs after the Release Date.

**"Term"** means the "Initial Term" or any "Renewal Term" set forth on an Order Form, Amendment or Addendum. For the avoidance of doubt, the Initial Term begins on the Release Date and not the Effective Date. For example, if the Effective Date on the Order Form is November 1st, 2021 and the Initial Term on the Order Form is six (6) years, and if the Release Date occurs on January 1, 2022; (i) the Initial Term would expire on January 1, 2028 and your obligation to pay fees hereunder would conclude upon your payment of seventy two (72) Monthly License Fee Payments as well as any other fees due under this Agreement as of the expiration of the Term.

**"Work Order"** means any written agreement signed by the parties for custom work.

**"User(s)"** or "User Accounts" means either [a] an employee of yours authorized and Registered to use the Products and Services or [b] any other individual you have authorized and registered to use the Products and Services ("Customer Authorized Individual"). Authorized and Registered means you have created a log in for our Products and Services indicating that the employee or Customer Authorized Individual is authorized by you to use our Products and Services pursuant to the Agreement.

## *Questions or Additional Information:*

If you have questions regarding this Agreement or wish to obtain additional information, please send an e-mail to legal@**OpenClose**.com.

**IN WITNESS WHEREOF**, this Terms of Service has been executed by the parties through their duly authorized officers as of the date set forth below.

| FIRST FEDERAL BANK | BEANSTALK NETWORKS LLC, DBA OPENCLOSE |
|---|---|
| Signature *Sherry Romano* | Signature *James P. Kelly* |
| Name *Sherry Romano* | Name James P. Kelly |
| Title *SVP Mortgage Lending* | Title President |
| Date *12/23/21* | Date Dec-27-2021 |

DocuSign Envelope



## Exhibit B to Agreement between First Federal Bank and OpenClose
## OPENCLOSE SERVICE LEVEL STANDARDS

We use commercially reasonable efforts to maintain the following Service Level Standards for Customers:

### *Software Maintenance Services:*

1. Correct, replace, or provide services to remedy any programming error which materially affects Customer's use of the software.
2. Remedy software bugs properly documented by Customer by means of a contemporaneous e-mail, help ticket, or letter describing in detail the software bug.
3. Provide, at no additional charge, newer versions, standard modifications, or enhancements to the software.  OpenClose requires its Customers to use a software version that is less than two (2) versions old.
4. Provide not less than Twenty Four (24) hours notice of scheduled maintenance and as much notice as commercially reasonable for events beyond our control. Scheduled maintenance is intended to last no longer than Four (4) hours, and will be scheduled between the hours of 9:00 p.m. and 7:00 a.m. (Eastern Time), unless otherwise agreed to by the Customer and OpenClose.  OpenClose may request extensions or timeframes of scheduled maintenance above Four (4) hours.  The time of the scheduled maintenance will be considered approved if OpenClose does not receive a written objection from Customer no later than Eight (8) hours in advance of the scheduled maintenance outage.

### *Web Hosting Services:*

1. Provide, install, and manage production Web server(s) and other equipment for Customer at a third party hosting provider, such as but not limited to Quality Tech Services (QTS) or Amazon Web Services (AWS).
2. Maintain sufficient server capacity and Internet connectivity to accommodate managed growth in User numbers and overall traffic levels to support the Products and Services you have ordered including the Customer Website(s).
3. Host and operate our Customers' Website such that the Users experience access times and time to retrieve full Web pages that are substantially similar to the access times and times to retrieve full Web pages by Users visiting other secure sites hosted by OpenClose.

### *Service Monitoring and Management:*

1. Perform periodic monitoring and management of Customers' Website(s) to optimize availability of service.
2. Monitor Web servers and other service components of firewalls on a periodic basis.
3. Restore service should a failure occur.
4. Maintain redundancy in key components such that service outages are less likely to occur due to individual component failures.
5. Customer Website(s) shall be available for use for no less than Ninety-Nine Percent (99%) of the time.  Upon written notification by Customer if reported down time exceeds 1%, in any two consecutive 30 day periods, by up to Four (4) hours in each 30 day period, Customer will receive a credit in the amount of fifteen percent (15%) of the amount of one month's Monthly License Fee.  If reported down time exceeds 1% by more than Four (4) hours in each 30 day period for any two consecutive 30 day periods, Customer will receive a credit of twenty five percent (25%) of the amount of one month's Monthly License fee.  To claim a remedy under this SLS, Customer will send OpenClose a notice, via email addressed to legal@openclose.com, containing the following details: (a) Customer name; (b) dates and time periods for each instance of claimed downtime during the relevant period; and (c) an explanation of the claim, including any relevant calculations. Claims must be submitted within ten (10) days after the end of the applicable consecutive thirty (30) day periods and must be verified by our records.
6. Determine the source of unscheduled service outages and report the finding to Customer.

DocuSign Envelope ID:

7. Monitor "heartbeat" signals of servers, routers, leased lines, and HTTPS availability of the Web server by proactively probing Twenty-Four (24) hours a day. If a facility does not respond to a ping-like stimulus, it is checked again. A second failure will automatically trigger a page to OpenClose's service center and a log entry will be generated.

8. Restore a service failure or, if determined to be a connectivity vendor problem, open a trouble ticket with the connectivity carrier and notify and provide updates to our Customer(s) Technical Administrator

9. Provide daily incremental back-ups and regular back-up of standard file systems and the timely restoration of data at Customer's request.

10. If the hosting server or location is expected to be down for an extended time , OpenClose will transfer appropriate back-up data and re-establish all hosting operations in an appropriately functioning secondary server or location.

## Security:

1. Limit physical and electronic access to Web servers.

2. Review security notifications and alerts relevant to the hosting platform (e.g., vendor notifications of bugs, attacks, patches, etc.).

3. Comply with vendor notifications and recommendations, apply patches, or take other commercially reasonable or customary actions as appropriate to maintain an industry standard   level of defense.

4. Prevent or halt a breach of security, including taking the affected Customer Websites off line.

## Support:

1. Provide help desk support to serve as the central collection point and information repository for our Customers' support issues and service requests in accordance with the target response times below. The Help Desk electronically documents, tracks, monitors, and manages all support issues from initial reporting through final resolution. Interactive reporting tools shall be employed to keep Customer advised of issue status.

2. Receive requests for support from up to two of Customers' designated employees during Business Hours, submitted via a Web portal, e-mail, or telephone, as directed by OpenClose. Business Hours are defined as any calendar day that is not a Saturday, Sunday or OpenClose observed holiday and are between the hours of 8 am to 7 pm EST. Requests received when the Help Desk is not staffed are automatically routed to an on-call technician. The on-call technician will respond to Customer as soon as reasonably possible to render assistance in accordance with the target response times below.

3. If a support request cannot be resolved at the time of the call, it will be categorized due to severity (severity definitions noted below):

**Target Response Times:**

Critical:

2 Hours during Business Hours

Use of Products and Services is stopped or is so severely impacted that the Users cannot reasonably use it. OpenClose will work continuously to resolve the issue and will provide frequent updates to Customer.

Low Severity Minimal:

1 Business Day

Customer requests information about or an enhancement to the Products and Services. Use of the Products and Services continues without work being impeded.

---

| **FIRST FEDERAL BANK** | **BEANSTALK NETWORKS LLC, DBA OPENCLOSE** |
|---|---|
| Signature _Sherry Romano_ | Signature _James P. Kelly_ |
| Name _Sherry Romano_ | Name   James P. Kelly |
| Title _SVP Mortgage Lending_ | Title    President |
| Date _12/23/21_ | Date    Dec-27-2021 |



Exhibit C

NOT A CERTIFIED COPY

# First Federal Bank

| Issue | Gap / Action | Solution | *hours |
|---|---|---|---|
| MCT Integration/reporting is not seamless like we were told. | * Setup Data Feed with MCT (15 minute intervals)<br>* Setup Bulk Loan Import Template<br>* Have no plans to sign up with GlobalDMS or Mercury Network at this time | | |
| Appraisal ordering: It was not made clear in the beginning that we had to use Global DMS for ordering our appraisals in the manner that the demo was presented. We were told that we could enter our own appraisal panel, but it was never made clear that it had to be through Global DMS. | * Appraisal ordering, tracking (flow is currently manual via spreadsheets and maintain own appraisal list and rotation<br>* Need to be able to enter appraiser details in the system without being visible to LOs.. Supported<br>* Once new vendor Hub integration is complete, First Fed appraisers could integrate directly with our Hub (QTR 4) | | |
| Processor/Underwriter have access to the same fields in the loan file at the same time, we feel this affects the integrity of the initial underwriting data. | * 1000 versions.. System versions w/ date/time/user stamp of any change<br>* Versions can be compared and system will show changes old/new values, data added and data deleted.<br>* UW can revert back to prior version<br>* Move Processors to Origination side Processor users | | |
| The report writing is cumbersome and cannot easily be distributed to many people | * Move Processors to Origination side Processor users<br>* Need training on OC Optics<br>* Field search function in Development | | |
| We cannot lock down fields so that they cannot be changed. | * Screen lock down supported<br>* LO lock downs are workflow and lock driven<br>* Most customers lock down supported | | |
| Cannot look out or hide screens and/or fields so that certain people/groups cannot see them | * Screens are permission based<br>* Move Processors to Origination side Processor users<br>* Appraisal fields are not exposed to Origination users | Small - Medium (*40 hours) | 40 |
| Cannot have custom screens | Gap<br>* First Fed to provide Screen shots of same custom screens they utilize to determine extent/need for custom fields<br>* Why they are many custom fields/screens in Byte that are native in OC<br>* Can provide view only access to screen where custom field resides to limit edit capability | | |
| Limited custom docs | * Custom form also include custom screens<br>First Fed to provide custom documents formed?<br>Supported | | |
| Anyone is able to add docs to the file after the loan is closed and not way to control that. | Gap<br>EX. LO gets Hazard Insurance after closing could loan to loan and no one knows. Rare instance.. couple times per month<br>Desired Behavior:<br>* Restrict upload rights after than is closed to lender employee manager only | Action: Metric Close Loan System default to restrict doc upload to employee managers only<br>Small - Medium (*40 hours) | 40 |
| Unable to keep LO/Processor from creating new contacts, will require constant monitoring to maintain integrity of the contacts | GAP<br>* Add feature to restrict ability to manage/add contacts to system Admins and Lender Employee Managers | Medium - Large (*80 hours)<br>Impacts multiple areas of the system | 80 |
| We were told UDM monitoring would be an automatic thing with Factual Data when in fact it is a manual process for the processors or LO's | * DataVerify Drive interface includes UDM support<br>* Updated Fraud Guard interface in development includes UDM support<br>Supported | | |
| Cannot block junk from other groups that may not need to see it | Supported | | |
| Cannot start a new file if there is already an application in the system for that same borrower | Supported | | |
| Nothing like a Sandbox mode where LO can work on file without making live changes to the file | Supported | | |
| Too much of the ordering of documents and/or services are not integrated services (transcripts, CAIVRS, fraud report) | GAPS:<br>* FHA Connection in development, Early QTR 4<br>* 4506t Tax transcripts New Vendor HUB<br>* What other vendor services are not natively supported? | Add 4506t vendor<br>4506t DataVerify: Small<br>4506t Other: Medium-Large | 25<br>60 |
| MI will not give multiple quotes for comparison for best execution, you have to pull each quote individually | Gap:<br>* Roadmap item<br>* Accelerate completion | | |
| No way to stop or hold files from moving forward if selected for a pre-funding QA Audit. | Gap:<br>* Need workflow context<br>GAP:<br>* Random selection @ CTC for pre-close Audit<br>* Restrict closing docs from being generated if loan is marked Pre-fund QA Audit<br>After discussion 4/4 it was determined that this would be an item to monitor for need | Medium - Large (*80 hours) | 60 |
| Not enough "assigned staff" options | * Desired Behavior: Suppress all #s except LND<br>* Can we use LND for LEI | | |
| Multiple loan numbers per file, is confusing and doesn't make sense to us | Supported | | |
| Cannot have more than one file open at a time | Supported with multiple browser sessions | | |
| Users cannot sign docs within the system. | Gap<br>* Create feature that allows for a signature to be stored in user settings and applied to a document in eDoc Manager | Medium (*40-50 hours) | 45 |
| Cannot make copy files with borrower data only | Gap<br>* Lending Authority build may cure<br>* Desired Behavior: When loan sent to Disclosure Desk status should be Disclosure Desk<br>OC to provide detail of what data is copied when loan is copied | | |
| Disclosure Desk – once a file is put in the disclosure desk queue status is processing, but it is not submitted to the processor. This is confusing. | * Could use Request Documents Loan Action, this would keep the loan in Origination status and can move the loan into a Disclosure queue | Small - Medium (*40 hours) | 40 |

# meridianlink®

PO Box 846822
Los Angeles, CA 90084-6822
(714) 662-9526
Email ████████████████████

# Invoice

### #2726157

8/29/2024

**Customer ID** 3913471

| Bill To | ACH Details: | TOTAL | |
|---|---|---|---|
| Accounts Payable<br>First Federal Bank<br>1300 McFarland Blvd. NE<br>Tuscaloosa AL 35406<br>United States | Wells Fargo Bank<br>Account #:████<br>Routing #: ████ | | $597,100.00 |

| Terms | Due Date | PO # |
|---|---|---|
| Net 30 | 9/28/2024 | |

| Item | Description | Qty | Amount |
|---|---|---|---|
| 11009 LenderAssist Commitment | LenderAssist Minimum Monthly License Fee<br>(Months (1-60) (Apr'22-Jul'24)<br>($21,325*28 Months) | 28 | $597,100.00 |

| | | |
|---|---|---|
| Subtotal | | $597,100.00 |
| Tax Total (%) | | $0.00 |
| Payments & Credits Applied | | $0.00 |
| Total Balance Remaining | | $597,100.00 |

EXHIBIT
D

If you have any questions regarding your invoice, please conta██████████████████████████

1 of 1



# Statement

PO Box 846822
Los Angeles, CA 90084-6822
(714) 708-6950

3/20/2025

**Billing Address**
Accounts Payable
First Federal Bank
1300 McFarland Blvd. NE
Tuscaloosa AL 35406
United States

| | | | | **Amount Due** |
|---|---|---|---|---|
| | | | | $1,279,500.00 |

| Date | Description | Charge | Payment | Balance |
|---|---|---|---|---|
| 8/29/2024 | Balance Forward | | | $0.00 |
| 8/29/2024 | Invoice #2726157 | $597,100.00 | | $597,100.00 |
| 3/19/2025 | Invoice #2755605 | $682,400.00 | | $1,279,500.00 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days | Amount Due |
|---|---|---|---|---|---|
| $682,400.00 | $0.00 | $0.00 | $0.00 | $597,100.00 | $1,279,500.00 |

NOT A CERTIFIED COPY



3/21/2025

First Federal Bank
1300 McFarland Blvd, NE
Tuscaloosa AL 35406-2252
Attention: Sherry Romano

Notice of Termination of Agreement with MeridianLink Inc.

WHEREAS, Beanstalk Networks LLC, dba OpenClose was acquired by MeridianLink, Inc. ("MeridianLink") effective November 4, 2022, by which the Agreements have been assigned to MeridianLink, including all rights and obligation set forth therein.

To Whom It May Concern:

Please allow this to serve as formal notice that certain agreement for services between First Federal Bank and MeridianLink, Inc. executed on 12/31/2021 is hereby terminated for cause. We sent multiple notices of default, followed by a "Notice of Material Breach" on 1/28/2025. Despite these notices, we have not received full payment on the amounts due of $597,100.00 to bring your account current.

Since the Agreement is now terminated, payment is immediately due in the amount of $1,279,500.00 in full satisfaction of Customer's obligations thereunder, inclusive of any applicable late fees for failure to make timely payment. MeridianLink retains all other rights and remedies available to it pursuant to the Agreement, at law or in equity. Please contact ~~████████████████████~~ with any questions on your statement, attached here for your reference.

Sincerely,

Elias Olmeta
Chief Financial Officer
MeridianLink, Inc.





## IN THE CIRCUIT COURT IN AND FOR PALM BEACH COUNTY, FLORIDA

**FIRST FEDERAL BANK,**

        PLAINTIFF,

vs.

                               **CASE NO: 50-2025-CA-002496-XXXA-MB**

**MERIDIANLINK, INC.**

        DEFENDANT,

### SUMMONS

**THE STATE OF FLORIDA:**
**To Each Sheriff of the State:**

        **YOU ARE COMMANDED** to serve this summons and a copy of the Complaint, the First Amended Complaint and the Uniform Differentiated Case Management Order And Order Setting Trial in the above styled cause upon Defendant **MERIDIANLINK, INC.,** *Attn. Corporation Service Company*, **1201 Hays Street, Tallahassee, FL 32301.**

Each defendant is hereby required to serve written defenses to said First Amended Complaint on plaintiff's attorney(s), whose address is

        **DARRYL STEVE TRAYLOR, JR.**
        **4300 BAYOU BLVD., STE 14**
        **PENSACOLA, FL 32503**

within **20 days** after service of this summons upon you, exclusive of the day of service, and to file the original of said written defenses with the Clerk of said Court either before service on said attorney or immediately thereafter. If you fail to do so, a default will be entered against you for the relief demanded in the counterclaim.

Witness, my hand and the seal of this Court on this **27TH** day of March, 2025.

JOSEPH ABRUZZO
CLERK OF THE CIRCUIT COURT

_____
By: Deputy Clerk **JOSIE LUCCE**



\* Except when suit is brought pursuant to Section 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one it its officials or employees sued in hir or her official capacity is a defendant, the time to be inserted as to it is 40 days. When suit is brought pursuant to Section 768.20, Florida Statutes, the time to be inserted is 30 days.

### This notice is provided pursuant to Administrative Order No. 2.207-6/22:

1

"**If you are a** <u>**person with a disability**</u> **who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**"

"**Si usted es una** <u>**persona minusválida**</u> **que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**"

"**Si ou se yon** <u>**moun ki enfim**</u> **ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., koodonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.**"

2

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

FIRST FEDERAL BANK,
a federal savings bank,

      Plaintiff,

v.                       Case No.: 50-2025-CA-002496-XXXA-MB

MERIDIANLINK, INC.
a Delaware corporation,

      Defendant.

_____/

## NOTICE OF SERVICE OF PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT MERIDIANLINK, INC.

COMES NOW, Plaintiff, FIRST FEDERAL BANK, a federal savings bank, by and

through its undersigned counsel, and gives notice of the service of **PLAINTIFF'S FIRST**

**SET OF INTERROGATORIES TO DEFENDANT MERIDIANLINK, INC**.

T. A. BOROWSKI, JR.
Florida Bar No. 843393
ted@borowski-traylor.com
DARRYL STEVE TRAYLOR, JR.
Florida Bar No. 0075981
steve@borowski-traylor.com
Borowski & Traylor, P.A.
4300 Bayou Blvd., Suite 14
Pensacola, FL 32503
(850) 429-2027; (850) 429-7465 fax
Attorneys for Plaintiff First Federal Bank

1

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing document has been furnished to:

MeridianLink, Inc.
c/o Corporation Service Company
Its Registered Agent
1201 Hays Street
Tallahassee, FL 32301-2525

by US mail, postage prepaid, on this 7th day of April 2025.

DARRYL STEVE TRAYLOR, JR.

2

IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

FIRST FEDERAL BANK,
a federal savings bank,

     Plaintiff,

v.                         Case No.: 50-2025-CA-002496-XXXA-MB

MERIDIANLINK, INC.
a Delaware corporation,

     Defendant.

_____/

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT MERIDIANLINK, INC.

COMES NOW, Plaintiff, FIRST FEDERAL BANK, a federal savings bank, by and through its undersigned counsel, pursuant to Rule 1.350, Florida Rules of Civil Procedure, and requests that Defendant MERIDIANLINK, INC. produce the following items at the office of its undersigned counsel within time set forth in Rule 1.350, Florida Rules of Civil Procedure.

### Definitions and Instructions:

If used herein, the following definitions and instructions apply to the requests below:

"Defendant" means Defendant MeridianLink, Inc., including its officers, directors, employees, agents, subsidiaries, parent company, related entities, successors, assigns, and any other person or entity acting on its behalf or at its direction.

1

"Plaintiff" means Plaintiff First Federal Bank, including its officers, directors, employees, agents, or any other person or entity acting on its behalf.

"OpenClose" means Beanstalk Networks, LLC, doing business as OpenClose, including its member, managers, officers, directors, employees, agents, subsidiaries, parent company, related entities, successors, assigns, and any other person or entity acting on its behalf or at its direction.

"First Amended Complaint" means the First Amended Complaint that was filed in this lawsuit in March 25, 2025.

"Answer" means Defendant's pleading in response to the First Amended Complaint.

"Affirmative Defense" means any affirmative defense or defense that Defendant asserts in its Answer.

"Order Form" means that Order Form that is attached to the First Amended Complaint that was filed in this lawsuit as its Exhibit B.

"Communication" or "Communications" means any conversation, discussion, correspondence, letter, memorandum, note, e-mail, text messages, voicemail, or other transfer of information, whether written, oral, electronic, telephonic, or by any other means, and includes any Document or other medium which describes, abstracts, digests, records, or transcribes any such communication, or any subsequent review or discussion of such communication, whether occurring at meetings or otherwise.

"Document" or "Documents" means every form of recording, by any means whatsoever, any representation upon any tangible thing, including files, folders, letters, words, drawings, pictures, sounds, symbols, or combination thereof, whether recorded by handwriting, printing, photo static, or by photographic means, magnetic impulse, tape, computer disk, and/or any other form of data storage, data compilation, or mechanical or electronic recording, and all other "documents" or "things" within the meaning of Rule 1.350 of the Florida Rules of Civil Procedure.  Every draft, version or non-identical copy of a "Document" is a separate "Document" as that term is used herein.

"Document" or "Documents" applies to all information within your possession, custody or control, including but without limitation any of your attorneys or other representatives.  Without limiting the term "control," a Document is deemed to be within your control if you have ownership, possession, or custody of the Document, or the right to secure the Document or a copy of the Document from any person having the right of access to or physical possession of the Document.

If any Document or Communication or information is withheld under a claim of privilege, in order that the Court and the parties may determine the validity of the claim of privilege, you are to provide sufficient information to determine the identity of the document or information so claimed to be privileged and set forth the basis for any asserted claim of privilege.

"Relating to," "reflecting," or "concerning" a given subject matter shall be construed to include all Documents or Communications embodying, comprising,

3

referring to, constituting, containing, memorializing, evidencing, describing, identifying, supporting, analyzing, discussing, mentioning, summarizing, stating, or pertaining in any way to, in whole or in part, the stated subject matter.

The connectives "and" and "or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of the request all items that might otherwise be construed to be outside of the scope.

Unless otherwise specified, the requests below are for items that were created on January 1, 2020, through the date of Defendant's response to this request for production.

## REQUESTS:

1.     Please produce legible copies of all Communications between Plaintiff and Defendant that are relating to, reflecting, or concerning the Order Form.

2.     Please produce legible copies of all Communications between Plaintiff and OpenClose that are relating to, reflecting, or concerning the Order Form.

3.     Please produce legible copies of all Communications between or among officers, directors, employees, or agents of Defendant that are relating to, reflecting, or concerning the Order Form.

4.     Please produce legible copies of all Communications between or among managers, members, officers, directors, employees, or agents of OpenClose that are relating to, reflecting, or concerning the Order Form.

4

5.     Please produce legible copies of all Communications between Defendant and any other person or entity that are relating to, reflecting, or concerning the Order Form.

6.     Please produce legible copies of all Communications between OpenClose and any other person or entity that are relating to, reflecting, or concerning the Order Form.

7.     Please produce legible copies of all Documents relating to, reflecting, or concerning the Order Form.

8.     Please produce legible copies of all invoices or other requests for payment that Defendant sent to Plaintiff that are relating to, reflecting, or concerning the Order Form.

9.     Please produce legible copies of all invoices or other requests for payment that OpenClose sent to Plaintiff that are relating to, reflecting, or concerning the Order Form.

10.     Please produce legible copies of all Documents and all Communications that are relating to, reflecting, or concerning any Affirmative Defense that is asserted in Defendant's Answer to Plaintiff's First Amended Complaint.

11.     Please produce legible copies of all Documents and all Communications that are relating to, reflecting, or concerning any denial of any allegation that is made in Plaintiff's First Amended Complaint that Defendant asserts in Defendant's Answer to Plaintiff's First Amended Complaint.

5

12.     Please produce legible copies of all Documents relating to, reflecting, or concerning the assignment of the Order Form from OpenClose to Defendant.

13.     Please produce legible copies of the articles of merger or articles of acquisition between Defendant and OpenClose.

T. A. BOROWSKI, JR.
Florida Bar No. 843393
ted@borowski-traylor.com
DARRYL STEVE TRAYLOR, JR.
Florida Bar No. 0075981
steve@borowski-traylor.com
Borowski & Traylor, P.A.
4300 Bayou Blvd., Suite 14
Pensacola, FL  32503
(850) 429-2027; (850) 429-7465 fax
Attorneys for Plaintiff First Federal Bank

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document has been furnished to:

MeridianLink, Inc.
c/o Corporation Service Company
Its Registered Agent
1201 Hays Street
Tallahassee, FL 32301-2525

by US mail, postage prepaid, on this 7th day of April 2025.

DARRYL STEVE TRAYLOR, JR.

6

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

CASE NO.:    2025-CA-2496

FIRST FEDERAL BANK,
a federal savings bank,

      Plaintiff,

vs.

MERIDIANLINK, INC.,
a Delaware corporation,
      Defendant.
_____/

## NOTICE OF APPEARANCE OF COUNSEL
## AND DESIGNATION OF E-MAIL ADDRESSES

PLEASE TAKE NOTICE that Crystal T. Broughan and the firm of Marks Gray, P.A., file this Notice of Appearance as counsel for Defendant, MERIDIANLINK, INC., in the above-styled cause.  The undersigned requests that she be served with copies of all pleadings, notices, motions and other documents in this case.

Crystal T. Broughan of the Marks Gray, P.A., pursuant to Fla. R. Jud. Admin. 2516(b)(1)(A), hereby designates the following primary and secondary e-mail addresses for service by e-mail:

Primary: cbroughan@marksgray.com

Secondary: jpopovici@marksgray.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing document was filed through the Florida

E-Filing Portal System and through that system a copy of the pleading was furnished to counsel

of record by electronic mail, this 24th day of April 2025.

*/s/Crystal T. Broughan*
CRYSTAL T. BROUGHAN
Florida Bar No.:  863343
**MARKS GRAY, P.A.**
Post Office Box 447
Jacksonville, Florida 32201
Telephone:  (904) 398-0900
Facsimile:  (904) 399-8440
Primary Email: cbroughan@marksgray.com
Secondary Email: jlp@marksgray.com
*Attorneys for Defendant Meridianlink, Inc.*

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

CASE NO.:    2025-CA-2496

FIRST FEDERAL BANK,
a federal savings bank,

      Plaintiff,

vs.

MERIDIANLINK, INC.,
a Delaware corporation,
      Defendant.

_____/

## UNOPPOSED MOTION FOR EXTENSION OF TIME FOR DEFENDANT MERIDIANLINK, INC. TO RESPOND TO AMENDED COMPLAINT

COMES NOW, the Defendant MERIDIANLINK, INC., by and through counsel, and pursuant to F.R.C.P. 1.090(b) hereby moves for an extension of time to file a response to the Amended Complaint.  In support of this motion, the Defendant states:

1.   The Defendant was served with a summons and Amended Complaint on April 8, 2025.

2.   The Defendant retained local counsel in Florida on Wednesday, April 23, 2025.

3.   Local counsel has not had an opportunity to confer with the client and file a responsive pleading.

4.   This Motion is made for good cause, in good faith, and not for the purpose of delay.

5.   Rule 1.090(b)(1) states that:

When an act is required or allowed to be done at or within a specified time . . . by these rules for cause shown the court at any time in its discretion (1) with or without notice, may order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order, or

Upon motion made and notice after the expiration of the specified period, may permit the act to be done when failure to act was the result of excusable neglect.

6. Florida Rule of Civil Procedure 1.090(b) allows the Court to extend the time for filing a responsive pleading in order to "secure the just, speedy, and inexpensive determination of every action." See Fla. R. Civ. P. 1.010. Such an Order is left to the sound discretion of the trial court. See Fla. R. Civ. P. 1.090(b)("When an act is required or allowed... for cause shown the court at any time in its discretion ... may order the period of time enlarged ... "); NBP Paribas v. Wynne, 944 So. 2d 1004, 1005 (Fla. 4th DCA 2005) (Rule 1.090(b) allows a court, in its discretion, to enlarge the time to perform an act).

WHEREFORE, Defendant MERIDIANLINK, INC., respectfully moves this Court for the entry of an order granting the Defendant an extension to May 15, 2025 to respond to the Plaintiff's Amended Complaint.

## <u>RULE 1.202 CERTIFICATE OF CONFERRAL</u>

I certify that prior to filing this amended motion, counsel for Defendant Eileen Rumfelt with the Miller & Martin law firm in Atlanta, Georgia spoke with counsel for Plaintiff, Darryl Traylor, Jr. on April 21, 2025, and he agreed to an extension of time to May 15, 2025.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document was filed through the Florida E-Filing Portal System and through that system a copy of the pleading was furnished to counsel of record by electronic mail, this 24th day of April, 2025.

*/s/Crystal T. Broughan*
CRYSTAL T. BROUGHAN
Florida Bar No.:  863343
**MARKS GRAY, P.A.**
Post Office Box 447
Jacksonville, Florida 32201
Telephone:  (904) 398-0900
Facsimile:  (904) 399-8440
Primary Email: cbroughan@marksgray.com
Secondary Email: jlp@marksgray.com
*Attorneys for Defendant Meridianlink, Inc.*

IN THE CIRCUIT COURT OF THE
FIFTEENTH JUDICIAL CIRCUIT, IN AND
FOR PALM BEACH COUNTY, FLORIDA

CASE NO.:    2025-CA-2496

FIRST FEDERAL BANK,
a federal savings bank,

      Plaintiff,

vs.

MERIDIANLINK, INC.,
a Delaware corporation,
      Defendant.

_____/

### ORDER ON UNOPPOSED MOTION FOR EXTENSION OF TIME FOR DEFENDANT TO RESPOND TO AMENDED COMPLAINT

THIS CAUSE is before the Court on Defendant Meridianlink, Inc.'s Unopposed Motion for Extension of Time to Respond to Amended Complaint.   Having reviewed the Motion, the pertinent portions of the record, and noting that the Motion is unopposed, the Court finds that good cause exists to grant the Motion.

IT IS HEREBY ORDERED:

1. The Motion is hereby GRANTED.

2. The Defendant shall file their response to Plaintiff's Amended Complaint on or before May 15, 2025.

**DONE AND ORDERED** in Chambers in West Palm Beach, Palm Beach County, Florida.

502025CA002496XXXAMB   04/25/2025
Scott Kerner
Circuit Judge

**Copies to Counsel of Record:**

Darryl Steven Traylor, Jr.
steve@borowski-traylor.com
maryann@borowski-traylor.com


T.A. Borowski, Jr.
ted@borowski-traylor.com
lexxi@borrowski-traylor.com


Crystal Broughan
cbroughan@marksgray.com
jpopovici@marksgray.com