IN THE CIRCUIT COURT FOR THE FIFTEENTH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

FIRST FEDERAL BANK,
a federal savings bank,

     Plaintiff,

v.                                 Case No.: 05-2025-CA-002496-XXXA-MB

MERIDIANLINK, INC.,
a Delaware corporation,

     Defendant.

_____/

## FIRST AMENDED COMPLAINT

     COMES NOW, Plaintiff, FIRST FEDERAL BANK, a federal savings bank, by and through its undersigned counsel, and sues Defendant, MERIDIANLINK, INC., a Delaware corporation, and alleges:

## GENERAL ALLEGATIONS

     1.     Plaintiff First Federal Bank ("**Plaintiff**") is a federal savings bank that conducts business in the State of Florida.

     2.     Defendant MeridianLink, Inc. ("**Defendant**") is a Delaware corporation that is authorized to conduct business in the State of Florida.

     3.     Defendant's address is 3560 Hyland Ave., Suite #200, Costa Mesa, CA 92626

     4.     Beanstalk Networks L.L.C. is a dissolved Florida limited liability company that shared the same address as Defendant.

1

5.     Beanstalk Networks L.L.C. conducted business under the fictitious name OpenClose, which was a name that was registered with the State of Florida, and which was owned by Beanstalk Networks L.L.C.

6.     OpenClose conducted business at 314 Clematis Street, Suite 200, West Palm Beach, Florida 33401.

7.     Defendant holds itself out as having acquired Beanstalk Networks, L.L.C. doing business as OpenClose effective as of November 4, 2022, and as having been assigned the agreements that were held by Beanstalk Networks. L.L.C. doing business as OpenClose, including both rights and obligations under those agreements.  However, Plaintiff did not receive any formal notice of that acquisition and assignment until January 28, 2025.  A redacted copy of the letter dated January 28, 2025, from Defendant to Plaintiff stating that it had been assigned "all rights and obligations" held by "Beanstalk Networks LLC, dba OpenClose" (herein "**OpenClose**") is attached hereto and incorporated herein by reference as <u>Exhibit A</u>.

<u>**COUNT ONE: DECLARATORY RELIEF**</u>

8.     This is an action that is within the jurisdiction of the Court pursuant to Chapter 86, Florida Statutes, or pursuant to other law, that seeks a declaration regarding Plaintiff's obligations, if any, with respect to and in connection with and "Order Form" dated December 23, 2021, and with respect to and in connection with the invoices discussed herein.

2

9.     Plaintiff incorporates the allegations made in paragraphs 1 through 7 by reference as if those allegations were fully set forth in this count.

10.     Venue is proper in Palm Beach County, Florida, pursuant to terms of an "Order Form" dated December 23, 2021, between Plaintiff and OpenClose.

11.     A redacted copy of the aforesaid Order Form is attached hereto and incorporated herein by reference as Exhibit B.

12.     The purpose of the Order Form was intended to be a subscription or software licensing arrangement whereby OpenClose would provide mortgage loan processing and origination software to Plaintiff, which are the "Products and Services" described in and contemplated by the Order Form ("**Products and Services**").

13.     The Order Form contains list of service level standards that OpenClose agreed to maintain and to which it agreed to adhere, and those standards are material terms of the Order Form.  (Ex. B, p. 10-11.)

14.     A representation and warranty by Defendant and by OpenClose that is contained in the Order Form provides that the Products and Services will be provided in a manner that is consistent with general industry standards and that the Products and Services will perform substantially as OpenClose had demonstrated to Plaintiff.

15.     In connection with the execution of the Order Form, Plaintiff remitted an "Implementation Fee Payment" to OpenClose in the amount of $51,500.00 ("**Implementation Fee**").

3

16.     Soon after the execution of the Order Form, problems arose with the OpenClose's ability to deliver the Products and Services that were promised to Plaintiff pursuant to or in connection with the Order Form.

17.     During the first six months of 2022, multiple meetings and conferences were held between employees of Plaintiff and employees of OpenClose regarding the problems that arose with respect to OpenClose not being able to deliver the Products and Services that Plaintiff had been promised in connection with or pursuant to the Order Form.

18.     For example, some of the problems and issues that OpenClose was unable or unwilling to resolve by June 2022, which resulted in Plaintiff not being able to use OpenClose's software to process or originate mortgage loans, are shown on the spreadsheet that is attached hereto and incorporated herein by reference as <u>Exhibit C</u>, which also identifies OpenClose's material misrepresentations and material omissions that it made in connection with the Order Form.

19.     Due to unresolved problems and issues with the OpenClose software or program that OpenClose was unable or unwilling to resolve, Plaintiff never "on boarded" OpenClose's program or software, and OpenClose's program or software was not used by Plaintiff, through no fault of its own, to process or originate mortgage loans.

20.     By August 2022, OpenClose knew that Plaintiff was not able to use OpenClose's software for mortgage loan origination or processing due to problems and issues with OpenClose's software that OpenClose was unable or unwilling to resolve in

4

order for OpenClose to deliver the Products and Services that are described in and contemplated by the Order Form.

21.     OpenClose being unable or unwilling to resolve all of the known problems and issues that prohibited Plaintiff from using OpenClose's program or software for its intended purpose of Plaintiff processing and originating mortgage loans was OpenClose's material breach of the Order Form that entitled Plaintiff to cancel or terminate any obligation that it may have had under the terms of or in connection with the Order Form, or that released or excused Plaintiff from any obligation that it may have had under the terms of or in connection with the Order Form.

22.     OpenClose not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

23.     Defendant not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

24.     OpenClose not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

5

25.     Defendant not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

26.     Defendant and OpenClose not providing the Products and Services in the manner that was demonstrated to Plaintiff by OpenClose was a material breach of the terms of the Order Form that released or excused or terminated any further obligation by Plaintiff.

27.     OpenClose being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form that released or excused or terminated any further obligation by Plaintiff.

28.     Defendant being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form that released or excused or terminated any further obligation by Plaintiff.

29.     The Order Form provides for a "Minimum Monthly License Fee" in the amount of $21,325.00 per month for "Months 1 – 60."  (Ex. B. p. 1.)

30.     The Order Form provides that there are additional monthly fees, over and above the "Minimum Monthly License Fees," for loans that Plaintiff funded using OpenClose's of Defendant's software or subscription or the Products and Services that exceeded two hundred funded loans per month.

6

31.     Both Defendant and OpenClose knew that Plaintiff was not actually using, and never used, the software or subscription or the Products and Services described in or contemplated by the Order Form. .

32.     A term of the Order Form provides that OpenClose or Defendant "will automatically issue an invoice" to Plaintiff "each month for payment as set forth on the Order Form." (Ex. B, p. 4.)

33.     In acknowledgment that Plaintiff had no further obligation to OpenClose or to Defendant pursuant to the Order Form, neither Defendant nor OpenClose sent Plaintiff any monthly invoice for the "Minimum Monthly License Fee" or for any other amount for any services that were rendered to Plaintiff pursuant to the Order Form during 2022 or during 2023 or during the first seven months of 2024.

34.     Knowing that, through no fault of its own, Plaintiff was unable to use the Products and Services stated in and contemplated by the Order Form, and knowing that OpenClose was not providing Plaintiff with those Products and Services, neither OpenClose nor Defendant communicated with Plaintiff regarding the Order Form between late October 2022 and August 2024.

35.     Notwithstanding the fact that Plaintiff was unable to use OpenClose's software or licensing that was described in or contemplated by the Order Form due to problems and issues that OpenClose did not resolve or correct through no fault of Plaintiff, and notwithstanding the fact the Plaintiff did not otherwise use any of the services that are described in or contemplated by the Order Form, on August 2024,

7

Defendant sent Plaintiff an invoice dated August 29, 2024, in the amount of $597,100.00 that purports to be for the "Minium Monthly License Fee" that is stated in the Order Form in the amount of $21,325 per month for the period of April 2022 through July 2024.

36.     In other words, prior to August 29, 2024, neither Defendant nor OpenClose sent Plaintiff any monthly invoice for any services that were rendered to Plaintiff or that sought payment from Plaintiff pursuant to the Order Form of the months of April 2022, May 2022, June 2022, July 2022, August 2022, September 2022, October 2022, November 2022, December 2022, January 2023, February 2023, March 2023, April 2023, May 2023, June 2023, July 2023, August 2023, September 2023, October 2023, November 2023, December 2023, January 2024, February 2024, March 2024, April 2024, May 2024, or June 2024.

37.     Notwithstanding the fact that Plaintiff was unable to use OpenClose's software or licensing that was described in or contemplated by the Order Form due to problems and issues that OpenClose did not resolve or correct through no fault of Plaintiff, and notwithstanding the fact the Plaintiff did not otherwise use any of the services that are described in or contemplated by the Order Form, on March 21, 2025, Defendant sent Plaintiff the attached "Statement" dated March 20, 2025, which states that an invoice dated March 19, 2025, in the amount of $682,400.00 was sent to Plaintiff. However, Plaintiff has not yet received that invoice.

38.     Using the "Minimum Monthly Licensing Fee" that is stated in the Order Form in the amount of $21,325 per month, the invoice dated March 19, 2025, in the

8

amount of $682,400.00 that is referenced in the "Statement" presumably seeks the minimum monthly fee for the monthly periods from August 2024 through March 2027.

39.     Redacted copies of the invoice dated August 29, 2024, in the amount of $597,100.00 and the "Statement" referencing the invoice dated March 19, 2025, in the amount of $682,400.00 are attached hereto and incorporated herein by reference as composite Exhibit D ( collectively herein the "**Invoices**").

40.     On March 21, 2025, Defendant sent Plaintiff a "Notice of Termination of Agreement with MeridianLink, Inc." that demanded or requested that Plaintiff immediately pay Defendant the sum of "$1,279,500.00 in full satisfaction" of obligations that Defendant contends it is owed by Plaintiff.  A redacted copy of this notice is attached hereto and incorporated herein by reference as Exhibit E.

41.     Presumably, Defendant arrives at the sum in the amount of $1,279,500.00 that it has sought from Plaintiff by multiplying the "Minimum Monthly License Fee" in the amount of $21,325.00 that is stated in the Order Form by the entire sixty (60) month period from April 2022 through March 2027, notwithstanding the fact that neither Defendant nor OpenClose actually provided Plaintiff any of the Products and Services that are described in or contemplated by the Order Form, and notwithstanding the fact that Plaintiff did not use the Products and Services to process or originate any mortgage loans.

42.     For Defendant to be owed or to otherwise be entitled to receive the sum of $1,279,500.00 from Plaintiff when, under the circumstances alleged herein, Plaintiff has

not used any of the Products and Services that are described in or contemplated by the Order Form would be unconscionable.

43.     Because Plaintiff, through no fault of its own, was not able to use OpenClose's software or subscription as contemplated by the Order Form because OpenClose was unable or unwilling to resolve the problems and issues with its software, Plaintiff is entitled to a refund of the Implementation Fee that is stated in the Order Form in the amount of $51,500.00.

44.     There is a bona fide, actual, present, and practical need for the Court to declare Plaintiff's obligations, if any, with respect to the Order Form.

45.     There is a bona fide, actual, present, and practical need for the Court to declare Plaintiff's obligations, if any, with respect to whether Plaintiff owes Defendant the sums that Defendant claims to be owed pursuant to the Invoices and with respect to other sums, if any, that Plaintiff may owe to Defendant that arise from or pertain to the Order Form.

46.     There is a bona fide, actual, present, and practical need for the Court to declare that Plaintiff is entitled to a refund of the Implementation Fee.

47.     The declarations that are sought by Plaintiff deal with a present, ascertained, or ascertainable state or set of facts.

48.     Plaintiff's obligations, if any, with respect to the Order Form, with respect to the Invoices, and with respect to the Implementation Fee are dependent upon the set of facts that are set forth herein or the law that is applicable to these facts.

10

49.     The parties have, or reasonably may have, actual, present, adverse, and antagonistic interests, either in fact or law, with respect to Plaintiff's obligations, if any, to Defendant that arise from or pertain to the Order Form, the Invoices, and the Implementation Fee.

50.     All parties with antagonistic and adverse interests with respect to the Order Form, the Invoice, and the Implementation Fee are before the Court.

51.     The relief and declarations that are sought herein are not sought for the purpose of obtaining legal advice or to answer questions propounded from curiosity.

52.     Plaintiff has performed any conditions precedent that were required to be performed by Plaintiff, or those conditions have been waived by Defendant.

53.     Plaintiff has employed the law firm of Borowski & Traylor, P.A. to represent its interests herein, and Plaintiff is obligated to pay its attorneys a reasonable fee for their services.

WHEREFORE, Plaintiff First Federal Bank prays that this Honorable Court will enter its judgment declaring that:

(i)     Plaintiff has no obligation to Defendant MeridianLink, Inc. that arises from or that pertains to the Order Form;

(ii)    Any obligation that Plaintiff may have previously had under the Order Form was terminated by OpenClose being unable or unwilling to provide Plaintiff with the Products and Services that are described in and contemplated by the Order Form;

11

(iii)   Plaintiff has no obligation to Defendant because it is unconscionable to enforce the terms of the Order Form under the circumstances here;

(iv)   Plaintiff does not owe Defendant MeridianLink, Inc. the sums that are stated in and sought by the Invoices;

(v)   Plaintiff does not owe Defendant MeridianLink, Inc. any other sums that arise from or pertain to the Order Form;

(vi)   Plaintiff is entitled to a refund of the Implementation Fee, and that Defendant MeridianLink, Inc. owes Plaintiff the Implementation Fee;

(vii)   Plaintiff is entitled to recover its attorney's fees that were incurred in connection with this action; and

(viii)   Plaintiff is entitled to such other and further relief as is just and proper.

**COUNT TWO: BREACH OF CONTRACT**

54.   This is an action for breach of contract that is within the jurisdiction of the Court that seeks damages in excess of $50,000, exclusive of attorney's fees and costs.

55.   Plaintiff incorporates the allegations made in paragraphs 1 through 7 by reference as if those allegations were fully set forth in this count.

56.   Venue is proper in Palm Beach County, Florida, pursuant to terms of an "Order Form" dated December 23, 2021, between Plaintiff and OpenClose.

57.   A redacted copy of the aforesaid Order Form is attached hereto and incorporated herein by reference as Exhibit B, which is the contract that is sought to be enforced in this count.

12

58.     The purpose of the Order Form was intended to be a subscription or software licensing arrangement whereby OpenClose would provide mortgage loan processing and origination software to Plaintiff, which are the "Products and Services" described in and contemplated by the Order Form ("**Products and Services**").

59.     In connection with the execution of the Order Form, Plaintiff remitted an "Implementation Fee Payment" to OpenClose in the amount of $51,500.00 ("**Implementation Fee**").

60.     Soon after the execution of the Order Form, problems arose with the OpenClose's ability to deliver the Produces and Services that were promised to Plaintiff pursuant to or in connection with the Order Form.

61.     During the first six months of 2022, multiple meetings and conferences were held between employees of Plaintiff and employees of OpenClose regarding the problems that arose with respect to OpenClose not being able to deliver the Products and Services that Plaintiff had been promised in connection with or pursuant to the Order Form.

62.     For example, some of the problems and issues that that OpenClose was unable or unwilling to resolve by June 2022, which resulted in Plaintiff not being able to use OpenClose's software to process or originate mortgage loans, are shown on the spreadsheet that is attached hereto and incorporated herein by reference as <u>Exhibit C</u>, which also identifies OpenClose's material misrepresentations and material omissions that it made in connection with the Order Form.

63.     A material term of the Order Form provides that OpenClose would "provide the Products and Services in a manner consistent with general industry standards and that the Products and Services will perform substantially as demonstrated under normal use and circumstances," which was an obligation that Defendant assumed.  (Ex. B, ¶ 12.)

64.     The Order Form contains list of service level standards that OpenClose agreed to maintain and to which it agreed to adhere, and those standards are material terms of the Order Form.  (Ex. B, p. 10-11.)

65.     Due to unresolved problems and issues with the OpenClose software or program that OpenClose was unable or unwilling to resolve, Plaintiff never "on boarded" OpenClose's program or software, and OpenClose's program or software was not used by Plaintiff, through no fault of its own, to process or originate mortgage loans.

66.     By August 2022, OpenClose knew that Plaintiff was not able to use OpenClose's software for mortgage loan origination or processing due to problems issues with OpenClose's software that OpenClose was unable or unwilling to resolve in order for OpenClose to deliver the Products and Services that are described in and contemplated by the Order Form.

67.     OpenClose being unable or unwilling to resolve all of the known problems and issues that prohibited Plaintiff from using OpenClose's program or software for its intended purpose of Plaintiff processing and originating mortgage loans was OpenClose's material breach of the Order Form that entitled Plaintiff to cancel or

14

terminate any obligation that it may have had under the terms of or in connection with the Order Form, or that released Plaintiff from any obligation that it may have had under the terms of or in connection with the Order Form.

68. OpenClose being unable or unwilling to resolve issues with its software so as to deliver the Products and Services described in and contemplated by the Order Form was its material breach of the terms of the Order Form, which is also Defendant's material breach of the Order Form.

69. In acknowledgment that Plaintiff had no further obligation to OpenClose or to Defendant pursuant to the Order Form, neither Defendant nor OpenClose sent Plaintiff any invoice for the monthly licensing fee for any services that were rendered pursuant to the Order Form during 2022 or during 2023 or during the first seven months of 2024.

70. Knowing that, through no fault of its own, Plaintiff was unable to use the Products and Services stated in and contemplated by the Order Form, and knowing that OpenClose was not providing Plaintiff with those Products and Services, neither OpenClose nor Defendant communicated with Plaintiff regarding the Order Form between late October 2022 and August 2024.

71. In connection with its acquisition of OpenClose, Defendant assumed "all rights and obligations" that OpenClose owed to Plaintiff pursuant to the Order Form. As such, Defendant is liable to Plaintiff for the damages that are sought in this count.

72.     OpenClose not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form.

73.     Defendant not providing Plaintiff with all of the Products and Services in a manner that was consistent with general industry standards was a material breach of the terms of the Order Form.

74.     OpenClose not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form.

75.     Defendant not complying with all of the service level standards that are contained in the Order Form was a material breach of the terms of the Order Form.

76.     Defendant and OpenClose not providing the Products and Services in the manner that was demonstrated to Plaintiff by OpenClose was a material breach of the terms of the Order Form.

77.     OpenClose being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form.

78.     Defendant being unable or unwilling to resolve all of the problems and issues with its software or subscription as described in or as contemplated by the Order Form was a material breach of the Order Form.

79.     Because of those material breaches of the Order Form, Plaintiff, through no fault of its own, was not able to use the software or subscription as described in or as

16

contemplated by the Order Form, and Defendant has assumed all of OpenClose's obligations under the Order Form.

80.     Plaintiff has been damaged as the result of the aforesaid material breaches of the Order Form in such amounts as will be established at trial or at the final hearing in this matter.

81.     As the direct and proximate result of the aforesaid material breaches of the Order Form, Plaintiff is entitled to a refund of the Implementation Fee that is stated in the Order Form in the amount of $51,500.00.

82.     Plaintiff has performed any conditions precedent that were required to be performed by Plaintiff, or those conditions have been waived by Defendant.

83.     Plaintiff has employed the law firm of Borowski & Traylor, P.A. to represent its interests herein, and Plaintiff is obligated to pay its attorneys a reasonable fee for their services.

WHEREFORE, Plaintiff First Federal Bank demands judgment for damages against Defendant MeridianLink, Inc., the amount of said judgment to include Plaintiff's attorney's fees and costs incurred in connection with this action, and said judgment to include prejudgment interest from the time that the Implementation Fee was remitted, and Plaintiff further prays that this Honorable Court will grant such other and further relief as is just and proper.

## COUNT THREE: VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

84.     This is an action that is within the jurisdiction of the Court pursuant to Chapter 501, Part II, Florida Statutes, which is known as the "Florida Deceptive and Unfair Trade Practices Act," or pursuant to other law, that seeks damages in an amount in excess of $50,000, exclusive of attorney's fees and costs.

85.     Plaintiff is a legitimate business enterprise that is entitled to protection pursuant to the Florida Unfair and Deceptive Trade Practices Act as set forth therein or pursuant to judicial rulings that have construed that act.

86.     Plaintiff incorporates the allegations made in paragraphs 1 through 7 by reference as if those allegations were fully set forth in this count.

87.     Venue is proper in Palm Beach County, Florida, pursuant to terms of an "Order Form" dated December 23, 2021, between Plaintiff and OpenClose.

88.     A redacted copy of the aforesaid Order Form is attached hereto and incorporated herein by reference as Exhibit B.

89.     The purpose of the Order Form was intended to be a subscription or software licensing arrangement whereby OpenClose would provide mortgage loan processing and origination software to Plaintiff, which are the "Products and Services" described in and contemplated by the Order Form ("**Products and Services**").

18

90.     The Order Form contains list of service level standards that OpenClose agreed to maintain and to which it agreed to adhere, and those standards are material terms of the Order Form.  (Ex. B, p. 10-11.)

91.     In connection with the execution of the Order Form, Plaintiff remitted an "Implementation Fee Payment" to OpenClose in the amount of $51,500.00 ("**Implementation Fee**").

92.     Soon after the execution of the Order Form, problems arose with the OpenClose's ability to deliver the Products and Services that were promised to Plaintiff pursuant to or in connection with the Order Form.

93.     During the first six months of 2022, multiple meetings and conferences were held between employees of Plaintiff and employees of OpenClose regarding the problems that arose with respect to OpenClose not being able to deliver the Products and Services that Plaintiff had been promised in connection with or pursuant to the Order Form.

94.     For example, some of the problems and issues that OpenClose was unable or unwilling to resolve by June 2022, which resulted in Plaintiff not being able to use OpenClose's software to process or originate mortgage loans, are shown on the spreadsheet that is attached hereto and incorporated herein by reference as Exhibit C, which also identifies OpenClose's material misrepresentations and material omissions that it made in connection with the Order Form.

95.     Due to unresolved problems and issues with the OpenClose software or program that OpenClose was unable or unwilling to resolve, Plaintiff never "on boarded" OpenClose's program or software, and OpenClose's program or software was not used by Plaintiff, through no fault of its own, to process or originate mortgage loans.

96.     By August 2022, OpenClose knew that Plaintiff was not able to use OpenClose's software for mortgage loan origination or processing due to problems and issues with OpenClose's software that OpenClose was unable or unwilling to resolve in order for OpenClose to deliver the Products and Services that are described in and contemplated by the Order Form.

97.     The Order Form provides for a "Minimum Monthly License Fee" in the amount of $21,325.00 per month for "Months 1 – 60."  (Ex. B. p. 1.)

98.     The Order Form provides that there are additional monthly fees, over and above the "Minimum Monthly License Fees," for loans that Plaintiff funded using OpenClose's of Defendant's software or subscription or the Products and Services that exceeded two hundred funded loans per month.

99.     Both Defendant and OpenClose knew that Plaintiff was not actually using, and never used, the software or subscription or the Products and Services described in or contemplated by the Order Form.

100.    A term of the Order Form provides that OpenClose or Defendant "will automatically issue an invoice" to Plaintiff "each month for payment as set forth on the Order Form."  (Ex. B, p. 4.)

101.    In acknowledgment that Plaintiff had no further obligation to OpenClose or to Defendant pursuant to the Order Form, neither Defendant nor OpenClose sent Plaintiff any monthly invoice for the "Minimum Monthly License Fee" or for any other amount for any services that were rendered to Plaintiff pursuant to the Order Form during 2022 or during 2023 or during the first seven months of 2024.

102.    Knowing that, through no fault of its own, Plaintiff was unable to use the Products and Services stated in and contemplated by the Order Form, and knowing that OpenClose was not providing Plaintiff with those Products and Services, neither OpenClose nor Defendant communicated with Plaintiff regarding the Order Form between late October 2022 and August 2024.

103.    Notwithstanding the fact that Plaintiff was unable to use OpenClose's software or licensing that was described in or contemplated by the Order Form due to problems and issues that OpenClose did not resolve or correct through no fault of Plaintiff, and notwithstanding the fact the Plaintiff did not otherwise use any of the services that are described in or contemplated by the Order Form, on August 2024, Defendant sent Plaintiff an invoice dated August 29, 2024, in the amount of $597,100.00 that purports to be for the "Minium Monthly License Fee" that is stated in the Order Form in the amount of $21,325 per month for the period of April 2022 through July 2024.

104.    In other words, prior to August 29, 2024, neither Defendant nor OpenClose sent Plaintiff any monthly invoice for any services that were rendered to Plaintiff or that sought payment from Plaintiff pursuant to the Order Form of the months of April 2022,

May 2022, June 2022, July 2022, August 2022, September 2022, October 2022, November 2022, December 2022, January 2023, February 2023, March 2023, April 2023, May 2023, June 2023, July 2023, August 2023, September 2023, October 2023, November 2023, December 2023, January 2024, February 2024, March 2024, April 2024, May 2024, or June 2024.

105.    Notwithstanding the fact that Plaintiff was unable to use OpenClose's software or licensing that was described in or contemplated by the Order Form due to problems and issues that OpenClose did not resolve or correct through no fault of Plaintiff, and notwithstanding the fact the Plaintiff did not otherwise use any of the services that are described in or contemplated by the Order Form, on March 21, 2025, Defendant sent Plaintiff the attached "Statement" dated March 20, 2025, which states that an invoice dated March 19, 2025, in the amount of $682,400.00 was sent to Plaintiff. However, Plaintiff has not yet received that invoice.

106.    Using the "Minimum Monthly Licensing Fee" that is stated in the Order Form in the amount of $21,325 per month, the invoice dated March 19, 2025, in the amount of $682,400.00 that is referenced in the "Statement" presumably seeks the minimum monthly fee for the monthly periods from August 2024 through March 2027.

107.    Redacted copies of the invoice dated August 29, 2024, in the amount of $597,100.00 and the "Statement" referencing the invoice dated March 19, 2025, in the amount of $682,400.00 are attached hereto and incorporated herein by reference as composite Exhibit D ( collectively herein the "**Invoices**").

22

108.     On March 21, 2025, Defendant sent Plaintiff a "Notice of Termination of Agreement with MeridianLink, Inc." that demanded or requested that Plaintiff immediately pay Defendant the sum of "$1,279,500.00 in full satisfaction" of obligations that Defendant contends it is owed by Plaintiff.  A redacted copy of this notice is attached hereto and incorporated herein by reference as Exhibit E.

109.     Presumably, Defendant arrives at the sum in the amount of $1,279,500.00 that it has sought from Plaintiff by multiplying the "Minimum Monthly License Fee" in the amount of $21,325.00 that is stated in the Order Form by the entire sixty (60) month period from April 2022 through March 2027, notwithstanding the fact that neither Defendant nor OpenClose actually provided Plaintiff any of the Products and Services that are described in or contemplated by the Order Form, and notwithstanding the fact that Plaintiff did not use the Products and Services to process or originate any mortgage loans.

110.     A term of the Order Form provides that Plaintiff is responsible for paying all of the Monthly License Fees that are set in the Order Form for its entire sixty (60) month term, "whether of not such Products and Services are actively used," which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

111.     A similar term of the Order Form provides that, if Defendant terminates the Order Form, then all of the Monthly Licensing Fees "for the entire term shall become immediately due and payable," and that Defendant will have "no further or continuing

23

obligation" to Plaintiff, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

112.    Defendant is attempting to collect the Monthly Licensing Fee for sixty (60) months from Plaintiff in the amount $1,279,500.00, notwithstanding the fact that Defendant has not actually provided any Products or Services to Plaintiff and notwithstanding the fact that Plaintiff has not used any Product or Services to process originate any mortgage loans, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

113.    For Defendant to claim to be owed or to otherwise be entitled to receive the sum of $1,279,500.00 from Plaintiff when, under the circumstances alleged herein, Plaintiff has not used any of the Products and Services that are described in or contemplated by the Order Form is Defendant's action that is so unfair or one-sided that it shocks the conscience, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

114.    A representation and warranty by Defendant and by OpenClose that is contained in the Order Form provides that the Products and Services will be provided in a manner that is consistent with general industry standards and that the Products and Services will perform substantially as OpenClose had demonstrated to Plaintiff.

115.    Inconsistent with that representation and warranty, another term of the Order Form contains a disclaimer of warranties whereby Defendant and OpenClose stated that there were no representations or warranty that the technology that was being

24

provided to Plaintiff would meet Plaintiff's requirements or expectations or that Defendant's and OpenClose's errors or defects would be corrected, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

116.    Inconsistent with Defendant's and OpenClose's representations and warranties made in Order Form or in connection with the Order Form, a term of the Order Form provides for Defendant's and OpenClose's limited liability for Plaintiff's inability to use the Products and Services, regardless of the cause, and provides that Defendant's and OpenClose's liability for their own errors and omissions is limited to the amount of the Minimum Licensing Fee that Plaintiff paid for a six (6) month period, which is an unconscionable, deceptive or unfair act or practice by Defendant in the conduct of Defendant's trade or commerce.

117.    As the direct and proximate cause of Defendant's or OpenClose's aforesaid unconscionable, deceptive or unfair acts or practices, Plaintiff has been damaged, including Plaintiff's damage in the amount of the Implementation Fee, and the total amount of Plaintiff's damages will be established at the trial or final hearing in this matter.

118.    Plaintiff has performed any conditions precedent that were required to be performed by Plaintiff, or those conditions have been waived by Defendant.

119.     Plaintiff has employed the law firm of Borowski & Traylor, P.A. to represent its interests herein, and Plaintiff is obligated to pay its attorneys a reasonable fee for their services.

WHEREFORE, Plaintiff First Federal Bank demands judgment for damages against Defendant MeridianLink, Inc., the amount of said judgment to include Plaintiff's attorney's fees and costs incurred in connection with this action, and Plaintiff further prays that this Honorable Court will grant such other and further relief as is just and proper.

_____
DARRYL STEVE TRAYLOR, JR.
Florida Bar No. 0075981
steve@borowski-traylor.com
T. A. BOROWSKI, JR.
Florida Bar No. 843393
ted@borowski-traylor.com
Borowski & Traylor, P.A.
4300 Bayou Blvd., Suite 14
Pensacola, FL 32503
(850) 429-2027; (850) 429-7465 fax
Attorneys for Plaintiff First Federal Bank

# meridianlink

January 28, 2025

First Federal Bank
1300 McFarland Blvd, NE
Tuscaloosa AL 35406-2252
ATTN: Sherry Romano

Notice of Material Breach under Agreement with MeridianLink, Inc.

WHEREAS, Beanstalk Networks LLC, dba OpenClose was acquired by MeridianLink, Inc. ("MeridianLink") effective November 4, 2022, by which the Agreements have been assigned to MeridianLink, including all rights and obligation set forth therein.

To Whom It May Concern:

Please allow this to serve as formal notice that First Federal Bank is currently in material breach of that certain agreement for services between OpenClose and customer dated 12/23/2021 (the "Agreement"). We have sent two prior notices of default on 10/13/2024 and 10/28/2024. Despite these notices, we have not received full payment on the amounts due of $597,100.00 to bring your account current. This amount may not include applicable late fees, which MeridianLink will assess on termination if this balance remains uncured.

Payment is immediately due for the amount listed above. If payment is not received within twenty (20) days (or as otherwise set forth in the Agreement to cure breach), MeridianLink may terminate this Agreement immediately with notice. Please be advised that services provided under the Agreement will be suspended pending payment of fees due. MeridianLink retains all other rights and remedies available to it pursuant to the Agreement, at law or in equity. Please contact ~~accountreceivable@meridianlink.com~~ with any questions on your current statement, attached here for your reference.

Sincerely,

Elias Olmeta
Chief Financial Officer
MeridianLink, Inc.

**EXHIBIT**

**A**

 3560 Hyland Ave., Suite # 200
Costa Mesa, CA 92626

844-986-3285

 meridianlink.com

DocuSign Envelope ID:

# ORDER FORM

**Beanstalk Networks LLC, dba OpenClose**
314 Clematis Street, Suite 200
West Palm Beach, FL 33401
(561) 650-8106 fax

## openclose

Order # 1                                   Proposed By: Ken Ellis                          Offer Valid Through: 12.31.2021

### Responsible Party

| | | | |
|---|---|---|---|
| Legal Entity Name: | First Federal Bank | Billing Contact: | ~~Janice Jolly~~Sherry Roman |
| Address: | 1300 McFarland Blvd. NE | Billing Email: | ~~[redacted]~~ om |
| | Tuscaloosa, AL 35406-2252 | | |
| Phone: | 910-793-4600 x31805 | Billing Phone: | 205-391-6700 |
| Fax: | | Billing Fax: | |
| Website | www.1stfed.com | Fed Tax ID #: | [redacted] |

### Terms and Conditions

| | | | |
|---|---|---|---|
| Effective Date: | _12/23_, 2021 | Implementation Payment Type: | ☑ Check or ☐ Wire/ACH |
| Initial Term: | 5 years from date of the first Monthly License Fee | Monthly Payment Type: | ☑ Check or ☐ Wire/ACH |
| Renewal Term: | 2 years | Payment Terms: | In advance of due date |

### Products and Fees(1)

**LenderAssist**: Retail LOS
**DecisionAssist**: Program Eligibility & Pricing Engine
**DocAssist**: Document Management & Imaging System
5 Simple PDF Forms
Includes (4) days of onsite training
Implementation Fee
Minimum Monthly License Fee

**\*Loan Fee Charges after Funded Loan Minimum**
201 - 400     Funded Loans
401+           Funded Loans

*Additional Modules*

**ConsumerAssist Enterprise Digital POS**
Implementation Fee
Per Funded Loan Fee
Monthly License Fee

**OC Optics**: Analytics and Reporting Module
Implementation Fee
Monthly License Fee

**Core Image Booking Module**
Implementation Fee
Monthly License Fee

Unlimited Users ☒
☒
☒

In OpenClose's West Palm Beach, FL corporate headquarters
$40,000.00 ($5,000 Implementation Fee discount if executed on or before 12/31/2021)
$14,000.00 Funded Loan Minimum* (includes 200 Funded Loans)

$65.00 per Funded Loan
$60.00 per Funded Loan

☒
$5,000.00
$35.00
$6,125.00 (includes 175 Funded Loans)

☒
$3,500.00
$950.00

$3,000.00
$250.00

### Payment Schedule for All Products

| Type of Fee | Schedule of Payments | Amount of Payment |
|---|---|---|
| Implementation Fee Payment | Due on the Effective Date | $51,500.00 |
| Minimum Monthly License Fee(2) | Months 1 - 60 | $21,325.00 |

(1) We reserve the right to increase our Fees annually by an amount not to exceed 3%, and we shall give you 30 days advance notice of any such increase.
(2) The first payment of the Minimum Monthly License Fee is due April 1, 2022 or on the Release Date whichever occurs first and monthly thereafter.
(3) -$5,000 Implementation Fee discount if executed on or before 12/31/2021.

By signing this Order Form, you agree that you have read the OpenClose Terms of Service attached hereto as Exhibit A and the Service Level Standards attached hereto as Exhibit B and agree to be legally bound by its and their terms which are incorporated by reference hereby. Prices do not include any taxes that may apply. Any such taxes are the responsibility of Customer. Subscriptions are non-cancelable before the end of the current Term. Additional Pricing for Products and Services not purchased are posted at https://www.openclose.com/publishedpricing/, and the Approved Investor Program List is posted at https://www.openclose.com/current-available-investors/ which are incorporated herein by reference. Upon your request, additional products may be added by addendum which will automatically adjust the Initial Term (or any Renewal Term) to begin on the Effective Date of the addendum.

**FIRST FEDERAL BANK**

Signature _Sherry Romano_
Name _Sherry Romano_
Title _SVP Mortgage Lending_
Date _12/23/2021_

**BEANSTALK NETWORKS LLC, DBA OPENCLOSE**

Signature _James P. Kelly_ (DocuSigned by:)
Name James P. Kelly
Title President
Date Dec-27-2021

EXHIBIT
B

DocuSign Envelope ID:



## Exhibit A to Agreement between First Federal Bank and OpenClose
## OPENCLOSE TERMS OF SERVICE

BY SIGNING OUR ORDER FORM, YOU AGREE TO THE FOLLOWING TERMS GOVERNING YOUR USE OF ONLINE PRODUCTS AND SERVICES OF OPENCLOSE©, INCLUDING OFFLINE COMPONENTS (THE "PRODUCTS AND SERVICES"). IF YOU ARE ENTERING INTO THIS AGREEMENT ON BEHALF OF A CORPORATION, LIMITED LIABILITY COMPANY OR OTHER LEGAL ENTITY, YOU REPRESENT THAT YOU HAVE THE AUTHORITY TO BIND SUCH ENTITY TO THESE TERMS AND CONDITIONS, IN WHICH CASE THE TERMS "YOU" OR "YOUR" SHALL REFER TO SUCH ENTITY.

### Introduction:

Welcome to OpenClose. Your registration for, or use of, the Products and Services set forth on the Order Form shall be deemed to be your agreement to our Terms of Service as applicable to our Products and Services, including any Customer Website. For reference, a Definitions Section is included at the end of this Agreement.

### 1. Advertising

By becoming a paying customer of the Products and Services, you agree that we shall have the right to disclose the fact that you are a paying customer, and the Products and Services that you are using however if either party desires to issue any press release or advertisement which relates to the Products and Services listed hereunder or which mentions the name of the other party, or the name of our Products and Services, then such party shall submit a copy of any such proposed press release or advertisement to the other party for its consent at least ten (10) days prior to its release to the media which consent shall not be unreasonably withheld or delayed. Each press release shall be deemed approved unless the party to whom it is submitted objects within such ten (10) day period. Notwithstanding the foregoing, the restrictions in this section will not apply to incidental oral comments in the ordinary course of business.

### 2. License Grant & Restrictions

For the Term described on the Order Form, you shall have a non-exclusive, non-transferable, right to use the Products and Services, subject to the terms and conditions of this Agreement. All rights not expressly granted to you are reserved by us.

You may not access the Products and Services if you are a direct competitor of ours, except with our prior written consent. In addition, you may not access the Products and Services for purposes of monitoring availability, performance or functionality, or for any other benchmarking or competitive purposes and in addition, you agree not to allow a competitor of ours to access our Products and Services.

You agree not to directly or indirectly (i) license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third party, the Products and Services or the Content; (ii) modify or make derivative works based upon the Products and Services or the Content; (iii) create Internet "links" to the Products and Services or "frame" or "mirror" any Content on any other server or wireless or Internet-based device; or (iv) reverse engineer or access or use the Products and Services for any improper purpose including: (a) building a competitive product or service, using ideas, features, functions or graphics similar to those contained within the Products and Services; (b) copying any ideas, features, functions or graphics of the Products and Services; (c) removing or modifying any copyright or other proprietary notice of ours; (d) using any of our Intellectual Property Rights in any foreign jurisdiction in violation of any trade laws or regulations; or (e) allowing others to do any of the foregoing. This paragraph may be enforced by injunction.

Starting on the Release Date, you may use the Products and Services only for your internal business purposes and you shall not: (i) send or store infringing, obscene, threatening, libelous, or otherwise unlawful or tortious material, including material harmful to children or violative of third party privacy rights; (ii) send or store material containing software viruses, worms, Trojan horses or other harmful computer code, files, scripts, agents or programs; (iii) interfere with or disrupt the integrity or performance of the Products and Services or the data contained therein; or (iv) directly or indirectly attempt to gain unauthorized access to the Products and Services or its related systems or networks.

DocuSign Envelope ID: 58

We shall not be responsible for errors, defects, or downtime caused by any of the following: hardware failures, power problems, environmental problems; modifications to any of Our Technology unless such modifications are made by us or with our authorization; viruses, destructive programs, or self-replicating code, programming, scripts, your business requirements, work flow, or applets unique to your business provided by you; misuse or negligence by you, your employees, or agents in operating any of Our Technology; functionality of third party software used in connection herewith or with which any of Our Technology interfaces except for third-party software approved or authorized by us; or any Force Majeure.

By you: For the Term of this Agreement, you hereby grant to us the royalty-free, irrevocable, worldwide, non-exclusive right and license to use, reproduce, modify, adapt, publish, translate, create derivative works from, distribute, perform, and display all content, remarks, suggestions, ideas, graphics, or other information communicated to us by you through the Customer Website or otherwise in connection with this Agreement, excluding Confidential Information (together, the "Feedback"), and to incorporate any Feedback in other works in any form, media, or technology now known or later developed. We will not be required to treat any Feedback as confidential, and may use any Feedback in our business (including without limitation, for products or advertising) without incurring any liability for royalties or any other consideration of any kind, and will not incur any liability as a result of any similarities that may appear in our future operations.

We will treat any Confidential Information, your Customer Data, or other proprietary data that you submit through this site in accordance with our Privacy Policy as stated in Section 4 of this Agreement.

## 3. Your Responsibilities

You are responsible for: (i) all activity occurring under your User accounts and you agree to abide by all applicable local, state, national and foreign laws, treaties and regulations in connection with your use of our Products and Services, including laws related to data privacy, international communications and the transmission of technical or Personally Identifiable Information as defined in Section 4; (ii) acquiring any authorization(s) necessary for hypertext links to third party Websites; (iii) the accuracy of materials provided to us including without limitation Customer Content, descriptive claims, warranties, guarantees, nature of your business, and address where your business is conducted; (iv) compliance by Users with the terms of this Agreement; (v) preventing access to the Customer Website by persons other than Users with Customer-issued passwords; and (vi) using commercially reasonable best efforts to assist us in providing configuration and testing services related to implementation of the Products and Services in your environment. You agree to: (a) notify us immediately of any unauthorized use of any password or account or any other known or suspected breach of security; (b) report to us immediately and use reasonable efforts to stop immediately any unauthorized copying or distribution of Customer Content and Customer Data that is known or suspected by you or your Users; and (c) be responsible for registration and maintenance of your Domain Names including acquisition of necessary SSL certificates.

## 4. Privacy Policy in Connection with Customer Data & Account Information.

We do not own any data, information or material that you submit to the Products and Services in the course of your use of the Products and Services ("Customer Data"). We have, however, the responsibility to maintain the confidentiality of your Customer Data and we will take steps we deem commercially reasonable to assure that confidentiality is maintained and that there is no unauthorized dissemination of your Customer Data. Personally identifiable information ("PII"), or sensitive personal information ("SPI"), as used in US privacy law and information security, is information that can be used on its own or with other information to identify, contact or locate a single person (accordingly PII excludes general statistical data or analysis of our customer base as a whole). In the unlikely event of a data breach resulting in unauthorized acquisition of Customer Data, you may be required by applicable regulations to take certain remedial actions such as notification of affected customers of yours, or we may be required by applicable law to take certain remedial actions on your behalf. In such event, we will use commercially reasonable efforts to notify you promptly, and we shall endeavor to work closely with you to minimize the impact, however you understand any costs we incur in connection with the foregoing are your responsibility and shall be paid by you as if set forth on a Work Order.

You, not us, shall have sole responsibility for the accuracy, quality, integrity, legality, reliability, appropriateness, or right to use of Customer Data, and we shall not be responsible or liable for the deletion, correction, destruction, damage, loss or failure to store or restore any Customer Data, although we shall use commercially reasonable efforts to prevent damage or loss of your Customer Data, we shall not be responsible or liable for such damage or loss other than as provided in this Agreement.

## 5. Confidentiality

By virtue of this Agreement, the parties may have access to information that is confidential to one another. Confidential Information shall mean: (i) Our Technology; (ii) all of the terms and conditions of this Agreement including the pricing as highlighted in Section 8 [Billing] under this Agreement; (iii) Customer Data; (iv) information related to loan programs and

DocuSign Envelope ID: ████████████████████████

product pricing; and (v) information clearly identified by either party as confidential at the time of disclosure (collectively, the "Confidential Information"). Confidential Information shall not include information that: (a) is or becomes a part of the public domain through no act or omission of the other party; (b) is lawfully disclosed to receiving party by a third party without an obligation of nondisclosure to the disclosing party; (c) is independently developed by the other party without reference to the Confidential Information; or (d) was already in the receiving party's possession prior to the Effective Date of this Agreement.

During the Term of this Agreement, the parties are authorized to use the Confidential Information of the other party solely for the purposes of this Agreement. The parties agree to use the same care and discretion to avoid the unauthorized disclosure, publication or dissemination of the other party's Confidential Information received pursuant to this Agreement as it uses to protect its own similar information that it does not wish to disclose, publish or disseminate (but in no event less than a reasonable standard of care). Each party's obligations of confidentiality hereunder for Confidential Information disclosed during the Term of this Agreement shall continue indefinitely.

A party may disclose its own Confidential Information as it deems appropriate in conducting its own business. A party may disclose the other party's Confidential Information solely to the extent required by subpoena, court order or government requirement to be disclosed, provided that the party which is required to make such disclosure shall give the other party prompt written notice of such subpoena, court order or government requirement so as to allow such the other party to have an opportunity to obtain a protective order to prohibit or restrict such disclosure. Confidential Information disclosed pursuant to subpoena, court order or government requirement shall otherwise remain subject to the terms applicable to Confidential Information.

## 6. Intellectual Property Ownership

We own all right, title and interest, including all related Intellectual Property Rights, in and to Our Technology, the Content and the Products and Services and any suggestions, ideas, enhancement requests, feedback, recommendations or other information provided by you or any of your employees, contractors or agents relating to the Products and Services. This Agreement is not a sale and does not convey to you any rights of ownership in or related to the Products and Services, Our Technology or the Intellectual Property Rights owned by us. Our name(s), our logo(s), and the product names associated with the Products and Services are owned by us, and no right or license is granted to use them other than as provided herein.

## 7. Hyper-Links

The Customer Website may be hyper-linked to other sites which are not maintained by, or related to us. Hyper-links to such sites are not sponsored by or affiliated with the Customer Web Site or us. We have not reviewed any or all of such sites and are not responsible for the content of those sites. Hyper-links are to be accessed at your own risk, and we make no representations or warranties about the content, completeness or accuracy of these hyper-links or the sites hyper-linked to the Site. The inclusion of any hyper-link to a third-party site does not necessarily imply endorsement by us of that site.

## 8. Billing

**Payment:** You agree to pay our fees or charges set forth on the Order Form(s) and any Work Orders. We charge and collect in advance for use of the Products and Services, and we will automatically issue an invoice to you each month for payment as set forth on the Order Form.

All payment obligations are non-cancelable, all amounts paid are nonrefundable and fully earned upon receipt, and you are responsible for paying for all Monthly License Fees set forth on the Order Form for the entire Term, whether or not such Products and Services are actively used.

**Additional Products and Services and Expenses:** The fee for any Products and Services ordered subsequent to the Order Form will be at the rates then in effect. You shall only be responsible to reimburse us for expenses which are reasonably incurred in rendering any Products and Services to you (hereinafter "Expenses") if approved by you in advance in writing. Such Expenses, which shall be billed monthly, include without limitation travel expenses including airfare and or ground transportation, lodging, meals, and the cost of any other related expenses.

**Confidential Nature of Fee Information:** All pricing terms are confidential, and you agree not to disclose them to anyone other than your employees, contractors or agents who have a need to know and who are informed of, and agree to the confidentiality provisions hereof.

**Taxes:** Our fees are exclusive of all taxes, levies, or duties imposed by taxing authorities, and you shall be responsible for payment of all such taxes, levies, or duties, excluding only United States (federal or state) taxes based solely on our income.

DocuSign Envelope ID:

**Your Billing Information:** You agree to provide us with complete and accurate billing and contact information. This information includes your legal company name, street address, e-mail address, and name, telephone number, and fax number of an authorized billing contact. You agree to update this information within 30 days of any change to it. If the contact information you have provided is false or fraudulent, we reserve the right to terminate your access to the Products and Services in addition to any other legal remedies. If you believe your bill is incorrect, you must contact us in writing within 30 days of the invoice date of the invoice containing the amount in question to be eligible to receive an adjustment or credit.

## 9. Non-Payment and Suspension

In addition to any other rights granted to us herein, in the event your account becomes delinquent, we reserve the right to either [a] terminate this Agreement pursuant to section 11 or [b] suspend your access to the Products and Services. Delinquent invoices are subject to a late fee of 1.5% per month on any outstanding balance, or the maximum amount permitted by law, whichever is less, plus all costs and expenses of collection including our reasonable attorney fees. During any period of delinquency, you will continue to be charged for monthly fees. We reserve the right to impose a reconnection fee in the event Services are suspended and thereafter you request access to the Products and Services.

## 10. Termination upon Expiration of the Term and Business Continuity Services

This Agreement commences on the Effective Date and continues for the Initial Term as agreed in the Order Form. Upon the expiration of the Initial Term, this Agreement will automatically renew for successive Renewal Terms as specified on the Order Form unless either of us notifies the other in writing at least ninety (90) days prior to the expiration of the then applicable Term of a decision not to renew this Agreement. Upon termination of this Agreement under this Section 10, your right to access or use our Products and Services ceases and we are no longer required to retain your Customer Data. However, in the event of termination upon expiration of the Term, the protocol shall be as follows:

Upon your request, if received by us within thirty (30) days of termination upon expiration of the Term of this Agreement ("Data Retrieval Notice Period"), and full payment of all fees due hereunder, we shall offer you the one time opportunity to enter into a Work Order by which we will provide Business Continuity Services of the Archived Modules, as defined below, at our then current professional service fee schedule (or we may apply a reasonable time and materials fee based on then current reasonable industry standards). Business Continuity Services is defined as the services we will provide to you for our continued hosting of your Customer Data and allow you access to our LenderAssist and DocAssist (the "Archived Modules") solely for data retrieval, and not to enter new loans, and to make such copies of your Customer Data as you require. Upon expiration of the Data Retrieval Notice Period or termination of our Business Continuity Services if applicable, we are not required to retain your Customer Data and it may be deleted.

## 11. Termination for Cause

In the event of any material breach of this Agreement, such as your payment obligations hereunder, or unauthorized use of Our Technology or Products and Services, we may, in our sole discretion, after written notice and a twenty (20) day period to cure (the "Cure Period") terminate this Agreement whereupon [i] your right to continue to access or use our Products and Services will cease; [ii] all Monthly License Fees set forth on the Order Form for the entire Term shall become immediately due and payable and [iii] your right to access or use your Customer Data ceases and [iv] we shall have no further or continuing obligation to deliver to you, maintain or retain any of your Customer Data and it will be deleted.

## 12. Representations & Warranties

Each party represents and warrants that it has the authority to enter into this Agreement. We represent and warrant that we will provide the Products and Services in a manner consistent with general industry standards and that the Products and Services will perform substantially as demonstrated under normal use and circumstances. You acknowledge that (a) you have examined the functionality of the Products and Services; (b) have not relied on general descriptions of our Products and Services as may be found on our Website to determine if the functionality of Our Products and Services is suitable for your intended use, and (c) you agree to license our Products and Services on the terms set forth herein and on the Order Form commencing on the Effective Date. You represent and warrant that you have not falsely identified yourself or provided any false information to gain access to the Products and Services and that your billing information is correct.

DocuSign Envelope ID:

## 13. Indemnification

You shall indemnify and hold us, and our parent organizations, subsidiaries, affiliates, officers, members, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with a claim against us: (i) alleging that you have infringed the rights of, or have caused harm to, a third party; (ii) which if true, would constitute a violation of your representations and warranties; or (iii) arising from the breach by you or your Users of this Agreement, provided in any such case that we (a) promptly give you written notice of the claim; (b) give you control of the defense and settlement of the claim (provided that you may not settle or defend any claim unless it unconditionally releases us of all liability, and such settlement does not have a material adverse effect on our business or Products and Services); (c) provide to you all available information and assistance; and (d) have not compromised or settled such claim.

We shall indemnify and hold you and your parent organizations, subsidiaries, affiliates, officers, directors, employees, attorneys and agents harmless from and against any and all claims, costs, damages, losses, liabilities and expenses (including attorneys' fees and costs) arising out of or in connection with a claim against you: (i) alleging that we have infringed a copyright, a U.S. patent issued as of the date of the Order Form, or a trademark of a third party; (ii) which if true, would constitute a violation of our representations or warranties; or (iii) arising from breach of this Agreement by us; provided that you (a) promptly give us written notice of the claim; (b) give us control of the defense and settlement of the claim (provided that we may not settle or defend any claim unless it unconditionally releases you of all liability), and such settlement does not have a material adverse effect on your business; (c) provide to us all available information and assistance; and (d) have not compromised or settled such claim. We shall have no indemnification obligation, and you shall indemnify us pursuant to this Agreement, for claims arising from any infringement arising from the combination of the Products and Services with any of your products, service, hardware, or business process(s).

## 14. Disclaimer of Warranties

YOUR USE OF OUR TECHNOLOGY IS AT YOUR OWN RISK. WE MAKE NO REPRESENTATION, WARRANTY, OR GUARANTY AS TO THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY, TRUTH, AVAILABILITY, ACCURACY OR COMPLETENESS OF THE PRODUCTS AND SERVICES OR ANY CONTENT. WE DO NOT REPRESENT OR WARRANT THAT: (i) THE USE OF THE PRODUCTS OR SERVICES WILL BE SECURE, TIMELY, UNINTERRUPTED OR ERROR-FREE OR OPERATE IN COMBINATION WITH ANY OTHER HARDWARE, SOFTWARE, SYSTEM OR DATA; (ii) THE PRODUCTS OR SERVICES WILL MEET YOUR REQUIREMENTS OR EXPECTATIONS; (iii) ANY STORED DATA WILL BE ACCURATE OR RELIABLE; (iv) ERRORS OR DEFECTS WILL BE CORRECTED; OR (v) THE PRODUCTS AND SERVICES OR THE SERVER(S) THAT MAKE THE PRODUCTS AND SERVICES AVAILABLE ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. THE PRODUCTS AND SERVICES AND ALL CONTENT ARE PROVIDED TO YOU STRICTLY ON AN "AS IS" BASIS. ALL CONDITIONS, REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY DISCLAIMED TO THE MAXIMUM EXTENT PERMITTED BY LAW.

## 15. Internet Delays

OUR PRODUCTS AND SERVICES MAY BE SUBJECT TO LIMITATIONS, DELAYS, AND OTHER PROBLEMS INHERENT IN THE USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS. WE ARE NOT RESPONSIBLE FOR ANY DELAYS, DELIVERY FAILURES, OR OTHER DAMAGE RESULTING FROM SUCH PROBLEMS.

## 16. Limitation of Liability

IN NO EVENT SHALL OUR AGGREGATE LIABILITY FOR ANY AND ALL CLAIMS ARISING UNDER THIS AGREEMENT EXCEED THE AMOUNT OF MINIMUM MONTHLY LICENSE FEES ACTUALLY PAID BY YOU IN THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO SUCH CLAIM. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO ANYONE FOR ANY INDIRECT, PUNITIVE, SPECIAL, EXEMPLARY, INCIDENTAL, CONSEQUENTIAL OR OTHER DAMAGES OF ANY TYPE OR KIND (INCLUDING LOSS OF DATA, REVENUE, PROFITS, USE OR OTHER ECONOMIC ADVANTAGE), ARISING OUT OF, OR IN ANY WAY CONNECTED WITH OUR PRODUCTS AND SERVICES, INCLUDING BUT NOT LIMITED TO THE USE OR INABILITY TO USE THE PRODUCTS AND SERVICES, OR FOR ANY CONTENT OBTAINED FROM OR THROUGH THE PRODUCTS AND SERVICES, ANY INTERRUPTION, INACCURACY, ERROR OR OMISSION, REGARDLESS

DocuSign Envelope ID:

OF CAUSE , EVEN IF THE PARTY FROM WHICH DAMAGES ARE BEING SOUGHT HAVE BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 17. Force Majeure

We shall not be responsible for any failure to perform our obligations under this Agreement caused by an event reasonably beyond our control, including but not limited to, hurricanes, floods, the infrastructure of the Internet, wars, riots, labor strikes, natural disasters, pandemic, national emergency or any law, regulation, ordinance, or other act or order of any court, government, or governmental agency.

## 18. Notices

We may give notice by means of a general notice on the Products and Services, electronic mail to your e-mail address on record in our account information, or by written communication sent by first class mail or pre-paid post to your address on record in our account information. Such notice shall be deemed to have been given upon the expiration of 48 hours after mailing or posting (if sent by first class mail or pre-paid post) or 12 hours after sending (if sent by email or fax). You may give notice to us (such notice shall be deemed given when received by us) at any time by any of the following: letter sent by confirmed facsimile to us; letter delivered by nationally recognized overnight delivery service or first class postage prepaid mail to us at the applicable fax number or address set forth on the Order Form or Work Order.

## 19. Modification to Terms

We reserve the right to modify the terms and conditions of these Terms of Service, or our policies relating to the Products and Services, at any time, effective upon these Terms of Service on our Website, however no such modification will have any effect on fees and charges you have agreed to pay in the Order Form unless they are set forth in an amendment which you and we have signed. Continued use of our Products and Services after any such modification to these Terms of Service shall constitute your consent to such changes.

## 20. Assignment; Change in Control

This Agreement may not be assigned by you without our prior written approval but may be assigned without your consent by us to: (i) a parent or subsidiary; (ii) an acquirer of assets; or (iii) a successor by merger. Any purported assignment in violation of this Section shall be void. Any actual or proposed change in control of yours that results or would result in a direct competitor of ours directly or indirectly owning or controlling 50% or more of you shall entitle us to terminate this Agreement for Cause immediately upon written notice.

## 21. Survival

The provisions of Sections 1. Advertising, 2. License Grant & Restrictions, 4. Privacy Policy in Connection with Customer Data & Account Information., 5. Confidentiality, 6. Intellectual Property Ownership, 8. Billing, 9. Non-Payment and Suspension, 10. Termination upon Expiration of the Term, 11. Termination for Cause, 13. Indemnification, 14. Disclaimer of Warranties, 16. Limitation of Liability, 17. Force Majeure, 18. Notices, 21. Survival, 22. General and 25. Definitions shall survive termination of this Agreement for any reason. In the event of any termination or expiration of this Agreement for any reason, all provisions of this Agreement whose meaning requires them to survive shall survive the expiration or termination of this Agreement for the period of time indicated therein.

## 22. General

This Agreement shall be governed by Florida law without regard to its conflict of law principles. Any action brought to enforce any of the terms hereof shall be brought exclusively in the State or Federal courts of Palm Beach County, Florida and in any such action, the prevailing party shall be entitled to an award of all of its reasonable attorney's fees and court costs. No text or information set forth on any other purchase order, preprinted form or document (other than an Order Form, Amendment or Work Order, if applicable) shall add to or vary the terms and conditions of this Agreement. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid or unenforceable, then such provision(s) shall be construed, as nearly as possible, to reflect the intentions of the invalid or unenforceable provision(s), with all other provisions remaining in full force and effect. No joint venture, partnership, employment, or agency relationship exists between the parties as a result of this Agreement or use of the Products and Services. Other than in connection with a general employment solicitation or response thereto, you shall not solicit, offer, or extend employment or consulting opportunities to any employee or consultant of ours

DocuSign Envelope ID:

during the Term of this Agreement and for a period of three (3) years following the end of the Term, or the earlier termination of this Agreement, without our prior written consent. Our failure to enforce any right or provision in this Agreement shall not constitute a waiver of such right or provision unless acknowledged and agreed to by us in writing. This Terms of Service, together with any applicable Order Form, Amendment or Work Order, comprises the entire agreement between the parties and supersedes all prior or contemporaneous negotiations, discussions or agreements, whether written or oral, between the parties regarding the subject matter contained herein.

## 23. Custom Work

Fees for customization of Customer Website(s) (hereinafter "Custom Work") are published on the Current Published Rate List. Any request for Custom Work must be pursuant to a Work Order. During the installation and integration of the Products and Services there will be discovery and gap analysis performed which may require Custom Work.

## 24. Training

Included in the Implementation Fee is a training package for your trainers. Training sessions typically may include: (a) lender administrator training, (c) broker/branch administrator training, (c) broker/branch loan flow training, and (d) lender loan flow training. A standard User manual will be provided along with training agendas for each session which will be designed to facilitate your intended use of the Customer's Website(s). Training will be performed via the Web and telephone using GoToMeeting® or a similar software selected by us. Additional charges shall apply for on-site training at your facilities as well as for supplementary training services offered by our training department as set forth on the Current Published Rate List.

## 25. Definitions

As used in this Agreement and in any Order Forms or change orders, the following meanings shall apply:

"**Agreement**" means any Order Form, all Exhibits referred to in the Order Form, and any amendments which both parties may agree to in the future.

"**Content**" means the audio and visual information, documents, software, products and services contained or made available to you in the course of using the Products and Services.

"**Customer Content**" means materials provided by you for incorporation into Customer Website including, but not limited to, audio clips, data, graphics, illustrations, images, photographs, text, or video clips. You shall deliver the Customer Content to us in an electronic file format specified and accessible by us (e.g., .gif, .jpg, .txt) or by entering directly using the site's existing functionality.

"**Customer Data**" means information or material provided or submitted by you in the course of using the Products and Services, but excludes general statistical data or analysis of our customer base.

"**Customer Website**" means the site(s) on the World Wide Web portion of the Internet developed by us for you pursuant to the terms of this Agreement for purposes of delivering the Products and Services.

"**Effective Date**" means the date this Agreement is accepted by your signature on an Order Form.

"**Intellectual Property Rights**" means unpatented inventions, patent applications, patents, design rights, copyrights, trademarks, service marks, trade names, domain name rights, mask work rights, know-how and other trade secret rights, and all other intellectual property rights, derivatives thereof, and forms of protection of a similar nature anywhere in the world pertaining to Our Technology.

"**Order Form(s)**" means any paper or online order form evidencing the initial subscription for the Products and Services and any subsequent order forms, specifying, among other things, the loan charges, number of licenses and other services contracted for, the applicable fees, the billing period, and other charges as agreed to between the parties, each such Order Form to be incorporated into and to become a part of this Agreement (in the event of any conflict between the terms of this Agreement and the terms of any such Order Form, the terms of this Agreement shall prevail).

"**Our Technology**" means our Products and Services named in the Order Form or otherwise belonging to us and also includes all related Intellectual Property as well as our hardware, products, processes, algorithms, User interfaces, know-how, techniques, designs and other tangible or intangible technical material or information made available to you by us in providing the Products and Services.

DocuSign Envelope ID: ███████████

**"Products and Services(s)"** means products and services specifically identified during the ordering process, developed, operated, and maintained by us, made accessible via the Customer Website or offline products and services provided to you by us, to which you are being granted access under this Agreement, including Our Technology and the Content.

**"Release Date"** is the date you are notified that the Products and Services are available to you in an environment for testing, training, configuration, and use. The Release Date may occur even if there are outstanding Custom Work requests. There may be a different Release Date for each Product. You assume the responsibility for the unique configuration of the Products and Services which occurs after the Release Date.

**"Term"** means the "Initial Term" or any "Renewal Term" set forth on an Order Form, Amendment or Addendum. For the avoidance of doubt, the Initial Term begins on the Release Date and not the Effective Date.  For example, if the Effective Date on the Order Form is November 1st, 2021 and the Initial Term on the Order Form is six (6) years, and if the Release Date occurs on January 1, 2022; (i) the Initial Term would expire on January 1, 2028 and your obligation to pay fees hereunder would conclude upon your payment of seventy two (72) Monthly License Fee Payments as well as any other fees due under this Agreement as of the expiration of the Term.

**"Work Order"** means any written agreement signed by the parties for custom work.

**"User(s)"** or "User Accounts" means either [a] an employee of yours authorized and Registered to use the Products and Services or [b] any other individual you have authorized and registered to use the Products and Services ("Customer Authorized Individual"). Authorized and Registered means you have created a log in for our Products and Services indicating that the employee or Customer Authorized Individual is authorized by you to use our Products and Services pursuant to the Agreement.

*Questions or Additional Information:*

If you have questions regarding this Agreement or wish to obtain additional information, please send an e-mail to legal@**OpenClose**.com.

**IN WITNESS WHEREOF**, this Terms of Service has been executed by the parties through their duly authorized officers as of the date set forth below.

| FIRST FEDERAL BANK | | BEANSTALK NETWORKS LLC, DBA OPENCLOSE | |
|---|---|---|---|
| Signature | *Sherry Romano* | Signature | *James P. Kelly* |
| Name | *Sherry Romano* | Name | James P. Kelly |
| Title | *SVP Mortgage Lending* | Title | President |
| Date | *12/23/21* | Date | Dec-27-2021 |

DocuSign Envelope



## Exhibit B to Agreement between First Federal Bank and OpenClose
## OPENCLOSE SERVICE LEVEL STANDARDS

We use commercially reasonable efforts to maintain the following Service Level Standards for Customers:

### Software Maintenance Services:

1. Correct, replace, or provide services to remedy any programming error which materially affects Customer's use of the software.
2. Remedy software bugs properly documented by Customer by means of a contemporaneous e-mail, help ticket, or letter describing in detail the software bug.
3. Provide, at no additional charge, newer versions, standard modifications, or enhancements to the software. OpenClose requires its Customers to use a software version that is less than two (2) versions old.
4. Provide not less than Twenty Four (24) hours notice of scheduled maintenance and as much notice as commercially reasonable for events beyond our control. Scheduled maintenance is intended to last no longer than Four (4) hours, and will be scheduled between the hours of 9:00 p.m. and 7:00 a.m. (Eastern Time), unless otherwise agreed to by the Customer and OpenClose. OpenClose may request extensions or timeframes of scheduled maintenance above Four (4) hours. The time of the scheduled maintenance will be considered approved if OpenClose does not receive a written objection from Customer no later than Eight (8) hours in advance of the scheduled maintenance outage.

### Web Hosting Services:

1. Provide, install, and manage production Web server(s) and other equipment for Customer at a third party hosting provider, such as but not limited to Quality Tech Services (QTS) or Amazon Web Services (AWS).
2. Maintain sufficient server capacity and Internet connectivity to accommodate managed growth in User numbers and overall traffic levels to support the Products and Services you have ordered including the Customer Website(s).
3. Host and operate our Customers' Website such that the Users experience access times and time to retrieve full Web pages that are substantially similar to the access times and times to retrieve full Web pages by Users visiting other secure sites hosted by OpenClose.

### Service Monitoring and Management:

1. Perform periodic monitoring and management of Customers' Website(s) to optimize availability of service.
2. Monitor Web servers and other service components of firewalls on a periodic basis.
3. Restore service should a failure occur.
4. Maintain redundancy in key components such that service outages are less likely to occur due to individual component failures.
5. Customer Website(s) shall be available for use for no less than Ninety-Nine Percent (99%) of the time. Upon written notification by Customer if reported down time exceeds 1%, in any two consecutive 30 day periods, by up to Four (4) hours in each 30 day period, Customer will receive a credit in the amount of fifteen percent (15%) of the amount of one month's Monthly License Fee. If reported down time exceeds 1% by more than Four (4) hours in each 30 day period for any two consecutive 30 day periods, Customer will receive a credit of twenty five percent (25%) of the amount of one month's Monthly License fee. To claim a remedy under this SLS, Customer will send OpenClose a notice, via email addressed to legal@openclose.com, containing the following details: (a) Customer name; (b) dates and time periods for each instance of claimed downtime during the relevant period; and (c) an explanation of the claim, including any relevant calculations. Claims must be submitted within ten (10) days after the end of the applicable consecutive thirty (30) day periods and must be verified by our records.
6. Determine the source of unscheduled service outages and report the finding to Customer.

DocuSign Envelope ID:

7. Monitor "heartbeat" signals of servers, routers, leased lines, and HTTPS availability of the Web server by proactively probing Twenty-Four (24) hours a day. If a facility does not respond to a ping-like stimulus, it is checked again. A second failure will automatically trigger a page to OpenClose's service center and a log entry will be generated.
8. Restore a service failure or, if determined to be a connectivity vendor problem, open a trouble ticket with the connectivity carrier and notify and provide updates to our Customer(s) Technical Administrator
9. Provide daily incremental back-ups and regular back-up of standard file systems and the timely restoration of data at Customer's request.
10. If the hosting server or location is expected to be down for an extended time , OpenClose will transfer appropriate back-up data and re-establish all hosting operations in an appropriately functioning secondary server or location.

## Security:

1. Limit physical and electronic access to Web servers.
2. Review security notifications and alerts relevant to the hosting platform (e.g., vendor notifications of bugs, attacks, patches, etc.).
3. Comply with vendor notifications and recommendations, apply patches, or take other commercially reasonable or customary actions as appropriate to maintain an industry standard   level of defense.
4. Prevent or halt a breach of security, including taking the affected Customer Websites off line.

## Support:

1. Provide help desk support to serve as the central collection point and information repository for our Customers' support issues and service requests in accordance with the target response times below. The Help Desk electronically documents, tracks, monitors, and manages all support issues from initial reporting through final resolution. Interactive reporting tools shall be employed to keep Customer advised of issue status.
2. Receive requests for support from up to two of Customers' designated employees during Business Hours, submitted via a Web portal, e-mail, or telephone, as directed by OpenClose. Business Hours are defined as any calendar day that is not a Saturday, Sunday or OpenClose observed holiday and are between the hours of 8 am to 7 pm EST. Requests received when the Help Desk is not staffed are automatically routed to an on-call technician. The on-call technician will respond to Customer as soon as reasonably possible to render assistance in accordance with the target response times below.
3. If a support request cannot be resolved at the time of the call, it will be categorized due to severity (severity definitions noted below):

**Target Response Times:**
Critical:

2 Hours during Business Hours
Use of Products and Services is stopped or is so severely impacted that the Users cannot reasonably use it. OpenClose will work continuously to resolve the issue and will provide frequent updates to Customer.
Low Severity Minimal:

1 Business Day
Customer requests information about or an enhancement to the Products and Services. Use of the Products and Services continues without work being impeded.

| FIRST FEDERAL BANK | BEANSTALK NETWORKS LLC, DBA OPENCLOSE |
|---|---|
| Signature _Sherry Romano_ | Signature _James P. Kelly_ |
| Name  Sherry Romano | Name   James P. Kelly |
| Title  SVP Mortgage Lending | Title   President |
| Date  12/23/21 | Date  Dec-27-2021 |



Exhibit C

NOT A CERTIFIED COPY

| First Federal Bank / Issue | Gap / Action | Solution | *hours |
|---|---|---|---|
| MCT Integration/reporting is not seamless like we were told. | * Setup Data Feed with MCT (15 minute intervals) <br> * Setup Bulk Loan Import Template <br> * Have no plans to sign up with GlobalDMS or Mercury Network at this time | | 40 |
| Appraisal ordering: It was not made clear in the beginning that we had to use Global DMS for ordering our appraisals in the manner that the demo was presented. We were told that we could enter our own appraisal panel, but it was never made clear that it had to be through Global DMS. | * Appraisal ordering, tracking flow is currently manual via spreadsheets and maintain own appraisal list and rotation <br> * Need to be able to enter appraiser details in the system without being visible to LOs. Supported <br> * Once new vendor Hub integration is complete, First Fed appraisers could integrate directly with our Hub (QTR 4) | | |
| Processor/Underwriter have access to the same fields in the loan file at the same time, we feel this affects the integrity of the initial underwriting data. | * 100SI versions... System versions w/ date/time/user stamp of any change <br> * Versions can be compared and system will show changes old/new values, data added and data deleted. <br> * UW can revert back to prior version <br> * Move Processors to Origination side Processor users | Action: Metric Close Loan <br> System default to restrict doc upload to employee managers only | 80 |
| The report writing is cumbersome and cannot easily be distributed to many people | * LO lock downs are workflow and lock driven <br> * Move Processors to Origination side Processor users | | |
| We cannot lock down fields so that they cannot be changed. | * Screen lock down supported <br> * Move Processors to Origination side Processor users <br> * Need training on OC Optics | | |
| Cannot lock out or hide screens and/or fields so that certain people/groups cannot see them | * Most customers love our LOS reporting utility <br> * Need training on OC Optics <br> * Field search function in Development | | |
| Cannot have custom screens | * Software are permission based <br> * Appraisal fields are not exposed to Origination users | | |
| Limited custom docs | First Fed to provide design/attach custom forms? <br> * First Federal to provide Screen shots of same custom screens they utilize to determine extent/need for custom fields <br> * Why they are many custom fields/screens in byte that are native in OC <br> * Can provide visibility/access to screen where custom field resides to limit edit capability <br> * Custom functions/include custom screens | Small - Medium (*40 hours) | 60 |
| Anyone is able to add docs to the file after the loan is closed and not way to control that. | Gap <br> EX. LO gets Hazard Insurance after closing could loan to loan and no one knows. Rare instance.. couple times per month <br> Desired Behavior: <br> * Restrict upload rights after loan is closed to lender employee manager only | Small - Medium (*40 hours) | 40 |
| Unable to keep LO/Processor from creating new contacts, will require constant monitoring to maintain integrity of the contacts | GAP <br> * Add feature to restrict ability to manage/add contacts to system Admins and Lender Employee Managers | Medium - Large (*80 hours) | 80 |
| We were told UDM monitoring would be an automatic thing with Factual Data when in fact it is a manual process for the processors or LO's | * DataVerify Drive interface includes UDM support <br> * Updated Fraud Guard interface in development includes UDM support | | |
| Cannot block junk from other groups that may not need to see it | Supported | | |
| Cannot start a new file if there is already an application in the system for that same borrower | Supported | | |
| Nothing like a Sandbox mode where LO can work on file without making live changes to the file | Supported | | |
| Too much of the ordering of documents and/or services are not integrated services (transcripts, CAIVRS, fraud report) | GAPS: <br> * FHA Connection in development, Early QTR 4 <br> * 4506t Tax transcripts New Vendor HUB <br> * What other vendor services are not natively supported? | Add 4506t vendor <br> 4506t DataVerify: Small <br> 4506t Other: Medium-Large | 25 <br> 60 |
| MI will not give multiple quotes for comparison for best execution, you have to pull each quote individually | Gap: <br> * Roadmap Item <br> * Accelerate completion | Medium - Large (*80 hours) <br> Impacts multiple areas of the system | 60 |
| No way to stop or hold files from moving forward if selected for a pre-funding QA Audit. | Gap <br> * Need workflow context <br> * Random selection @CTC for pre-close Audit <br> * Restrict closing docs from being generated if loan is marked Pre-fund QA Audit <br> After discussion 4/4 it was determined that this would be an item to monitor for need | Bulk loan update to set status <br> Medium - Large (*80 hours) | 80 |
| Not enough "assigned staff" options | * Desired Behavior: Suppress all #'s except LND <br> * Can we use LND for LEI | | |
| Multiple loan numbers per file, is confusing and doesn't make sense to us | * Supported with multiple browser sessions | | |
| Cannot have more than one file open at a time | Supported | | |
| Users cannot sign docs within the system. | Gap <br> * Create feature that allows for a signature to be stored in user settings and applied to a document in eDoc Manager | | 45 |
| Cannot make copy files with borrower data only | * Desired Behavior: When loan sent to Disclosure Desk status should be Disclosure Desk <br> OC to provide detail of what data is copied when loan is copied <br> * Could use Request Documents Loan Action, this would keep the loan in Origination status and can move the loan into a disclosure queue | Medium/*40-50 hours | 60 |
| Disclosure Desk – once a file is put in the disclosure desk queue status is processing, but it is not submitted to the processor. This is confusing. | * Lending Authority build may cure | Small - Medium (*40 hours) | 40 |

# meridianlink®

PO Box 846822
Los Angeles, CA 90084-6822
(714) 662-9526
Email ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

# Invoice

#2726157

8/29/2024

**Customer ID** 3913471

| Bill To | ACH Details: | TOTAL | |
|---|---|---|---|
| Accounts Payable | Wells Fargo Bank | | |
| First Federal Bank | Account #:▓▓▓▓▓▓ | | $597,100.00 |
| 1300 McFarland Blvd. NE | Routing #: ▓▓▓▓▓ | | |
| Tuscaloosa AL 35406 | | | |
| United States | | | |

| Terms | Due Date | PO # |
|---|---|---|
| Net 30 | 9/28/2024 | |

| Item | Description | Qty | Amount |
|---|---|---|---|
| 11009 LenderAssist Commitment | LenderAssist Minimum Monthly License Fee (Months (1-60) (Apr'22-Jul'24) ($21,325*28 Months) | 28 | $597,100.00 |

| | |
|---|---|
| Subtotal | $597,100.00 |
| Tax Total (%) | $0.00 |
| Payments & Credits Applied | $0.00 |
| **Total Balance Remaining** | $597,100.00 |

NOT A CERTIFIED COPY

**EXHIBIT**
D

If you have any questions regarding your invoice, please contact ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

1 of 1



# Statement

PO Box 846822
Los Angeles, CA 90084-6822
(714) 708-6950

3/20/2025

**Billing Address**
Accounts Payable
First Federal Bank
1300 McFarland Blvd. NE
Tuscaloosa AL 35406
United States

|  |  |  |  | **Amount Due** |
|---|---|---|---|---|
|  |  |  |  | $1,279,500.00 |

| Date | Description | Charge | Payment | Balance |
|---|---|---|---|---|
| 8/29/2024 | Balance Forward |  |  | $0.00 |
| 8/29/2024 | Invoice #2726157 | $597,100.00 |  | $597,100.00 |
| 3/19/2025 | Invoice #2755605 | $682,400.00 |  | $1,279,500.00 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days | Amount Due |
|---|---|---|---|---|---|
| $682,400.00 | $0.00 | $0.00 | $0.00 | $597,100.00 | $1,279,500.00 |

NOT A CERTIFIED COPY



3/21/2025

First Federal Bank
1300 McFarland Blvd, NE
Tuscaloosa AL 35406-2252
Attention: Sherry Romano

Notice of Termination of Agreement with MeridianLink Inc.

WHEREAS, Beanstalk Networks LLC, dba OpenClose was acquired by MeridianLink, Inc. ("MeridianLink") effective November 4, 2022, by which the Agreements have been assigned to MeridianLink, including all rights and obligation set forth therein.

To Whom It May Concern:

Please allow this to serve as formal notice that certain agreement for services between First Federal Bank and MeridianLink, Inc. executed on 12/31/2021 is hereby terminated for cause. We sent multiple notices of default, followed by a "Notice of Material Breach" on 1/28/2025. Despite these notices, we have not received full payment on the amounts due of $597,100.00 to bring your account current.

Since the Agreement is now terminated, payment is immediately due in the amount of $1,279,500.00 in full satisfaction of Customer's obligations thereunder, inclusive of any applicable late fees for failure to make timely payment. MeridianLink retains all other rights and remedies available to it pursuant to the Agreement, at law or in equity. Please contact ███████████████████████████ with any questions on your statement, attached here for your reference.

Sincerely,

Elias Olmeta
Chief Financial Officer
MeridianLink, Inc.



